## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

## DEFENDANT'S DISPOSITIVE MOTION
## TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendant Intuitive Surgical, Inc. ("Intuitive") moves to dismiss the Complaint of Plaintiff Restore Robotics Repair LLC ("Restore") with prejudice for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and submits the following memorandum of law in support of its motion.

## MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

Restore's complaint is a legally defective attempt to reprise claims it previously asserted in this Court in 2019 and settled in 2023.  Restore admits that Intuitive—the company that developed the first FDA-cleared system for performing robotic-assisted, minimally invasive soft tissue surgery in the United States—currently imposes no restraint on Restore's ability to remanufacture Intuitive's

1

EndoWrist instruments, and alleges that Restore is on the cusp of gaining FDA clearance to do so for the X/Xi generation of EndoWrists. Restore also admits that Intuitive has announced to the world that Intuitive will not enforce its contracts to prevent *any* third-party, including Restore, from marketing and selling FDA-cleared remanufactured EndoWrists to Intuitive customers. Restore complains that but-for Intuitive's contracts—which limit the use of *unauthorized* third-party products and services with the Intuitive system—Restore would have invested in developing the technical ability to remanufacture X/Xi EndoWrists, and would have applied for FDA clearance, sooner. This utterly fails to state an antitrust claim.

The contract terms that Restore complains about have been in place for many years, and were the subject of Restore's prior lawsuit. Its attempt to reassert claims relating to these same contract terms is time-barred. Further, Restore pleads no facts showing that Restore's failure to invest in the remanufacturing of X/Xi EndoWrists earlier than 2023 was the result of anything other than Restore's own business choices. Restore fails to allege facts showing that Intuitive did anything to prevent Restore from seeking FDA clearance to remanufacture any EndoWrists, including X/Xi, or that Intuitive did anything to preclude Restore (or anyone else) from selling remanufactured EndoWrists with FDA clearance at any time. That, along with other independent and fatal legal deficiencies, renders Restore's complaint dead on arrival.

As noted, Intuitive was the first company to invent and market an FDA-cleared, robotic-assisted surgical system for performing minimally-invasive soft-tissue surgeries, such as general, gynecologic, urologic, cardiothoracic, and head and neck surgery.  ECF No. 1, ¶9.  Intuitive's da Vinci "uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera" that allows surgeons to sit "at a console and use[] hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints."  ECF No. 1, ¶6.  Intuitive's revolutionary technology has been used for millions of patients, improving clinical outcomes, lowering hospital costs, and saving lives.

Restore is a company that services and remanufacturers surgical instruments.  ECF No. 1, ¶1.  It brings this antitrust complaint claiming that Intuitive restrained competition in the alleged relevant market "for service and replacement of X/Xi EndoWrist instruments."  ECF No. 1, at p.1. EndoWrists are instruments that articulate to mimic a human wrist.  They attach to the end of the arms of a da Vinci to perform surgical tasks including grasping, suturing, cutting, cauterizing, and tissue manipulation.  Restore complains that Intuitive's contracts with hospitals require the hospitals to obtain servicing or replacement of EndoWrists from either Intuitive or third-parties authorized by Intuitive.

This is not the first time Restore has sued Intuitive on this antitrust theory.  It brought the same claims regarding an earlier generation of EndoWrists (S/Si) in a

3

2019 lawsuit before Judge Wetherell.  ECF No. 1, ¶68.  That case was resolved through settlement.  *Id.*  At the time Restore filed the initial lawsuit, Restore had not received clearance from the Food and Drug Administration ("FDA") to remanufacture any EndoWrists.  Subsequently, Restore applied for and received FDA 510(k) clearance to remanufacture one model of S/Si EndoWrist.  ECF No. 1, ¶66–67.  Shortly thereafter, Intuitive published on its website a statement that "Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA."  ECF No. 1, ¶71.

Restore's current complaint relates to the next generation of EndoWrists—X/Xi.  Restore alleges that it achieved the capability "to reset the pre-programmed usage limits on the [X/Xi] EndoWrist instruments" in February 2024, "completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists" on August 16, 2024, and submitted its application for FDA clearance "to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses" on August 30, 2024.  ECF No. 1, ¶¶72–73.  Restore thus alleges it is well on its way to being able to market and sell remanufactured X/Xi EndoWrists with FDA clearance, and asserts no facts showing that Intuitive is doing anything to stop it.

So why is Restore suing again?  It alleges that, "but for the enforcement of the contractual restrictions by Intuitive … Restore would have started the process to achieve" the capability to service X/Xi EndoWrists in July 2019; "achieved that capability as early as July 2020"; and "would have also sought and received clearance from the FDA to remanufacture X/Xi EndoWrists as early as January of 2021."  ECF No. 1, ¶74.  In other words, Restore is *not* alleging that Intuitive is doing anything to stop it from entering the alleged market today, but seeks damages because Intuitive allegedly delayed Restore from doing so earlier.

Restore's claims fail for several, independent reasons.

*First*, its complaint is time-barred.  Restore challenges the same provisions of the same contracts on the same theories it asserted in its previous lawsuit against Intuitive.  The four-year statute of limitations on an antitrust claim resting on a vertical contract (such as Intuitive's contracts with hospitals) begins to run when the defendant first imposes the challenged term.  *See SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023).  Restore asserts that Intuitive has employed the contractual term it challenges for far longer than four years, and its claims are therefore untimely.

*Second*, Restore challenges Intuitive's contracts as illegal tying or exclusive dealing arrangements.  But, as a matter of law, there is no tying or exclusive dealing where the defendant requires customers to buy a secondary product or service from

either itself or an approved third-party in which the defendant does not have a financial interest. *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 377 (5th Cir. 1977);[1] *see also Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979). While tying or exclusive dealing may be shown if the plaintiff pleads (and, ultimately, proves) facts establishing the third-party approval process is illusory, Restore's own allegations preclude any such inference here. Restore acknowledges that Intuitive has made clear to the entire industry—in a public statement still on the company's website—that third parties who obtain FDA clearance for remanufactured EndoWrists automatically are "approved" within the meaning of its contracts. As soon as Restore or any other company obtains FDA clearance for remanufacturing EndoWrists, the challenged contractual provisions are no obstacle to that company's ability to compete. Restore pleads no facts to the contrary.

*Third*, Restore has failed to plead causation of antitrust injury. Restore alleges no facts showing that it could not have entered the alleged X/Xi EndoWrist market earlier if it had made the same investments it made to remanufacture S/Si EndoWrists. Nor does Restore allege facts showing that Intuitive enforced its contracts to preclude its customers from purchasing remanufactured EndoWrists

---

[1] The Eleventh Circuit adopted as binding all Fifth Circuit decisions handed down before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

from companies that had obtained FDA clearance, thereby preventing Restore from investing in the required technology or seeking FDA approval.  To the contrary, Restore's own pleading refutes the assumption that it needed to wait for Intuitive's statement about third-party FDA clearance to begin investing in the technology to remanufacture X/Xi EndoWrists or to seek FDA clearance—Restore made those same investments as to S/Si EndoWrists *years before* Intuitive's announcement.  The complaint also alleges no facts showing that Intuitive *ever* took the position that a company that obtained FDA clearance would not be "approved" under Intuitive's contracts.  Nor does the complaint allege that Restore (or anyone else) sought Intuitive's approval for an FDA-cleared remanufactured EndoWrist and was rejected.  In short, there are no facts to show that Restore's failure to develop the technology to remanufacture X/Xi EndoWrists, or obtain FDA clearance, was the result of anything other than Restore's own business choices.

*Fourth*, to the extent Restore challenges Intuitive's EndoWrist use limits themselves, Restore fails to allege facts showing that the use limits have an anticompetitive effect or caused Restore antitrust injury.

*Finally*, the alleged "aftermarket" in which Restore claims that Intuitive restrained competition—Intuitive's X/Xi EndoWrists, *see* ECF No. 1, ¶41—is improperly limited to a single brand.  Restore fails to allege the kinds of facts required to establish a single-brand aftermarket under controlling law.  In particular,

Restore fails to plead facts showing that the alleged market power that Intuitive supposedly has over servicing of X/Xi EndoWrists derives from anything other than hospitals' conscious contractual undertakings, which precludes Restore's antitrust claims. *See Maris Dist. Co.* v. *Anheuser Busch, Inc.*, 302 F.3d 1207, 1221–24 (11th Cir. 2002).

Restore's complaint should be dismissed with prejudice.

## ALLEGATIONS ASSERTED IN THE COMPLAINT

### I. Intuitive Offers FDA-Cleared Products That Have Revolutionized Surgery

This case concerns a "robotic revolution" in surgery led by Intuitive.  ECF No. 1, ¶6. Robotic surgery has practical advantages over laparoscopic surgery, including better visibility from high-definition cameras, an additional arm for the surgeon to hold a third instrument, wrist joints for expanded range of motion, scalability to allow for small movements in the arms and instruments, and an ergonomic console design to minimize surgeon fatigue.  ECF No. 1, ¶¶6-7.  It is thus no surprise that the da Vinci was used in 2.2 million procedures worldwide in 2023, nearly double the amount of procedures just four years earlier.  ECF No. 1, ¶11. "As of June 30, 2024, Intuitive had an installed base of 5,385 da Vinci Surgical Systems in the U.S.," nearly all of which were Intuitive's X/Xi generation. ECF No. 1, ¶12. While there are other competitors selling robotic-assisted surgery systems, Intuitive sells a large percentage of such systems in the United States. ECF No. 1, ¶16.

Intuitive is the sole manufacturer of the da Vinci robotic surgical system, and has been continually innovating and developing the da Vinci over the last 20 years. ECF No. 1, at p.2, ¶¶26–27.  The Xi model is the fourth generation da Vinci system. ECF No. 1, at p.2.  Earlier this year, after engaging in the FDA's "rigorous process for clearing any surgical robot in the United States," Intuitive secured FDA clearance to market its fifth generation system—da Vinci 5 or "dV5."  ECF No. 1, ¶¶15, 25.

The FDA has cleared the da Vinci surgical system for use only with EndoWrist instruments.  ECF No. 1, ¶9.  Intuitive sells all necessary instruments and accessories for the da Vinci system.  *Id.*  Intuitive offers roughly 80 different instruments, including forceps, retractors, and scissors, under the EndoWrist brand. *Id.*  Intuitive is the only original manufacturer of X/Xi EndoWrists (the instruments compatible for use with X, Xi, and dV5 da Vinci models).  ECF No. 1, ¶¶15, 41. EndoWrist instruments are cleared by the FDA to be reused up to a certain number of uses, and include a usage counter to track how many times each instrument has been used.  *See* ECF No. 1, ¶47.

### A.    Restore Has Yet to Offer Modified X/Xi EndoWrists To Any Customers

Unlike Intuitive, Restore has not invented anything involving robotic surgery. Instead, Restore initially licensed "technology from a third party" to modify EndoWrists for the third generation da Vinci system—known as S and Si models— by "replacing the programmed memory chip" to reset the usage limit on the

instruments.  ECF No. 1, ¶66.  Restore then developed "its own technology and process" by July 2020.  *Id.*  The FDA cleared Restore to remanufacture one type of S/Si EndoWrist under its "Iconocare" label.  ECF No. 1, ¶67.

Restore alleges that modifying the usage counter on the newer generation X/Xi EndoWrists requires "significant time and expense with significant risk of failure to achieve the technological capability."  ECF No. 1, ¶70.  It was "unproven" and "unknown" whether anyone would achieve the technological capability to modify X/Xi instruments.  ECF No. 1, ¶¶49, 70.  Restore admits it did not begin this "expensive and risky process" until September 15, 2023, and achieved the "technological capability" to reset the usage counter on an X/Xi EndoWrist "for one or more additional cycles of use" only on or about February 29, 2024.  ECF No. 1, ¶72.  Restore then submitted an application to the FDA for clearance to market and sell its X/Xi EndoWrist "remanufactured for a second cycle of uses" on August 30, 2024.  ECF No. 1, ¶73.

Restore does not allege that FDA has cleared its remanufactured X/Xi instrument.  Nor does Restore allege it has sold—or even tried to sell—a single remanufactured X/Xi instrument to a single customer.  Restore asserts it is "futile" to even "offer" its modified X/Xi instruments to customers, ECF No. 1, ¶75—even though Restore did offer its modified S/Si EndoWrists to hospitals based on its then-view (disputed by Intuitive) that FDA clearance was not required to do so, and has

since offered its FDA-cleared remanufactured S/Si EndoWrist to hospitals. *See Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019) ("*Restore I*"), Am. Cplt., ECF No. 14 ¶¶68–69 (alleging that "FDA permits servicing of approved medical devices by third parties" and that "Restore began to offer repair services for EndoWrist instruments in 2018"); *Restore I*, Pl.'s Opp'n to Mot. to Dismiss, ECF No. 18 at 14 ("Restore is currently providing service for instruments for the da Vinci Si model … without clearance from the FDA.").

### B.    Intuitive Requires Hospitals To Service EndoWrists With Authorized Providers

"In order to work with the Da Vinci Surgical System, the EndoWrist Instrument must have a serial number to be recognized by the machine." ECF No. 1, ¶46. The memory chip that controls this function is encrypted to prevent remote tampering or other types of wireless attacks. ECF No. 1, ¶48. Further, "[t]he memory chip prevents the instrument from being connected to the robot for more than a certain number of times." ECF No. 1, ¶51. After the specified number of uses, the EndoWrist must be replaced—either with a new EndoWrist from Intuitive, or with a remanufactured EndoWrist from a provider than can "bypass or override the encrypted memory chip" to reset the usage count. ECF No. 1, ¶70.

Restore does not challenge the encryption on X/Xi EndoWrists as anticompetitive, ECF No. 1, ¶48, and alleges that it has been able to create

11

technology to bypass the memory chip and reset the use counter, ECF No. 1, ¶72. Restore obtained FDA clearance to remanufacture one type of S/Si EndoWrist, and has applied for FDA clearance as to the X/Xi generation.  ECF No. 1, ¶¶67, 73.  Its complaint arises not from Intuitive's technology, but from Intuitive's contracts with customers.

Restore alleges that "Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System."  ECF No. 1, ¶51.  But Restore's other allegations reveal that this is not true.  As discussed below, Restore admits—as it must—that Intuitive's contracts require customers to obtain EndoWrist service or replacement *either* from Intuitive *or* from an authorized third party.  *See* ECF No. 1, ¶52.  Further, Restore admits that Intuitive made clear on its website in March 2023 that Intuitive will not consider it a breach of contract for a customer to purchase remanufactured instruments from third parties who, like Intuitive, have obtained FDA clearance.  ECF No. 1, ¶71.  Restore does not allege it is anticompetitive for Intuitive to require FDA clearance as the condition for a third party to be authorized within the meaning of its customer contracts.

Restore's antitrust case thus boils down to the assertion that, "[b]ut for the enforcement of the contractual restrictions by Intuitive in its standard contracts for the sale and lease of the da Vinci Surgical System, Restore would have started the

process to achieve the technological capability to reset usage limits on the X/Xi EndoWrists as early as July of 2019"; "achieved" that capability by July 2020; and "would have sought and received clearance from the FDA to remanufacture X/Xi EndoWrists as early as January of 2021." ECF No. 1, ¶74. In other words, Restore is seeking damages on the theory that Intuitive somehow delayed Restore's ability to provide FDA-cleared service for X/Xi EndoWrists.

### C.   Restore's Claims Rest on a Challenge to Contracts That Restore Has Known About For More than Four Years

Restore previously challenged Intuitive's contracts in an antitrust case filed in this Court in February 2019. ECF No. 1, ¶68 (citing *Restore I*). Restore based its claims in that case on Intuitive's allegedly anticompetitive contracts with customers:

> Intuitive also forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service. The standard contract removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third parties repair the instruments. In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci robot system.

*Restore I*, Am. Cplt., ECF No. 14, ¶85.[2] Restore asserts nearly identical allegations in this case:

> Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System…. Intuitive

---

[2] The Court can take judicial notice of Plaintiff's statements in its pleadings in *Restore I*. *See Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013).

contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service. The standard sales contract removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third parties repair the instruments. In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System.

ECF No. 1, ¶¶51, 54.

Restore further alleges that Intuitive's contracts have not changed. According to the complaint, Intuitive incorporates "the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi." ECF No. 1, ¶76. Restore claims that "Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA" and that customers "will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their contracts." *Id.* The complaint does not allege any new anticompetitive acts by Intuitive. At most, Plaintiff alleges Intuitive's "enforcement" of its contracts as the only anticompetitive acts since February 2019. *See, e.g.*, ECF No. 1, ¶¶74–75.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the

14

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Though well-pleaded factual allegations must be accepted as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

## ARGUMENT

## I.   RESTORE'S CLAIMS ARE TIME-BARRED UNDER THE CLAYTON ACT'S FOUR-YEAR STATUTE OF LIMITATIONS

The statute of limitations governing antitrust claims requires the claim to be asserted "within four years after the cause of action accrued."  15 U.S.C. § 15b.  An antitrust cause of action accrues—and the statute of limitations begins to run— "when [the] defendant commits an act which injures the plaintiff's business." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

Restore's claims are facially time-barred.  Restore challenges the same "contractual restrictions" that it challenged in its February 2019 complaint.  *See Restore I*, Am. Cplt., ECF No. 14, ¶85.  Restore alleges here that the contracts have never changed.  ECF No. 1, ¶76.

Where an antitrust challenge is directed to a contract, the statute of limitations begins to run at the time of the contract's formation.  *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1501–02 (11th Cir. 1985) (finding plaintiff's antitrust claim based on allegedly anticompetitive contract accrued at the time she became

bound by the contract). Further, if a competitor challenges as exclusionary a contractual term that the defendant embeds in all of its customer contracts, the statute begins to run when that term is introduced, and does not start again each time the defendant repeats that same term in a new customer contract or each time the contract is performed or enforced. *See, e.g.*, *SaurikIT*, 2023 WL 8946200, at \*1 (competitor's claims arising from iOS warranty term accrued when the term was introduced, not each time Apple sold a new iOS device with the warranty term); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) (antitrust cause of action accrues at the time of entering an allegedly anticompetitive contract, not each time the terms of the contract are performed). Just like the competitor in *SaurikIT*, Restore is challenging as exclusionary the terms of a customer contract that has been in place without modification far longer than four years.

The complaint does not identify any anticompetitive acts by Intuitive in the last four years. At most, Restore alleges that Intuitive has "enforced" its contracts since February 2019. *See, e.g.*, ECF No. 1, ¶¶74–75. Restore claims it would have had the ability to modify X/Xi EndoWrists by July 2020, and admittedly was aware of all the alleged conduct it challenges here as early as 2019. ECF No. 1, ¶74. Yet Restore did not file this case until September 2024. Thus, even if every single allegation in the complaint were true, Restore brought suit more than four years after

it claims to have been excluded from the market.  Its claims are facially time-barred, and should be dismissed accordingly.

## II.   RESTORE FAILS TO PLEAD FACTS SHOWING UNLAWFUL TYING OR EXCLUSIVE DEALING

### A.   All Four Counts of the Complaint Hinge on the Same Alleged Conduct

Restore asserts the same conduct as the basis for its claims for Monopolization, Attempted Monopolization, Tying, and Exclusive Dealing. Restore's principal allegation of anticompetitive conduct is that "Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service," ECF No. 1, ¶54, which allegedly constitutes both tying and exclusive dealing.  ECF No. 1, ¶¶84, 87.  Courts assess Section 1 and 2 tying arrangements and exclusive dealing arrangements under similar standards.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (analyzing Section 2 tying claims under same evidence that supported Section 1 tying claims); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (applying same framework to Section 1 and 2 exclusive dealing claims).

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman*

*Kodak*, 504 U.S. at 461–62 (quoting *N. Pacific R. Co.* v. *United States*, 356 U.S. 1, 5–6 (1958)).  The Eleventh Circuit has explained that the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361 (11th Cir. 1999) (citation omitted).   "'Exclusive dealing' is similar [to tying]: it refers to a monopolist's conditioning the sale of a product on the buyer's agreement not to deal with its competitors."  *N.Y. v. Facebook, Inc.*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023).  Where a tying and exclusive dealing claim rest on the same factual allegations, the failure of the tying claim dooms the exclusive dealing claim as well.  *See Dream Big Media Inc. v. Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024).

## B.    Restore Fails to Allege Facts Showing that Intuitive's Third-Party Authorization Clause Is "Illusory"

Restore fails to allege facts showing a crucial element of any tying or exclusive dealing claim: the forcing or coercion of customers to buy a product or service *exclusively* from the defendant.  As Restore acknowledges, Intuitive's contracts with hospitals do not require hospitals to obtain aftermarket service or refurbished EndoWrists exclusively from Intuitive itself, but only from companies Intuitive has approved.  ECF No. 1, ¶52.  Although Restore does not attach

Intuitive's standard sales or lease contract to the complaint or quote its language, this is in fact what Intuitive's contracts—the same contracts that are the subject of Restore's complaint—say.[3]

Where a supplier's "contractual language at least provides for the possibility of purchasing" a secondary product from third-party sources, courts are "reluctant to find a tying arrangement without some evidence that [the defendant] applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest*, 606 F.2d at 722. In a case still binding in this Circuit, the Fifth Circuit acknowledged the "fundamental distinction" between "coercing [customers] to purchase from [the defendant] and coercing [customers] to purchase from approved sources." *Kentucky Fried Chicken*, 549 F.2d at 377. Where the defendant permits customers to purchase the supposedly tied product from third parties in which it has no interest and from which it receives no commission, but which it has to approve, there is no illegal tie. *Id.* at 377–78; *see also Pullos v. Alliance Laundry Sys.*, 2009 WL 10708625, at *13

---

[3] *See, e.g.*, Declaration of Andrew Lazerow, Esq., ¶ 2 and Ex. A at 4 § 5.2(A) ("Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician ***or an individual <u>approved</u> by Intuitive*** or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of ***<u>unauthorized</u> repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration***, or misuse of the System, or negligence or recklessness on the part of Customer.") (emphases added). This Court may consider a contract referenced in the Complaint when deciding a motion to dismiss. *Day* v. *Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

(N.D. Nev. 2009) (recognizing "the important distinction between a seller coercing buyers to purchase supplies from the seller itself as opposed to from approved sources" and rejecting tying claim where customers were permitted to purchase from third parties that met the defendant's specifications).

The only exception to this rule applies when the defendant's contract contains a third-party authorization clause for the purchase of an aftermarket product or service, but the possibility of "authorization" is "illusory" because the defendant refuses to authorize third parties in good faith. *Mozart v. Mercedes-Benz*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)). The question, then, is whether Restore has adequately pled facts showing that although the challenged contracts expressly permit hospitals to buy from third parties authorized by Intuitive, that possibility is "illusory" because Intuitive refuses to authorize third-party suppliers.

Restore's own allegations conclusively refute any such inference. While Restore asserts that Intuitive "has never approved any third party to repair instruments and has never set up a process for doing so," ECF No. 1, ¶52, Restore also acknowledges that, after Restore obtained FDA clearance to remanufacture one type of the prior generation of S/Si EndoWrists, Intuitive issued a "public statement" that it "will not void its service contract with, cease doing business with, or consider

20

it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with 510(k) clearance or equivalent granted by the FDA."  ECF No. 1, ¶71.  That policy, which remains on Intuitive's website,[4] does not distinguish between the S/Si and the X/Xi generations of EndoWrists.  Thus, not only did Restore in fact obtain the contractual authorization for its FDA-cleared remanufactured S/Si EndoWrist that it denies Intuitive has ever granted, Intuitive made known to the market that *any other company* that obtains FDA clearance has the same contractual authorization.

Restore's allegation that Intuitive "has never approved any third party to repair instruments," ECF No. 1, ¶52, is thus demonstrably untrue, unless it can somehow be construed to refer only to X/Xi EndoWrists.  But that is only because neither Restore nor any other company has yet satisfied Intuitive's clearly specified approval condition: FDA clearance (which Intuitive itself also has). Restore alleges it is well on its way to meeting that condition as to the X/Xi, as it did with the S/Si. ECF No. 1, ¶73.  If and when Restore obtains that FDA clearance, it will have the contractual clearance it needs under Intuitive's stated policy.  And the same is true

---

[4] *See* Da Vinci Instruments, Intuitive.com, https://tinyurl.com/3ne4jz3r (hereafter "Authorization Announcement").  The Court may take notice of the content of a website in considering a motion to dismiss. *U.S. ex rel. Jacobs* v. *JP Morgan Chase Bank, NA*, 113 F.4th 1294, 1300 (11th Cir. 2024).

for any other company that seeks to sell refurbished EndoWrists.  From the face of the complaint, therefore, it is clear that Intuitive has **not** in fact refused third-party authorization nor failed to specify clearly the criteria to obtain such authorization.

Nor is there any merit to Restore's suggestion that, because Intuitive has not published a list of third parties authorized to perform service on the X/Xi EndoWrists, the possibility of buying from a third party is illusory.  The Seventh Circuit rejected just such an argument in *Photovest*:

> Photovest did not show that Fotomat unreasonably withheld approval. Indeed, it appears that Photovest never submitted a processor to Fotomat for approval during this time period. Photovest contends that the tie was nevertheless sufficiently established because Fotomat did not provide a list of approved processors. This does not in our opinion establish the requisite condition for illegal tying. Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.

606 F.2d at 722; *see also Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1418 (11th Cir. 1987) (favorably citing *Photovest*).  Consistent with *Photovest*, the mere fact that Intuitive has not explicitly granted third-party approval does not make its approval process "illusory."  Restore does not allege that it or any other third party applied for authorization and has been turned down, or told it will be turned down if it applies.  *Cf. Photovest*, 606 F.2d at 722.  And far from alleging that Intuitive's approval condition is so onerous that no third party can satisfy it, Restore admits that it previously *did* satisfy it (with respect to an S/Si EndoWrist)

22

and alleges it is well on the way to doing so again (with respect to X/Xi EndoWrists).
Restore likewise makes no allegation that Intuitive has an interest in or receives a
commission from the third parties who satisfy Intuitive's approval condition. *See
Kentucky Fried Chicken*, 549 F.2d at 377.  Under such circumstances, there is no
forced dealing with the defendant as a matter of law, and hence no violation of the
antitrust laws.

Restore tries to save its complaint by asserting that Intuitive has never
amended the language in its contracts to make clear that third parties' FDA-cleared
devices are authorized, and that some unidentified number of customers allegedly
said they will not work with Restore because Intuitive has not changed the terms of
its contracts.  ECF No. 1, ¶76.  But those assertions are both factually vague and
legally irrelevant.  Restore does not say whether the hospitals supposedly refusing
to do business with Restore are using S/Si or X/Xi da Vincis.  If the former, then the
allegation contradicts Restore's other allegations that it has been successful in
obtaining S/Si business. *See Restore I*, Pl.'s Opp'n to Mot. to Dismiss, ECF No. 18
at 14.  If the latter, then Restore's claim is premature since it has not yet received
FDA clearance for the X/Xi.  In any event, the law does not require Intuitive to
change its "authorized servicer" terms, which are facially lawful. *Kentucky Fried
Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722.  Restore bears the burden of
showing that those terms are "illusory" insofar as Intuitive refuses to grant third-

party authorization. Its own allegations refute any such inference, and its claims fail accordingly.

## III.    RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENFORCEMENT OF ITS CONTRACTS CAUSED RESTORE'S ANTITRUST INJURY

To assert a claim under the antitrust laws, Restore must plead antitrust injury—"injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The antitrust injury requirement ensures that a plaintiff can recover only if [its] loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis original); *see also Brunswick*, 429 U.S. at 488 (the antitrust laws "were enacted for 'the protection of competition not competitors'" (internal quotation omitted)). Moreover, an antitrust plaintiff must allege facts showing that the challenged conduct caused antitrust injury to the plaintiff's own "business or property." 15 U.S.C. § 15; *Duty Free Ams., Inc.* v. *Estee Lauder Cos.*, 797 F.3d 1248, 1273 (11th Cir. 2015).

Courts routinely dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury is directly attributable to anticompetitive conduct by the defendant. *See, e.g.*, *Spanish Broad.*

24

*Sys. of Fla. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1076 (11th Cir. 2004) (affirming dismissal where plaintiff failed to allege injury resulted from "practices [that] have harmed competition"); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010) (affirming dismissal where plaintiff's complaint was "bereft of the critical allegations linking [defendant's] market power to harm to competition").  Further, a nascent competitor lacks antitrust injury unless they can demonstrate an existing capability to compete.  *See Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1272–73 (11th Cir. 2013).

Restore does not allege any specific conduct by Intuitive that has prevented Restore from competing.  There is no allegation that Intuitive or its contracts blocked Restore from pursuing the ability to compete.  In fact, Restore implicitly concedes the opposite, because Restore developed its alleged capability to compete while Intuitive's contracts allegedly remained in force and unchanged.  ECF No. 1, ¶¶72–73, 76.  Restore concedes that it did not even begin developing the capability to offer modified X/Xi EndoWrists until September 2023, and allegedly achieved the capability only a few months ago.  ECF No. 1, ¶¶ 72–73.  Restore does not allege it has offered its product to any customers, much less actually made any sales.

Restore fails to allege facts showing that Intuitive's conduct caused Restore's delayed entry into the X/Xi market and hence the damages that it seeks for 2021 to the present.  Restore admits that it obtained clearance for one S/Si EndoWrist and

has applied for clearance to remanufacture X/Xi EndoWrists.  ECF No. 1, ¶¶67, 73–

74.  Its present damages claim for delayed entry therefore hinges on the unstated

assumption that Intuitive did something to prevent Restore from developing the

technology to service X/Xi EndoWrists and applying for FDA clearance in 2020,

rather than in 2024.  But Restore pleads no facts to support that assumption.  The

most one can infer from the Complaint's vague allegations is that Intuitive's March

2023 statement on its website that Intuitive approved customers' purchases of

EndoWrists from third-party remanufacturers with FDA clearance constituted a

change in Intuitive's policy that then enabled Restore to "start[] the process to

evaluate options for trying to achieve the technological capability to reset the usage

limits on the X/XI EndoWrists" the following month.  ECF No. 1, ¶¶72; *see also*

Authorization Announcement ("As of March 1, 2023 …").  But, for two reasons,

any such inference is unsustainable.

*First*, Restore admits that it made the investments necessary to service S/Si

EndoWrists, and that it applied for and obtained FDA clearance to remanufacture

one S/Si EndoWrist, long *before* March 2023.  ECF No. 1, ¶¶66–67.  Restore pleads

no facts showing that it was somehow prevented from doing the same as to X/Xi

EndoWrists.

*Second*, Restore alleges no facts showing that Intuitive's website statement

was a change of policy—*i.e.*, that before March 2023, Intuitive took the position or

communicated to the market that even third-party servicers *with* FDA clearance would be considered unauthorized.  There is a reason Restore does not make any such allegation: it would be false.  As Restore knows, Intuitive has consistently communicated to the market its objection to third-party servicers that *do not have FDA clearance*.  In any event, Restore alleges no fact showing that, before the March 2023 announcement, Restore had reason to believe that Intuitive would refuse to authorize a third-party that actually received FDA clearance.  The fact that Restore chose to invest in applying for and obtaining FDA clearance for S/Si EndoWrists years before Intuitive's announcement contradicts any such inference.  Restore therefore fails to allege that Intuitive caused its delay in seeking FDA clearance for its remanufactured X/Xi EndoWrists, and cannot demonstrate causation of antitrust injury.

## IV.   RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENDOWRIST USE LIMITS VIOLATE THE ANTITRUST LAWS OR CAUSE INJURY TO RESTORE

Restore makes clear that it is not challenging Intuitive's chip encryption on its X/Xi EndoWrists.  ECF No. 1, ¶48.  However, it is not clear if Restore means to challenge the use limits on EndoWrists, independently from the contract provision requiring users to obtain service from authorized third parties.  If it does, it has not asserted a viable claim.  There is nothing anticompetitive about a medical device manufacturer setting a limit on how many times its device can be used—and indeed,

the FDA cleared Intuitive's EndoWrists *with programmed use limits*. At most, Restore's assertion that EndoWrist use limits "extract consumer surplus, *i.e.* monopoly profits, from [] customers," ECF No. 1, ¶ 59, amounts to an assertion that Intuitive uses its alleged monopoly power to charge monopoly prices, which is not a proper antitrust claim. *See Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407, (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). Restore makes no allegation that EndoWrist use limits exclude competitors from the market, and therefore it has no antitrust claim even if it were true—which it is not—that the use limits result in higher prices. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2013) (explaining why "higher consumer prices can result from pro-competitive conduct").

Moreover, Restore has no standing to challenge Intuitive's EndoWrist use limits because Restore alleges no facts showing that the limits cause injury to Restore's "business or property." *Duty Free Ams.*, 797 F.3d at 1273. Restore's business model involves the *remanufacture* of X/Xi EndoWrists. When and if Restore begins providing this service, Intuitive's programmed use limit will *help*, not hurt, Restore economically. The entire premise of Restore's complaint is that, absent the contractual restrictions on third-party service, hospitals would come to

28

Restore to reset their use-limited EndoWrists.  ECF No. 1, ¶75.  If there were no use

limits on the EndoWrists, then under Restore's own theory, hospitals would need its

services less often, and Restore would earn *fewer* profits, not more.

## V.    RESTORE FAILS TO ALLEGE A PROPER SINGLE-BRAND AFTERMARKET

Proper definition of a relevant market is a necessary threshold step in any

challenge to a vertical agreement, including Intuitive's customer agreements.  *Ohio*

*v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018).  Whether a plaintiff's relevant

market definition is adequate is properly determined on a motion to dismiss.  *Jacobs*

*v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).

Restore asserts that Intuitive caused harm in the alleged aftermarket for

"repairing and replacing EndoWrist instruments."  ECF No. 1, ¶30.[5]  In antitrust

parlance, Restore has alleged a "single-brand" aftermarket—*i.e.*, a market confined

to parts or service (EndoWrists) necessary only in conjunction with Intuitive's own

branded surgical robot (the da Vinci).  "It is an understatement to say that single-

brand markets are disfavored.  From nearly the inception of modern antitrust law,

the Supreme Court has expressed skepticism of single-brand markets."  *In re Am.*

*Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y.

2019) (collecting cases).  "Because it would be inappropriate to punish a firm for its

---

[5] Intuitive disputes that EndoWrists are a separate product from the da Vinci system, but the Court need not address that issue for purposes of this motion.

natural monopoly in its own products, courts embrace[] a sweeping prohibition against analyzing alleged anticompetitive activity by focusing on single-brand relevant markets: 'Absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.'" *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984)); *see also Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004) (noting that "products of a single manufacturer" constitute "a relevant product market" only "in rare circumstances"). Restore has not pled the exceptional facts necessary to establish a single-brand aftermarket, and its complaint must therefore be dismissed.

The rare exception to the general rule prohibiting single-brand markets arises from the Supreme Court's decision in *Eastman Kodak*, 504 U.S. 451 (1992), where the Court permitted a claim that Kodak had restrained competition in the aftermarkets for parts and service for Kodak copiers based on the unique facts of that case. Drawing on *Kodak* and its progeny, the Ninth Circuit recently distilled the requirements for demonstrating a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4)

general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). *Epic* is consistent with Eleventh Circuit precedent, which has similarly interpreted *Kodak* and related cases to require distinguishing "between contract power and market power," including when customers knowingly contract to make aftermarket purchases from the seller's single brand. *Maris*, 302 F.3d at 1222.

Restore recognizes it needs to plead exceptional factors to establish a single-brand market, but fails to plead the most important one—that the relevant contract provision was "not generally known" at the time the hospitals make their purchase decisions. *Epic*, 67 F.4th at 977. Restore makes a weak and implausible effort to plead the second two *Epic* factors—inability to anticipate life-cycle pricing and high switching costs, *see* ECF No. 1, ¶¶37-38—but it does not and cannot allege that the challenged contractual provisions were unknown to hospitals when they purchased their da Vincis. To the contrary, Restore's entire case is premised on explicit terms in Intuitive's customer contracts—including contract language that (according to Restore itself) provides that customers that purchase a da Vinci must thereafter purchase EndoWrist instruments from Intuitive. *See* ECF No. 1, ¶¶53–54.

As the Eleventh Circuit noted in *Maris*, "contracts always restrain and affect a party's available choices," so the terms of a contract are not the appropriate focus

for defining a relevant single-brand market. *Maris*, 302 F.3d at 1221 (discussing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 439–40 (3d Cir.1997)). Unlike in *Kodak*, where the challenged contract provision was implemented only after customers had *already* purchased a Kodak copier and were therefore "locked in," when the challenged provision is disclosed to customers "up front," it does not "raise the same antitrust concerns." *Metzler*, 19 F. Supp. 2d at 1356. Thus, the Seventh Circuit has recognized that the critical issue in *Kodak* was "whether the *change* in policy enabled Kodak to exact supracompetitive prices from customers who had *already* purchased its machines." *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756 (7th Cir.1996) (emphases added). Similarly, in *Queen City*—adopted by the Eleventh Circuit in *Maris*, 302 F.3d at 1222—the Third Circuit held that "the Kodak case arose out of concerns about unilateral changes in Kodak's parts and repairs policies" imposed after customers had already made their primary market purchases. 124 F.3d at 440. The Sixth Circuit agrees, as well, holding that the "*change in policy* in Kodak was the crucial factor in the Court's decision." *PSI Repair Servs, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) (emphasis added); *see also Clark Mem'ls v. SCI Ala. Funeral Servs., Inc.*, 991 F. Supp. 2d 1151, 1164 (N.D. Ala. 2014) ("[A]n essential element of a lock-in claim is a change in policy in the after-markets after a consumer has made a purchase in the initial

market."). Restore acknowledges that Intuitive has made no change in policy. ECF No. 1, ¶76.

It is no matter that, in *Epic*, the Ninth Circuit held that a change in policy is not an "absolute" requirement. 67 F.4th at 979. That is because, even if the challenged policy was in place at the time customers purchased the primary product, customers might be unaware of it if the defendant "concealed its rules from its customers." *Clark Memorials*, 991 F. Supp. 2d at 1164. Yet the plaintiff must still show that customers were unaware of the challenged aftermarket restriction at the time they made their primary market purchase. *Epic*, 67 F.4th at 979. Restore makes no allegation that Intuitive concealed the challenged terms from its customers or that they were otherwise unaware of the terms of the contracts they signed. This is a straightforward challenge to supposed market power resulting from a contractual term agreed to by customers. Under such circumstances, there cannot be a single-brand relevant market, nor any antitrust theory arising from the defendant's "contract power." *Maris*, 302 F.3d at 1221–22.

## VI.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

A complaint should be dismissed with prejudice if granting leave to amend would be futile because "the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant." *Cockrell* v. *Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). Restore's allegations make clear that

its complaint is time-barred and that the challenged provisions of Intuitive's hospital contracts do not foreclose competition under the applicable legal standards. Accordingly, amendment of the complaint would be futile, and dismissal should be with prejudice.

## CONCLUSION

For the foregoing reasons, Restore's complaint should be dismissed with prejudice.

Dated December 9, 2024                    Respectfully submitted,

                                         */s/ Bruce D. Partington*

---

Bruce D. Partington
CLARK PARTINGTON
125 East Intendencia Street, 4th Floor
Pensacola, Florida 32502
T: (850) 432-1399
E: bpartington@clarkpartington.com

Andrew Lazerow (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
T: 202-662-6000
E: alazerow@cov.com

Kenneth A. Gallo (*pro hac vice*
forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
T: 202-223-7300
E: kgallo@paulweiss.com

William B. Michael (*pro hac vice*
forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
T: 212-373-3000
E: wmichael@paulweiss.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Intuitive certifies that its Memorandum in support of its Motion to Dismiss For Failure To State A Claim complies with the word count limitation set forth in Local Rule 7.1(F) because it contains 7,998 words, excluding the parts exempted by the Local Rule.