## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

## DEFENDANT'S DISPOSITIVE MOTION TO DISMISS
## AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

Defendant Intuitive Surgical, Inc. ("Intuitive") moves to dismiss the Amended Complaint of Plaintiff Restore Robotics Repair LLC ("Restore") with prejudice for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and submits the following memorandum of law in support of its motion.

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Despite an opportunity to amend its complaint in light of the defects noted in Intuitive's Motion to Dismiss the original complaint, Restore has come no closer to asserting a viable claim. Its Amended Complaint is a legally defective attempt to reprise claims it previously asserted in this Court in 2019 and settled in 2023. Restore admits that Intuitive—the company that developed the first FDA-cleared

1

system for robotic-assisted, minimally invasive soft tissue surgery in the United States—imposes no restraint on Restore's ability to remanufacture Intuitive's EndoWrist instruments, and alleges that Restore is on the cusp of gaining FDA clearance to do so for the X/Xi generation of EndoWrists. Restore also admits that in 2023, Intuitive announced to the world that Intuitive would not enforce its contracts to prevent *any* third party, including Restore, from marketing and selling FDA-cleared remanufactured EndoWrists to Intuitive customers. Restore complains that but for Intuitive's contracts—which limit the use of *unauthorized* third-party products and services with Intuitive's da Vinci system—Restore would have developed the technical ability to remanufacture X/Xi EndoWrists and would have applied for FDA clearance sooner. But in the same breath Restore admits that these same contracts have not stopped it from either developing the technical ability to remanufacture X/Xi EndoWrists or applying for FDA clearance to do so. Restore utterly fails to state an antitrust claim.

The contract terms that Restore complains about have been in place for many years, and were the subject of Restore's prior lawsuit. Its attempt to reassert claims relating to these same terms is time-barred. Further, the complaint admits that Restore's failure to invest in the remanufacturing of X/Xi EndoWrists earlier than 2023 was solely the result of Restore's own business choices. Restore fails to allege facts showing that Intuitive did anything to prevent Restore from seeking FDA

clearance to remanufacture any EndoWrists, including X/Xi, or that Intuitive did anything to preclude Restore (or anyone else) from selling remanufactured EndoWrists with FDA clearance at any time. That, along with other independent and fatal legal deficiencies, renders Restore's complaint dead on arrival.

This is not the first time Restore has sued Intuitive on antitrust claims relating to EndoWrists. It brought claims regarding an earlier generation of EndoWrists (S/Si) in a 2019 lawsuit. ECF No. 21 ¶79. That case was resolved through settlement. *Id.* At the time Restore filed the initial lawsuit, Restore had not yet received clearance from the Food and Drug Administration ("FDA") to remanufacture EndoWrists. Subsequently, Restore applied for and received FDA 510(k) clearance to remanufacture one model of S/Si EndoWrist. *Id.* ¶¶77–78. Shortly thereafter, Intuitive published on its website a statement that "Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA." *Id.* ¶63.

Restore's current complaint relates to the next generation of EndoWrists—X/Xi. Restore alleges that it achieved the technological capability "to reset the pre-programmed usage limits on the [X/Xi] EndoWrist instruments" in February 2024,

"completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists" on August 16, 2024, and submitted its application for FDA clearance "to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses" on August 30, 2024. *Id.* ¶¶86–87. Restore thus alleges it will soon be able to market and sell remanufactured X/Xi EndoWrists with FDA clearance, and that Intuitive is not doing anything to stop it.

So why is Restore suing again? It alleges that, but for the challenged provisions in Intuitive's contracts, it would have begun the process to achieve the capability of resetting the X/Xi EndoWrist use counters "as early as July 2019" and achieved the capability of servicing EndoWrists "as early as July 2020." *Id.* ¶88. In other words, Restore seeks damages because Intuitive allegedly delayed Restore from entering the alleged market earlier.

Restore's claims fail as a matter of law for several, independent reasons.

*First*, its complaint is time-barred. The four-year statute of limitations on an antitrust claim resting on a vertical contract (such as Intuitive's contracts with hospitals) begins to run when the defendant first imposes the challenged term. *See SaurikIT, LLC* v. *Apple, Inc*., 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023). Restore asserts that Intuitive has employed the contractual term it challenges for far longer than four years. Its claims are therefore untimely.

*Second*, Restore challenges Intuitive's contracts as illegal tying or exclusive dealing arrangements. But there is no tying or exclusive dealing where the defendant permits customers to buy a secondary product or service from an approved third party in which the defendant does not have a financial interest. *Kentucky Fried Chicken* v. *Diversified Packaging*, 549 F.2d 368, 377–78 (5th Cir. 1977); *see also Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979). While tying or exclusive dealing may be shown if the plaintiff pleads facts establishing that third-party approval process is illusory, Restore's own allegations preclude any such inference here. Restore acknowledges that Intuitive has made clear to the entire industry—in a public statement still on the company's website—that third parties who obtain FDA clearance for remanufactured EndoWrists automatically are "approved" within the meaning of its hospital contracts. It does not allege that Intuitive has ever denied contractual approval to any third party, that Restore itself sought and was denied such approval, or that there is any objective basis for believing that Intuitive would not grant third-party authorization in good faith. Accordingly, Restore fails to allege facts showing that contractual authorization was "illusory," and its tying and exclusive dealing claims fail.

*Third*, Restore has failed to demonstrate causation of antitrust injury. Restore alleges no facts showing that it could not have entered the alleged X/Xi EndoWrist market earlier. Nor does Restore allege facts showing that Intuitive enforced its

contracts to preclude its customers from purchasing remanufactured EndoWrists from companies that obtained FDA clearance. To the contrary, Restore's own pleading refutes the assumption that it needed to wait for Intuitive's March 2023 statement about third-party FDA clearance to begin investing in the technology to remanufacture X/Xi EndoWrists—Restore made those same investments as to S/Si EndoWrists *years before* Intuitive's announcement. The complaint also alleges no facts showing that Intuitive *ever* took the position that a company that obtained FDA clearance would not be "approved." Nor does the complaint allege that Intuitive ever refused approval to Restore (or anyone else) for an FDA-cleared remanufactured EndoWrist. In short, there are no facts alleged to show that Restore's failure to develop the technology to remanufacture X/Xi EndoWrists, or obtain FDA clearance, was the result of anything other than Restore's own business choices.

*Fourth*, to the extent Restore challenges Intuitive's EndoWrist use limits themselves, Restore fails to allege facts showing that the use limits have an anticompetitive effect or caused Restore antitrust injury. In fact, the use limits enable the business opportunity Restore allegedly seeks to pursue with regard to EndoWrists.

*Finally*, the alleged "aftermarket" in which Restore claims that Intuitive restrained competition—Intuitive's X/Xi EndoWrists, *see* ECF No. 21 ¶41—is

6

limited to a single brand.  Restore fails to allege the kinds of facts required to establish a single-brand aftermarket under controlling law.  In particular, Restore fails to allege facts showing that the alleged market power that Intuitive supposedly has over servicing of X/Xi EndoWrists derives from anything other than hospitals' conscious contractual undertakings, which precludes Restore's antitrust claims.  *See Maris Dist. Co.* v. *Anheuser Busch, Inc.*, 302 F.3d 1207, 1222–24 (11th Cir. 2002).

Restore's complaint should be dismissed with prejudice.

## ALLEGATIONS ASSERTED IN THE COMPLAINT

### A.    Intuitive Offers FDA-Cleared Products That Have Revolutionized Surgery.

This case concerns a "robotic revolution" in surgery led by Intuitive.  ECF No. 21 ¶6.  Robotic surgery has practical advantages over laparoscopic surgery, including better visibility from high-definition cameras, an additional arm for the surgeon to hold a third instrument, wrist joints for expanded range of motion, scalability to allow for small movements in the arms and instruments, and an ergonomic console design to minimize surgeon fatigue.  *Id.* ¶¶6–7.  Intuitive's da Vinci robotic surgical system was used in 2.2 million procedures worldwide in 2023, nearly double the amount of procedures just four years earlier.  *Id.* ¶11.  "As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S.," nearly all of which were Intuitive's X/Xi generation.  *Id.* ¶12.

While other competitors sell robotic-assisted surgery systems, Intuitive sells a large percentage of such systems in the United States.  *Id.* ¶16.

Intuitive is the sole manufacturer of the da Vinci robotic surgical system, and has been continually innovating and developing the da Vinci over the last 20 years. *Id.* at 2, ¶¶26–27.  The Xi model is the fourth generation da Vinci system.  *Id.* at 2. Earlier this year, after engaging in the FDA's "rigorous process for clearing any surgical robot in the United States," Intuitive secured FDA clearance to market its fifth generation system—da Vinci 5 or "dV5."  *Id.* ¶¶15, 25.

EndoWrists are instruments that articulate to mimic a human wrist.  The FDA has cleared the da Vinci surgical system for use only with EndoWrist instruments. *Id.* ¶9.  Intuitive sells instruments and accessories for the da Vinci system, including EndoWrists.  *Id.*  Intuitive offers roughly 80 different instruments, including forceps, retractors, and scissors, under the EndoWrist brand.  *Id.*  Intuitive is the only original manufacturer of X/Xi EndoWrists (the instruments compatible for use with X, Xi, and dV5 da Vinci models).  *Id.* ¶¶15, 41, 43.  EndoWrist instruments are cleared by the FDA to be reused up to a limited number of uses, and include a usage counter to track how many times each instrument has been used.  *See id.* ¶48.

## B.    Restore Has Yet to Offer Modified X/Xi EndoWrists to Any Customers.

Unlike Intuitive, Restore has not invented anything involving robotic surgery. Instead, Restore services and remanufactures surgical instruments.  *Id.* ¶1.  Restore

initially licensed "technology from a third party" to modify EndoWrists for the third generation da Vinci system—known as S and Si models—by "replacing the programmed memory chip" to reset the usage limit on the instruments. *Id.* ¶77. Restore then developed "its own technology and process" by July 2020. *Id.* The FDA cleared Restore to remanufacture one type of S/Si EndoWrist under its "Iconocare" label. *Id.* ¶78.

Restore alleges that modifying the usage counter on the newer generation X/Xi EndoWrists requires "significant time and expense with significant risk of failure to achieve the technological capability." *Id.* ¶84. It was "unproven" and "unknown" whether anyone would achieve the technological capability to modify X/Xi instruments. *Id.* ¶¶50, 84. Restore admits it did not begin this process until September 15, 2023, and achieved the "technological capability" to reset the usage counter on an X/Xi EndoWrist for "one or more additional cycles of use" only on or about February 29, 2024. *Id.* ¶86. Restore then submitted an application to the FDA for clearance to market and sell its X/Xi EndoWrist "remanufactured for a second cycle of uses" on August 30, 2024. *Id.* ¶87.

Restore does not allege that FDA has cleared its remanufactured X/Xi instrument. Nor does Restore allege it has sold—or even tried to sell—a remanufactured X/Xi instrument to a customer. Restore asserts it is "futile" to "offer" its modified X/Xi instruments to customers, *id.* ¶89—even though Restore

did offer its modified S/Si EndoWrists to hospitals based on its then-view (disputed by Intuitive) that FDA clearance was not required to do so, and has since offered its FDA-cleared remanufactured S/Si EndoWrist to hospitals. *See Restore Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019) ("*Restore I*"), Am. Compl., ECF No. 14, ¶¶68–69 (alleging that "FDA permits servicing of approved medical devices by third parties" and that "Restore began to offer repair services for EndoWrist instruments in 2018").

## C.    Intuitive Requires Hospitals to Use Authorized Providers for EndoWrist Service.

"[T]o work with the Da Vinci Surgical System, the EndoWrist Instrument must have a serial number to be recognized by the machine." ECF No. 21 ¶47. The memory chip that controls this function is encrypted to prevent remote tampering or wireless attacks. *Id.* ¶49. Further, "[t]he memory chip prevents the instrument from being connected to the robot for more than a certain number of times." *Id.* ¶51. After the specified number of uses, the EndoWrist must be replaced—either with a new EndoWrist from Intuitive, or with a remanufactured EndoWrist from a provider that can "bypass or override the encrypted memory chip" to reset the usage count. *Id.* ¶84.

Restore does not challenge the encryption on X/Xi EndoWrists as anticompetitive, *id.* ¶49, and alleges that it has been able to create technology to bypass the memory chip and reset the use counter. *Id.* ¶86. Restore obtained FDA

clearance to remanufacture one type of S/Si EndoWrist, and has applied for FDA clearance as to the X/Xi generation. *Id.* ¶¶78, 87. Its complaint arises not from Intuitive's technology, but from Intuitive's contracts with customers.

Restore alleges that "Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System." *Id.* ¶52. But Restore's other allegations reveal that is not true. Restore admits—as it must—that Intuitive's contracts require customers to obtain EndoWrist service or replacement *either* from Intuitive *or* from an authorized third party. *See id.* ¶53. Restore also admits that Intuitive made clear on its website in March 2023 that Intuitive will not consider it a breach of contract for a customer to purchase remanufactured instruments from third parties who have obtained FDA clearance. *Id.* ¶63. Restore does not allege it is anticompetitive for Intuitive to require FDA clearance as the condition for a third party to be authorized under its customer contracts. Nor does Restore allege that Intuitive ever took the position that it would require FDA clearance as a condition for contractual authorization in all cases.

Restore's antitrust case boils down to the assertion that, but for the challenged provisions in Intuitive's contracts, it would have begun the process of achieving the capability of resetting the X/Xi EndoWrist use counters "as early as July 2019" and achieved the capability of servicing EndoWrists "as early as July 2020." *Id.* ¶88. In

other words, Restore is seeking damages on the theory that Intuitive somehow delayed Restore's ability to provide service for X/Xi EndoWrists.

**D.    Restore Is Challenging Contracts That Restore Has Known About for More than Four Years**.

Restore previously challenged Intuitive's contracts in an antitrust case filed in this Court in February 2019.  ECF No. 21 ¶79 (citing *Restore I*).  Restore based its claims in that case on Intuitive's allegedly anticompetitive contracts with customers:

> Intuitive also forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service.  The standard contract removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third parties repair the instruments.  In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci robot system.

*Restore I*, Am. Compl., ECF No. 14, ¶85.[1]  Restore asserts nearly identical allegations in this case:

> Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System.…  Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service.  The [standard sales contract] removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third party repairs the instruments.  In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System.

---

[1] The Court can take judicial notice of Plaintiff's statements in its pleadings in *Restore I*.  *Lozman* v. *City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013).

ECF No. 21 ¶¶52, 58.

Restore alleges that Intuitive's contracts have not changed. Rather, Intuitive incorporates "the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi." *Id.* ¶90. Restore claims that "Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA" and that customers "will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their contracts." *Id.* The complaint does not allege any new anticompetitive acts by Intuitive. At most, Plaintiff alleges Intuitive's enforcement of its contracts as the only anticompetitive acts since February 2019. *See, e.g.*, *id.* ¶¶88–89.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Though well-pleaded factual allegations must be accepted as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

## ARGUMENT

## I.   RESTORE'S CLAIMS ARE TIME-BARRED UNDER THE CLAYTON ACT'S FOUR-YEAR STATUTE OF LIMITATIONS

The statute of limitations governing antitrust claims requires the claim to be asserted "within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust cause of action accrues "when [the] defendant commits an act which injures the plaintiff's business." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

Restore's claims are facially time-barred. Restore challenges the same "contractual restrictions" it challenged in its February 2019 complaint. *See Restore I*, Am. Compl., ECF No. 14, ¶85. Restore alleges here that the contracts have never changed. ECF No. 21 ¶90.

Where an antitrust challenge is directed to a contract, the statute of limitations begins to run at the time of the contract's formation. *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1501–02 (11th Cir. 1985). If a competitor challenges as exclusionary a contractual term that the defendant embeds in all of its customer contracts, the statute begins to run when that term is introduced, and does not restart each time the defendant repeats that term in a new contract or each time the contract is performed or enforced. *See, e.g., SaurikIT*, 2023 WL 8946200, at *1 (competitor's claims arising from iOS warranty term accrued when the term was introduced, not

each time Apple sold a new iOS device with the warranty term); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) (similar). Just like the competitor in *SaurikIT*, Restore is challenging as exclusionary the terms of a customer contract that has been in place without modification far longer than four years.

The complaint does not identify any anticompetitive acts by Intuitive in the last four years. At most, Restore alleges that Intuitive has enforced its contracts since February 2019. *See, e.g.*, ECF No. 21 ¶89. Restore admits it was aware of all the challenged conduct as early as 2019, and claims it would have had the ability to modify X/Xi EndoWrists by July 2020. *Id.* ¶88. Yet Restore did not file this case until September 2024. Restore thus brought suit more than four years after it claims to have been excluded from the market.

Attempting to distract from the statute of limitations bar, Restore cites Intuitive's opposition to Restore's motion to compel discovery in the prior litigation, in which Intuitive argued that it would be too speculative for Restore to make a claim regarding the X/Xi because it did not yet have the technology to circumvent the use limits. ECF No. 21 ¶91. Restore's argument is unavailing. The Court rejected Intuitive's position and compelled discovery regarding the X/Xi. *Restore I*, ECF No. 192, at 3. More importantly, Restore now alleges that, but for contracts of which it was fully aware in 2019, it would have entered the relevant market in July of 2020.

15

ECF No. 21 ¶88.  Restore alleges that it was fully aware more than four years ago of all of the allegedly anticompetitive conduct it now challenges, and that Intuitive's conduct since then has consisted only of enforcing the same contractual provisions that were in place in 2019.  Restore's claims are thus facially time-barred.

## II.    RESTORE FAILS TO PLEAD FACTS SHOWING UNLAWFUL TYING OR EXCLUSIVE DEALING

### A.    All Four Counts of the Complaint Hinge on the Same Alleged Conduct.

Restore asserts the same conduct as the basis for its claims for Monopolization, Attempted Monopolization, Tying, and Exclusive Dealing. Restore's principal allegation of anticompetitive conduct is that "Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service," ECF No. 21 ¶58, which allegedly constitutes both tying and exclusive dealing, *id.* ¶¶99, 102.  Courts assess Section 1 and 2 tying arrangements and exclusive dealing arrangements under similar standards.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).

The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to

purchase elsewhere on different terms." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361 (11th Cir. 1999) (citation omitted). "'Exclusive dealing' is similar [to tying]: it refers to a monopolist's conditioning the sale of a product on the buyer's agreement not to deal with its competitors." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023). Where a tying and exclusive dealing claim rest on the same factual allegations, the failure of the tying claim dooms the exclusive dealing claim. *Dream Big Media Inc. v. Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024).

**B.    Restore Fails to Allege Facts Showing That Intuitive's Third-Party Authorization Clause Is "Illusory."**

Restore fails to allege facts showing a crucial element of any tying or exclusive dealing claim: the forcing or coercion of customers to buy a product or service *exclusively* from the defendant. To the contrary, Intuitive's contracts with hospitals expressly allow for third parties to service EndoWrists with Intuitive's authorization, and Restore alleges no facts showing that the possibility of obtaining such authorization was "illusory," as required by law.

**1.    There Is No Tying or Exclusive Dealing Where the Contract Allows for Purchase from Authorized Third Parties, Unless Authorization Is Illusory.**

Where a supplier's "contractual language at least provides for the possibility of purchasing" a secondary product from third-party sources, the courts are "reluctant to find a tying arrangement without some evidence that [the defendant]

17

applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest*, 606 F.2d at 722. In a case still binding here, the Fifth Circuit acknowledged the "fundamental distinction" between "coercing [customers] to purchase from [the defendant] and coercing [customers] to purchase from approved sources." *Kentucky Fried Chicken*, 549 F.2d at 377. Where the defendant permits customers to purchase the supposedly tied product from third parties in which it has no interest and from which it receives no commission, but which it has to approve, there is no illegal tie. *Id.* at 377–78; *see also Pullos v. All. Laundry Sys.*, 2009 WL 10708625, at *13 (D. Nev. July 29, 2009) (rejecting tying claim where customers were permitted to purchase from third parties that met the defendant's specifications).

The only exception to this rule applies when the defendant's contract contains a third-party authorization clause for the purchase of an aftermarket product or service, but the possibility of authorization is "illusory" because the defendant refuses to authorize third parties in good faith. *Mozart Co. v. Mercedes-Benz of N. Am.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citation omitted).

### 2. Repair, Resetting of Use Counters, and Remanufacturing of EndoWrists Can All Be Done by Authorized Third Parties.

In its original Complaint, Restore acknowledged that Intuitive's customer contracts do not require hospitals to obtain aftermarket service or refurbished EndoWrists exclusively from Intuitive, but only from companies Intuitive has

approved.    ECF No. 1 ¶52.    Restore's Amended Complaint continues to acknowledge that Intuitive's contracts provide for third-party approval as to EndoWrist remanufacturing, but Restore now asserts that the contracts flatly prohibit third-party servicing of EndoWrists, including resetting the use counters, without provision for approval of third parties to provide those services.  ECF No. 21 ¶¶ 62–66.  Restore is simply wrong.

The Amended Complaint repeatedly refers to Intuitive's Sales, License, and Service Agreement which Intuitive submitted with its prior Motion to Dismiss, ECF No. 17.  The Court may therefore consider the terms of Intuitive's customer contract on a motion to dismiss.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  The interpretation of a contract is a question of law that a court may determine on a motion to dismiss.  *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1105–06 (11th Cir. 2014).

Three provisions of the contract concern potential third-party servicing of da Vinci robots or EndoWrists.   Section 3.4 prohibits any third party to "modify, disassemble, reverse engineer, alter, or misuse the System, Instruments, or Accessories," including "reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software … ***without Intuitive's express written <u>permission</u>***."  ECF No. 17 at 5.  Section 5.2(A) provides that "Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have

been made by an individual other than an Intuitive technician ***or an individual***
***approved by Intuitive*** or (2) which are either necessary or desired as a direct or
indirect result, in whole or in part, of ***<u>unauthorized</u> repair, modification,***
***disassembly, alteration, addition to, subtraction from, reconfiguration***, or misuse
of the System, or negligence or recklessness on the part of Customer.") (emphases
added). *Id.* at 6. And Section 8 prohibits "repair, refurbishment, or reconditioning
***<u>not approved by Intuitive</u>***." *Id.*

The Amended Complaint selectively quotes Section 3.4, *see* ECF No. 21 ¶58,
but omits the language concerning Intuitive giving permission for third-party
activities. Even standing alone, Section 3.4 makes clear that the third-party activities
otherwise prohibited may be done with Intuitive's permission. And, if that was not
already clear from Section 3.4, it is made abundantly clear in Sections 5.2(A) and 8,
which expressly contemplate that third-party repairs may be done when authorized
by Intuitive. *See Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1368 (11th Cir.
2018) (contracts must be read "as a whole").

Contrary to Restore's assertion, the challenged contracts expressly
contemplate that Intuitive may provide third-party authorization for the activities
that Restore purportedly wishes to do, whether those involve repair, servicing,
re-setting use counters, or remanufacturing. Unless the possibility of obtaining such
authorization is "illusory," there is no unlawful tying or exclusive dealing.

### 3. Restore Does Not Allege that Intuitive Has Ever Refused Third-Party Authorization for Repair or Remanufacturing.

Restore alleges that Intuitive "tracks use of instruments by serial number," "sends a warning letter" when customers violate the terms of its contracts, threatens termination of agreements for breaches of contract, and has given "verbal warnings and sent warning letters" to Restore's customers. ECF No. 21 ¶¶59–61. It further alleges that, despite the possibility of contractual authorization, "customers did not and do not have a meaningful freedom of choice in the markets for instruments," and that "Intuitive continues to manipulate the approval clause." *Id.* ¶¶62–63.

None of these allegations establishes what the law requires Restore to plead: that, despite the presence of the contractual approval clauses, actually obtaining approval was "illusory" because Intuitive refused to grant such approval in good faith. *Kentucky Fried Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722.

*First*, Restore does not allege that any of Intuitive's contractual enforcement concerned third parties that had sought or obtained third-party approval from Intuitive. It is not unlawful tying or exclusive dealing for a contract to prohibit third-party servicing except with authorization, and then to enforce the contract when the third party does not have authorization and does not seek it.

*Second*, although asserting that Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses," ECF No. 21 ¶65, Restore fails to allege that any third party ever

21

sought such approval and was denied.    As the Seventh Circuit explained in
*Photovest*, where a contract contains a third-party authorization clause, it is not
enough for the plaintiff to allege that no third party was approved.    The plaintiff must
demonstrate that the approval clause was applied restrictively to *preclude* third-party
approval:

> Photovest did not show that Fotomat unreasonably withheld approval.
> Indeed, it appears that Photovest never submitted a processor to
> Fotomat for approval during this time period. Photovest contends that
> the tie was nevertheless sufficiently established because Fotomat did
> not provide a list of approved processors. This does not in our opinion
> establish the requisite condition for illegal tying. Given the contractual
> language, which at least provides for the possibility of purchasing
> processing from non-Fotomat sources, we are reluctant to find a tying
> arrangement without some evidence that Fotomat applied the contract
> language so restrictively as to constitute a de facto tying clause.

606 F.2d at 722; *see also Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407,
1418 (11th Cir. 1987) (favorably citing *Photovest*).    Consistent with *Photovest*, the
mere fact that Intuitive has not explicitly granted third-party approval does not make
its approval process "illusory."    Restore does not allege that it or any other third
party applied for authorization and was turned down, or told it would be turned
down.    *Cf. Photovest*, 606 F.2d at 722.

   *Third*, while Restore asserts that Intuitive "has never approved any third party
to repair the instruments and has never set up a process for doing so," ECF No. 21
¶53, its own pleading refutes this allegation.    Restore acknowledges that, after
Restore obtained FDA clearance to remanufacture one type of the prior generation

of S/Si EndoWrists, Intuitive issued a "public statement" that it "will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with 510(k) clearance or equivalent granted by the FDA." ECF No. 21 ¶63. That policy, which remains on Intuitive's website,[2] does not distinguish between the S/Si and the X/Xi generations of EndoWrists. Thus, not only did Restore obtain the contractual authorization for its FDA-cleared remanufactured S/Si EndoWrist that it denies Intuitive has ever granted, Intuitive made known to the market that *any other company* that obtains FDA clearance has the same authorization.

To the extent Restore means that Intuitive has never granted contractual approval for any third party that engages in EndoWrist servicing and use counter resetting that does *not* constitute "remanufacturing," any such allegation cannot save its complaint.[3] Again, Restore does not allege that it or any third party has sought

---

[2] *See* Da Vinci Instruments, Intuitive.com, https://tinyurl.com/3ne4jz3r (hereafter "Authorization Announcement"). The Court may take notice of the content of a website in considering a motion to dismiss. *U.S. ex rel. Jacobs* v. *JP Morgan Chase Bank, NA*, 113 F.4th 1294, 1300 (11th Cir. 2024).

[3] Intuitive disputes Restore's assumption that when it services an EndoWrist and resets the use counter, that is not "remanufacturing" for purposes of FDA clearance. However, that dispute is not relevant to the resolution of this motion. Since Restore has alleged no facts showing that Intuitive ever failed to grant contractual approval

such approval and been denied, and hence cannot establish that Intuitive has withheld, or would withhold, approval. *Photovest*, 606 F.2d at 722. In any event, according to Restore's own Amended Complaint, "remanufacturing" and "repair" are part of the same market. *See, e.g.*, ECF No. 21 at 2, ¶ 82. Restore cannot claim that Intuitive violated the antitrust laws by not granting third-party approval on precisely the terms that Restore preferred.

Restore asserts that Intuitive's announcement that FDA-cleared remanufacturers are contractually approved "has created confusion rather than clarity," because Intuitive "has not revised its Agreement or User Manual to conform to the Statement." *Id.* ¶66. But that vague allegation is legally irrelevant. The law does not require Intuitive to change its "authorized servicer" terms, which are facially lawful. *Kentucky Fried Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722. Restore bears the burden of showing that those terms are "illusory" insofar as Intuitive refuses to grant third-party authorization. Its own allegations refute any such inference, and its claims fail accordingly.

---

for *anything*, it has failed to meet its burden of alleging facts showing that the possibility of authorization was illusory.

## III.    RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENFORCEMENT OF ITS CONTRACTS CAUSED RESTORE ANTITRUST INJURY

To assert a claim under the antitrust laws, Restore must plead antitrust injury—"injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Moreover, an antitrust plaintiff must allege facts showing that the challenged conduct caused antitrust injury to the plaintiff's own "business or property."  15 U.S.C. § 15(a); *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1272–73 (11th Cir. 2015).

Courts routinely dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury is directly attributable to anticompetitive conduct by the defendant.  *See, e.g., Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1076 (11th Cir. 2004); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010).  Further, a nascent competitor lacks antitrust injury unless they can demonstrate an existing capability to compete.  *See Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1272–73 (11th Cir. 2013).

Restore does not allege any conduct by Intuitive that has prevented Restore from competing.  There is no allegation that Intuitive or its contracts blocked Restore

from pursuing the ability to compete. Rather, Restore concedes the opposite, because Restore developed its alleged capability to compete while Intuitive's contracts allegedly remained in force and unchanged. ECF No. 21 ¶77. Restore concedes it did not even begin developing the capability to offer modified X/Xi EndoWrists until September 2023, and allegedly achieved the capability only a few months ago. *Id.* ¶¶86–87. Restore does not allege it has offered its X/Xi product to any customers, much less actually made any sales.

Restore fails to allege facts showing that Intuitive's conduct caused Restore's delayed entry into the X/Xi market and hence the damages that it seeks for 2021 to the present. Restore admits that it obtained clearance for one S/Si EndoWrist and has applied for clearance to remanufacture X/Xi EndoWrists. *Id.* ¶¶78, 87–88. Its damages claim for delayed entry therefore hinges on the assumption that Intuitive did something to prevent Restore from developing the technology to service X/Xi EndoWrists and applying for FDA clearance in 2020, rather than in 2024, even though Restore had begun the same process with respect to the S/Si EndoWrists years earlier and subject to the same Intuitive contracts with hospitals.

Attempting to cure this obvious problem, Restore asserts there is a difference between the S/Si and X/Xi—namely, that "Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists," that Restore did not know whether it would be able to bypass that encryption, and that it "was futile to take that step to expand

26

into X/Xi EndoWrists" before Intuitive's 2023 announcement that companies with FDA clearance were contractually cleared. *Id.* ¶¶83–84. For two reasons, this effort to blame Intuitive for Restore's delay in developing X/Xi capability is unavailing.

*First*, far from alleging facts showing that investing in X/Xi capability before 2023 was "futile," Restore asserts it took ***many*** steps to achieve X/Xi capability starting in 2019. *Id.* ¶82. These included "execut[ing] an agreement with Medline"; "filing for 510(k) clearances for remanufactured instruments, which expressly included the X/Xi EndoWrists"; "working with its engineering firm on options for developing the technological capability to reset the usage counter on the X/Xi EndoWrists and testing and validation protocols"; "development of a handheld wireless reader through its engineering firm"; "development of a patented handheld wireless reader to determine the remaining lives on an X/Xi instrument"; beginning to operate "out of a new facility to handle the much larger demand for manufacturing the X/Xi EndoWrists"; and acquiring "a da Vinci robot from a third party for regularly testing X/Xi EndoWrists." *Id.* The allegations that Restore spent considerable resources on X/Xi technology before 2023 contradict and render implausible its conclusory assertion that "the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture." *Id.* ¶81.

27

*Second*, Restore alleges no facts showing that Intuitive's website statement was a change of policy—*i.e.*, that before March 2023, Intuitive said or did anything that suggested it was not open to authorizing third parties. There is a reason Restore does not make any such allegation: it would be false. As Restore knows, Intuitive has consistently communicated to the market, including to Restore itself, that it would be willing to consider authorization upon a showing of FDA clearance or clinical evidence that third-party activities were safe and effective. That Restore did not take advantage of that offer until 2023 was the result of its own business choice.

## IV.  RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENDOWRIST USE LIMITS VIOLATE THE ANTITRUST LAWS OR CAUSE INJURY TO RESTORE

Restore makes clear it is not challenging Intuitive's chip encryption on its X/Xi EndoWrists. ECF No. 21 ¶49. However, it is not clear if Restore means to challenge the use limits on EndoWrists, independently from the contract provisions requiring authorization of third parties. If it does, it has not asserted a viable claim. There is nothing anticompetitive about a medical device manufacturer setting a limit on how many times its device can be used—indeed, the FDA cleared Intuitive's EndoWrists *with programmed use limits*. Restore's assertion that EndoWrist use limits "extract consumer surplus, *i.e.* monopoly profits, from [] customers," *id.* ¶70, amounts at most to an assertion that Intuitive uses its alleged monopoly power to charge monopoly prices, which is not an antitrust claim. *See Verizon Comm'ns Inc.*

28

*v. Trinko*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). Restore makes no allegation that EndoWrist use limits exclude competitors, and therefore has no antitrust claim even if it were true—which it is not—that the use limits result in higher prices. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2013) ("higher consumer prices can result from pro-competitive conduct").

Moreover, Restore has no standing to challenge the use limits because Restore alleges no facts showing that the limits cause injury to Restore's "business or property." *See Duty Free Ams.*, 797 F.3d at 1273. The entire premise of Restore's complaint is that, absent the contractual restrictions on third-party service, hospitals would come to Restore to reset their use-limited EndoWrists. ECF No. 21 ¶89. When and if Restore begins providing this service, Intuitive's programmed use limit will *help*, not hurt, Restore economically. If there were no use limits on the EndoWrists, then under Restore's own theory, hospitals would need its services less often (if at all), and Restore would earn *fewer* profits, not more.

## V.    RESTORE FAILS TO ALLEGE A PROPER SINGLE-BRAND AFTERMARKET

Proper definition of a relevant market is a necessary threshold step in any challenge to a vertical agreement, including Intuitive's customer agreements. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018). Whether a plaintiff's relevant

market definition is adequate is properly determined on a motion to dismiss. *Jacobs*, 626 F.3d at 1336–37.

Restore asserts that Intuitive caused harm in the alleged aftermarket for "repairing and replacing EndoWrist instruments." ECF No. 21 ¶30. In antitrust parlance, Restore has alleged a "single-brand" aftermarket—*i.e.*, a market confined to parts or service (EndoWrists) necessary only in conjunction with Intuitive's own branded surgical robot (the da Vinci).[4] "It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (collecting cases). "'Absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.'" *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) (quoting *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984)); *see also Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1283

---

[4] In a footnote, Restore asserts that Intuitive would have a market share of 99.9% "even if the aftermarkets were more broadly defined to include all brands of surgical robots." ECF No. 21 ¶30 n.1. Restore does not define an alternative relevant aftermarket for "all brands of surgical robots" nor assert any facts from which the plausibility of such a relevant market could be tested. *See Jacobs*, 626 F.3d at 1338 (holding that plaintiff has "responsibility under *Twombly* to plead facts 'plausibly suggesting'" a relevant market). The Amended Complaint's sufficiency must be tested based on the relevant market actually asserted.

(10th Cir. 2004). Restore has not pled the exceptional facts necessary to establish a single-brand aftermarket.

The rare exception to the general rule prohibiting single-brand aftermarkets arises from the Supreme Court's decision in *Eastman Kodak*, where the Court permitted a claim that Kodak had restrained competition in the aftermarkets for parts and service for Kodak copiers based on the unique facts of that case. 504 U.S. at 481–82. Drawing on *Kodak* and its progeny, the Ninth Circuit recently distilled the requirements for demonstrating a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). *Epic* is consistent with Eleventh Circuit precedent, which has similarly interpreted *Kodak* and related cases to require distinguishing "between contract power and market power," including when customers knowingly contract to make aftermarket purchases from the seller's single brand. *Maris*, 302 F.3d at 1222.

Restore recognizes it needs to plead exceptional factors to establish a single-brand market, but fails to plead the most important one—that the relevant contract

provision was "not generally known" at the time the hospitals make their purchase decisions. *Epic*, 67 F.4th at 977. Restore makes a weak and implausible effort to plead the second two *Epic* factors—inability to anticipate life-cycle pricing and high switching costs, *see* ECF No. 21 ¶¶37–38—but it does not and cannot allege that the challenged contractual provisions were unknown to hospitals when they purchased their da Vincis. To the contrary, Restore's entire case is premised on explicit terms in Intuitive's customer contracts—including contract language that (according to Restore) provides that customers that purchase a da Vinci must thereafter purchase EndoWrist instruments from Intuitive. *See id.* ¶54.

As the Eleventh Circuit noted in *Maris*, "contracts always restrain and affect a party's available choices," so the terms of a contract are not the appropriate focus for defining a relevant single-brand market. *Maris*, 302 F.3d at 1222. Unlike in *Kodak*, where the challenged contract provision was implemented only after customers had *already* purchased a Kodak copier and were therefore "locked in," when the challenged provision is disclosed to customers "up-front," it does not "raise the same antitrust concerns." *Metzler*, 19 F. Supp. 2d at 1356. Thus, the Seventh Circuit has recognized that the critical issue in *Kodak* was "whether the *change* in policy enabled Kodak to exact supracompetitive prices from customers who had *already* purchased its machines." *Digit. Equip. Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir.1996) (emphases added). Similarly, in *Queen City, Inc. v.*

*Domino's Pizza, Inc.*—adopted by the Eleventh Circuit in *Maris*, 302 F.3d at 1222—

the Third Circuit held that "the Kodak case arose out of concerns about unilateral

changes in Kodak's parts and repairs policies" imposed after customers had already

made their primary market purchases. 124 F.3d 430, 440 (3d Cir. 1997). The Sixth

Circuit agrees, as well, holding that the "*change in policy* in *Kodak* was the crucial

factor in the Court's decision." *PSI Repair Servs, Inc. v. Honeywell, Inc.*, 104 F.3d

811, 820 (6th Cir. 1997) (emphasis added); s*ee also Clark Mem'ls of Ala. v. SCI Ala.*

*Funeral Servs., Inc.*, 991 F. Supp. 2d 1151, 1164 (N.D. Ala. 2014) ("[A]n essential

element of a lock-in claim is a change in policy in the after-markets after a consumer

has made a purchase in the initial market."). Restore acknowledges that Intuitive

has made no change in policy. ECF No. 21 ¶90.

Because Restore does not and cannot allege that the contractual provisions it

challenges were unknown to the hospitals who bought da Vinci robots, it cannot

establish a single-brand aftermarket and all of its antitrust claims fail accordingly.

## VI.   THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

A complaint should be dismissed with prejudice if granting leave to amend

would be futile because "the complaint as amended would still be properly dismissed

or be immediately subject to summary judgment for the defendant." *Cockrell v.*

*Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). Restore's allegations make clear its

complaint is time-barred and that the challenged provisions of Intuitive's hospital

contracts do not foreclose competition under the applicable legal standards. Although all of these deficiencies were present in its original complaint, Restore did not cure them in its Amended Complaint. Accordingly, further amendment of the complaint would be futile, and dismissal should be with prejudice. *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys.*, 673 F. App'x 925, 930 (11th Cir. 2016) (dismissal with prejudice was appropriate where "Plaintiff—and its counsel—was offered ample opportunity to state a claim on which relief could be granted").

## CONCLUSION

Restore's complaint should be dismissed with prejudice.

Dated January 31, 2025                Respectfully submitted,

                                      /s/ *Andrew Lazerow*
                                      _____

                                      Bruce D. Partington
                                      CLARK PARTINGTON
                                      125 East Intendencia Street, 4th Floor
                                      Pensacola, Florida 32502
                                      T: (850) 432-1399
                                      E: bpartington@clarkpartington.com

                                      Andrew Lazerow (*pro hac vice*)
                                      COVINGTON & BURLING LLP
                                      One CityCenter, 850 Tenth Street, NW
                                      Washington, DC 20001
                                      T: 202-662-6000
                                      E: alazerow@cov.com

                                      Kenneth A. Gallo (*pro hac vice*)
                                      PAUL, WEISS, RIFKIND, WHARTON &
                                      GARRISON LLP
                                      2001 K Street, NW
                                      Washington, DC 20006
                                      T: 202-223-7300
                                      E: kgallo@paulweiss.com

                                      William B. Michael (*pro hac vice*)
                                      PAUL, WEISS, RIFKIND, WHARTON &
                                      GARRISON LLP
                                      1285 Avenue of the Americas
                                      New York, NY 10019
                                      T: 212-373-3000
                                      E: wmichael@paulweiss.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Intuitive certifies that its Memorandum in support of its Motion to Dismiss For Failure To State A Claim complies with the word count limitation set forth in Local Rule 7.1(F) because it contains 7890 words, excluding the parts exempted by the Local Rule.