IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

Plaintiff,

v.                                              Case No. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,

Defendant.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, Georgia 30309

Plaintiff Restore Robotics Repairs LLC ("Restore") hereby opposes the motion to dismiss its First Amended Complaint (ECF No. 21 or "Complaint") for monopolizing and restraining trade in the nationwide market for service and replacement of X/Xi EndoWrist instruments for use with the Da Vinci Surgical Systems ("X/Xi EndoWrist Market"). For more than two decades, Intuitive has maintained a market share of more than 99% of the sales and installed base for surgical robots for minimally-invasive soft-tissue surgery ("Surgical Robots") in the United States. Complaint ¶ 16. In addition to selling each robot for as much as $2.5 million, Intuitive sells billions of dollars per year in instruments for use with the robot. Id. ¶ 14.

Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use their robot. Complaint ¶ 52. For more than twenty years, Intuitive has operated on a business model of extracting monopoly rents through recurring revenue from instruments with limited uses. Id. Intuitive kept the same 10 use limits for most instruments for almost two decades. Id.

Restore previously filed an antitrust case for injury to its business repairing the prior generation of instruments, *i.e.*, S/Si EndoWrists. *Restore Robotics LLC, v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019) ("S/Si EndoWrist Litigation"). At that time, Restore was unable to reset the

usage count on the X/Xi EndoWrists and could not bring any claims for injury to business repairing X/Xi EndoWrists. *S/Si EndoWrist Litigation*, ECF No. 1 (Complaint) ¶ 60. Intuitive took the position throughout the S/Si EndoWrist Litigation that the usage limits were necessary because a second cycle of uses would diminish product quality and patient safety. *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.[1]

In this action, Restore alleges Intuitive has used its Sales, License, and Service Agreement ("Agreement") for the sale and service of the robots to block and delay the entry of competitors into the market for replacement of X/Xi EndoWrist instruments. Intuitive agrees to provide new EndoWrist instruments for use with the robot under a "limited license" based on usage limits set by Intuitive. Complaint ¶ 57. "This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory." Id. Intuitive will void the contract and cease providing new

---

[1] After settlement by the parties of the S/Si EndoWrist Litigation after the pretrial conference in the case on January 27, 2023, S/Si EndoWrist Litigation, ECF No. 225, Intuitive publicly reversed its position on the safety of instruments remanufactured for an additional cycle of uses, issuing a statement on its website on March 1, 2023 that it would not "not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who uses an instrument remanufactured by Restore under its own label for an additional cycle of uses. Complaint ¶ 63.

instruments if the hospital uses any instruments for a second cycle of uses. Id. ¶¶ 60-62.

On or about February 29, 2024, Restore became the first and only independent service organization ("ISO") to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments. Restore brings this action for injury to its business repairing and remanufacturing X/Xi EndoWrists. If Intuitive had not imposed the contractual restrictions on da Vinci X and Xi users and vigorously enforced those terms, Restore would have sought and achieved the technological capability to reset the usage count on the encrypted memory chip to allow for an additional cycle of uses and entered the X/Xi EndoWrist market as early as July 2020. Restore also continues to suffer harm and the threat of future harm to its X/Xi EndoWrist business because Intuitive maintains contractual restrictions on the use of X/Xi EndoWrists for an additional cycle of uses in its existing and new contracts for sale and lease of the Da Vinci X and Xi Surgical System.

The X/Xi EndoWrist claims were not part of the S/Si EndoWrist Litigation. The X/Xi EndoWrist claims did not arise until February 29, 2024 at the earliest.[2]

---

[2] "On or about that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with requisite certainty the existence and amount

During the S/Si EndoWrist Litigation, Restore was unable to reset the usage count on the X/Xi EndoWrists. Complaint ¶ 79 (citing S/Si EndoWrist Litigation Complaint). Therefore, its X/Xi EndoWrist claims had not accrued because it was not able to ascertain the fact or amount of damages without proof if and when it would have acquired the technological capability to break the instrument encryption and enter that market. *E.g.*, S/Si EndoWrist Litigation, ECF No. 218 at 3 (granting motion in limine to exclude evidence and argument relating to X/Xi business).[3]

## I.   THE X/XI ENDOWRIST CLAIMS WERE TIMELY FILED.

The motion to dismiss omits two fundamental tenets of antitrust law:

- The claims do not accrue until damages can be reasonably established.

- A claim accrues with each lost sale resulting from the restraint of trade.

The complaint here survives on either basis. This opposition brief discusses each principle below in that order.

---

of damages to its business in repairing and replacing X/Xi EndoWrists going back to June 2020." Complaint ¶ 91.

[3] *See also* S/Si EndoWrist Litigation ECF No. 192 at 3 (referring to ECF No. 190 at 6: "It would be too speculative for Restore to assert a claim alleging harm to its currently non-existent X/Xi EndoWrist business—when it admittedly lacks the technology to circumvent X/Xi use limits."). Litigants can be estopped from asserting inconsistent legal positions. In re 3M Combat Arms Earplug Prods. Liab. Litig., No. 3:19MD2885, 2022 WL 3345969, at *3 (N.D. Fla. Aug. 14, 2022) (Rodgers, J.).

**A. Damages Could Not Be Reasonably Established Until February 2024.**

The Supreme Court has explained that "it is hornbook law" that antitrust claims accrue when the fact and amount of damages is provable. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). Thus, the plaintiff can commence suit more than four years after defendant committed the act causing injury "where the defendant committed the act causing injury more than four years before plaintiff commenced suit, but where damages resulting from the act could not have been proven with the requisite certainty until more than four years after commission of the act." *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1034 n.14 (5th Cir. 1977); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985) (customer's damages became provable when customer signed agreement binding it to pay overcharge).

The S/Si EndoWrist Litigation was limited to the S/Si EndoWrist business because Restore's damages to its X/Xi EndoWrist business were speculative so long as Restore did not have the technological capability to get into the X/Xi EndoWrist business. S/Si EndoWrist Litigation, ECF No. 218 (Order on Motions in Limine) at 3.

> The claims in this action for lost profits in the business of repairing and replacing X/Xi EndoWrists accrued no sooner than February 29, 2024. On or about that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with

requisite certainty the existence and amount of damages to its business
in repairing and replacing X/Xi EndoWrists going back to June 2020.

Complaint ¶ 91. Thus, Restore timely filed the complaint in this action within four
years of acquiring the technological capability to reset the X/Xi EndoWrists and
establish the fact and amount of damages to its X/Xi EndoWrist business.

## B.    Restore Alleges Continuing Harm from Continuing Violation.

In the alternative, it is also hornbook law that an antitrust claim accrues each
time that a plaintiff is injured by a "continuing violation" that results in continuing
and accumulating harm to the plaintiff. *Hanover Shoe, Inc. v. United Shoe
Machinery Corp.*, 392 U.S. 481, 502 n. 15 (1968). "As a cause of action accrues with
each sale, the statute of limitations begins to run anew." *Morton's Mkt., Inc. v.
Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999).[4] Otherwise, no new
competitor could bring an action to break up a long-standing monopoly based on
locking customers into exclusive dealing indefinitely to block ISOs from ever selling
to them. Restore alleges that it has continued to lose sales as a result of the

---

[4] Intuitive touts an unpublished decision purportedly to the contrary from another
circuit: *SaurikIT, LLC v. Apple, Inc.*, No. 22-16527, 2023 WL 8946200, at *1 (9th
Cir. Dec. 28, 2023). That decision has not been followed by any subsequent decision
in that circuit or elsewhere. Moreover, Intuitive has continued to engage in
anticompetitive conduct to prevent customers from using their EndoWrists for a
second cycle of uses. "As recently as 2022, Intuitive has instructed Panama City
Surgery Center that they could not use EndoWrists that had been reset for an
additional cycle of uses by Restore." Complaint ¶ 61. Intuitive has continued to
manipulate any opportunity for customers to get approval to reuse their instruments
for a second cycle of uses. Id. ¶¶ 62-66.

6

Agreement imposed on every customer and its enforcement and manipulation by Intuitive. Complaint ¶¶ 60-68. Intuitive enforced the limited license against all customers to prevent them from using their instruments for an additional cycle of uses and defended that policy in litigation against ISOs through 2022. Id. But for the anticompetitive conduct of Intuitive, Restore would have entered the market for replacing X/Xi EndoWrists as early as June 2020 and has lost significant sales since that time. Complaint ¶ 88.

### C. Intuitive Has Continued To Restrain Trade in X/Xi EndoWrists.

Restore's X/Xi EndoWrist business has also been harmed by Intuitive's anticompetitive conduct after September 19, 2020. "The commencement of the statute of limitations is a question of fact." *Morton's Mkt.*, 198 F.3d at 828. Within the four years before the filing of this action, Intuitive sold thousands of robots with the Agreement. FAC ¶¶ 55-59. Intuitive continued to enforce the Agreement. Id. ¶¶ 60-61. Intuitive has continued to manipulate the terms of the Agreement. Id. ¶¶ 63-66. Therefore, the complaint alleges facts that give rise to a scheme to violate the antitrust laws that has continued within the last four years – and continues to this day – and harmed Restore in its X/Xi EndoWrist business.

## II.    INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT.

Judge Wetherell previously ruled in the S/Si EndoWrist Litigation that actual coercion and exclusive dealing can be plausibly inferred from the restrictions

requiring approval from Intuitive for any repairs during or after the usage limit on the EndoWrists. *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2019 WL 8063989, at *3 (N.D. Fla. Sept. 16, 2019).[5] Intuitive omits that decision from its motion to dismiss.

In fact, the Agreement provides the customer with a limited license for each instrument that "expires once an [i]nstrument is used up to its maximum number of uses." Complaint ¶ 57. There is no qualification on the expiration of that license. Intuitive routinely enforced that limited license without qualification in its dealings with customers. Complaint ¶¶ 60-62. Intuitive maintained that position – that the usage limits were absolute and could not be extended without jeopardizing product quality and patient safety – in the S/Si EndoWrist Litigation.[6]

Now that Intuitive has been forced through settlement of the S/Si EndoWrist Litigation to modify restrictions on the use of instruments reset for an additional cycle of uses, Intuitive has embraced the idea in the present motion that customers

---

[5] *See also Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2022 WL 1495005, at *5 (N.D. Fla. Apr. 11, 2022) (denying summary judgment on robot service aftermarket claims "because the SLSA states that Intuitive has no obligation to provide services on a system that has been serviced by someone other than Intuitive and that any unauthorized service will void the system's warranty).

[6] *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

always had meaningful freedom of choice for turning to ISOs for an additional cycle of uses on their instruments. Motion at 18-24. Despite its prior objections to any resetting of the usage limits for an additional cycle of uses, Intuitive now points to language in the Agreement regarding approval of repair, refurbishment, or reconditioning of the robot, the instruments, or accessories. Motion at 19-20.

On its face, however, the language about the expiration of the license is unqualified.[7] Complaint ¶ 57. "This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory." Id. Moreover, Intuitive did not qualify the limited license in its dealings with customers. Id. ¶ 60-61. In fact, Intuitive underscored that customers should not be using the instruments "beyond the programmed number of uses" and terminated customers that used the instruments for a second cycle of uses. Id.

Even if the approval clause modified the limited license on the instruments, Restore only needs to show at trial that the approval clause was "somewhat bogus" under the circumstances and customers did not have meaningful freedom of choice. *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1416 (11th Cir. 1987). For example, Restore can raise a genuine dispute of fact by showing a

---

[7] "This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory." Complaint ¶ 57.

course of dealing between Intuitive and its customers that Intuitive would not permit customers to use the instruments for a second cycle of uses. *Id.* at 1417. Here, Intuitive has threatened dozens of hospitals and hospital systems around the country as recently as 2022 with possible termination of their agreements with Intuitive for "[u]sing instruments beyond the programmed number of uses" – and terminated their agreement if they did not heed the warning letter. Complaint ¶¶ 60-61. Intuitive also publicly and aggressively defended its opposition to a second cycle of uses in litigation with ISOs. So it is plausible that Intuitive did engage in a course of dealing showing that Intuitive would not permit customers to use their instruments for a second cycle of uses.

In the alternative, Restore can raise a genuine dispute of fact by showing Intuitive had never approved anyone or showing that Intuitive had never established written standards and procedures for approving vendors. *Tic-X-Press*, 815 F.2d at 1417. Since entering the surgical robot market more than two decades ago, Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses." Complaint ¶ 62. Intuitive did not issue any written policy – much less standards or procedures – on the use of instruments for an additional cycle of uses until March 2023. Id. ¶ 63. Even then, customers do not have a meaningful choice until ISOs have notice of the policy and have sufficient time to meet the requirements. Id. ¶ 65.

10

Finally, the statement itself is "somewhat bogus." Intuitive has not revised its Agreement or User Manual to conform with the Statement. Complaint ¶ 66. The Agreement and User Manual continue to state that the customer has a limited license to use the EndoWrists up to the maximum number of uses specified by Intuitive and programmed on the instrument. Id.

### III.    INTUITIVE FORECLOSED ALL ENTRY INTO MARKET.

Restore has been willing and able to enter the X/Xi EndoWrist market *but for* the exclusionary conduct of Intuitive. Complaint ¶¶ 77-91. "[T]he plaintiff must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013). Intuitive already lost this exact same argument on antitrust injury – at summary judgment no less – in related litigation against a potential competitor Rebotix that had not achieved the technological capability to reset the usage limits on the X/Xi EndoWrists. *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538, at *9–10 (M.D. Fla. Aug. 10, 2022).

"Rebotix points out that it has not completed the X/Xi Interceptor because expending the resources to do so would be futile in light of Intuitive's ongoing anticompetitive conduct." Id. at *9. So has Restore: "Since Intuitive was blocking any and all access to customers indefinitely, the expenditure of substantial resources

on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture." Complaint ¶ 81.

Moreover, "Rebotix point[ed] to the following affirmative steps it has taken: (1) Rebotix 'was and is operational' and 'it remains ready to repair EndoWrists'; and (2) it has already staffed a team for its business, spent millions of dollars on research and development, and obtained two patents on its method for resetting the usage counter." Id.

Here, Restore has done far more: (1) validating its repair process, (2) building a customer base, (3) obtaining the first ever clearance with the FDA, (4) lining up a large distributor, (5) retaining encryption specialists, (6) developing proprietary technology, (7) patenting its proprietary technology, (8) leasing a larger facility for the increased demand for the X/Xi EndoWrists, (9) acquiring an Xi robot for testing products, and (10) building out inventory of used X/Xi EndoWrists for remanufacturing. Complaint ¶¶ 80, 82.

"Restore would have taken those steps to expand into X/Xi EndoWrists much more quickly if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses." Complaint ¶ 82. The Agreement – along with its enforcement – has prevented ISOs from entering the market for replacing X/Xi EndoWrists. For nearly a decade, no

ISO was willing to undertake the costly and risky attempt to try to bypass or override the proprietary encryption on the memory chip installed on the X/Xi EndoWrists–until Intuitive agreed that it would not block ISOs from remanufacturing the instruments for an additional cycle of uses. Contrary to the argument in the motion to dismiss, Intuitive had always aggressively enforced the limited license in its dealings with customers and litigation with ISOs. Complaint ¶¶ 60-62; S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

## IV.    THE LIMITED LICENSE HARMS COMPETITION AND RESTORE.

Restore is challenging the limited license in the Agreement, which prevents customers from using the instruments for an additional cycle of uses. E.g., Complaint ¶¶ 54, 57, 60, 61, 62, 64, 66. Nevertheless, Intuitive complains that Restore is instead challenging the usage limit on the initial cycle of uses. Motion at 28. But the claims are clearly based on preventing ISOs from resetting the instruments for an *additional cycle of uses*:

- Intuitive sells and leases every robot with a Sales, License, and Service Agreement ("Agreement") that prohibits the customer from using its robot with instruments that have been reset for an *additional cycle of uses*. Complaint ¶ 54.
- The Agreement prohibits the customer from using the instruments beyond the usage limits set by Intuitive, which includes any resetting of the usage count for an *additional cycle of uses* by the customer or an ISO. Id. ¶ 57.
- The warning letters and contract terminations have a massive ripple effect across the industry because potential customers will usually

review their contracts with Intuitive and ask the ISO whether Intuitive objects to the use of instruments for an *additional cycle of uses*. Id. ¶ 60.

- Whenever a hospital uses its da Vinci robot with an EndoWrist reset for an *additional cycle of uses*, Intuitive engages in the same pattern of behavior. Id.
- From around July 2018 to around October 2019, Intuitive gave verbal warnings and sent warning letters to hospitals around the country, including Panama City Surgery Center, that were using instruments repaired and reset for an *additional cycle of uses* by Restore. Id. ¶ 61.
- As recently as 2022, Intuitive has instructed Panama City Surgery Center that they could not use EndoWrists that had been reset for an *additional cycle of uses* by Restore. Id.
- If Intuitive continued to detect use of instruments reset for an *additional cycle of uses*, Intuitive terminated the agreement in its entirety, citing Sections 3.4 and 8 of the Agreement. Id.
- Many other hospitals asked Restore if Intuitive had taken any action against its customers using the instruments that had been reset for an *additional cycle of uses* and ended negotiations when Restore told them that Intuitive had done so. Id.
- Customers understand from their course of dealing in the market that Intuitive does not approve of the use of EndoWrists for an *additional cycle of uses*. Id. ¶ 62.
- The Statement reminds customers that Intuitive can and will "void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who chooses to use instruments that have been reset for an *additional cycle of uses* without 510(k) clearance from the FDA. Id. ¶ 64.
- The Statement has created confusion rather than clarity with customers regarding the use of repaired or remanufactured EndoWrists for an *additional cycle of uses* because Intuitive has not revised its Agreement or User Manual to conform with the Statement. Id. ¶ 66.

So the harm to competition generally and Restore specifically is the elimination of competition for the replacement of X/Xi EndoWrists by blocking ISOs from resetting the instruments for an *additional cycles of uses* instead of buying

14

a new instrument from Restore. In other words, customers would be able to replace their instrument by hiring Restore to reset the usage limit for an *additional cycle of uses*. Intuitive has prevented customers from being able to make that choice instead of paying Intuitive for a new instrument at a higher price. Thus, customers have paid higher prices for new instruments from Intuitive instead of remanufactured instruments from Restore. Restore has lost sales as a result. Complaint ¶¶ 88, 89.

## V.    THE X/XI ENDOWRIST AFTERMARKET IS PLAUSIBLE.

Judge Wetherell previously ruled in the S/Si EndoWrist Litigation that it was plausible that there is a primary product market for surgical robots and aftermarkets for service of the da Vinci robots and replacement of the EndoWrist instruments. *Restore Robotics*, 2019 WL 8063989, at *5-6. Specifically, Intuitive uses its dominant position in robots (99% of the surgical robot market) to eliminate competition in the aftermarkets and its robot and instruments are so unique or dominant in the market "any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed." *Id.* (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978) and citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 479 n.29 (1992)).[8] Intuitive omits this decision from its motion to dismiss.

---

[8] *See also Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2021 WL 1227593, at *7 (M.D. Fla. Mar. 8, 2021) ("Both exceptions apply to the current case.")

Judge Wetherell noted the Supreme Court in *Kodak* took the same approach: "[P]ower gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next." *Restore Robotics*, 2019 WL 8063989, at *5 & n.8. So did the Ninth Circuit in *Epic Games*: The court only undertakes an analysis of whether competition in the aftermarket is adequately disciplined by competition in the foremarket to defeat the ability to "lock in" customers *after* the purchase in the foremarket *if and only if* the defendant does not have market power in the foremarket in the first place.[9]

Even if a single-brand aftermarket were not plausible on the facts alleged in the complaint, it is plausible that Intuitive has market power in a broader aftermarket for surgical robot instruments generally. *Restore Robotics*, 2019 WL 8063989, at *6

---

[9] "In *Kodak*, the Supreme Court considered the question of whether a *lack of market power in the foremarket* (photocopier machines, generally) categorically precludes a finding of market power in the aftermarket (replacement parts for and servicing of Kodak-brand photocopiers), which Kodak had allegedly achieved by contractually limiting customers to Kodak-provided parts and services." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024). The Court of Appeals in *Kodak* believed that respondents did "not dispute Kodak's assertion that it lacks market power in the [equipment] markets." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466 & n.10 (1992). Thus, the Supreme Court developed *Kodak*-style aftermarkets based on "locking in" customers after their purchase in the foremarket *when the defendant does not have market power in the foremarket for the original purchase of the equipment*.

(N.D. Fla. Sept. 16, 2019). Surgical robot instruments generally – like surgical robots – are a plausible relevant product market. *See id.* at *5 (describing peculiar characteristics of robotic surgery).[10] Judge Wetherell explained that there is essentially no practical difference between defining the aftermarket as EndoWrists specifically or robotic instruments generally because Intuitive necessarily has such a large market share in a broader aftermarket for surgical robot instruments. *Id.* at *6.

## VI.    AMENDMENT WOULD NOT BE FUTILE.

Intuitive argues that the complaint does not meet the "applicable legal standards" and that "Restore did not cure them in its Amended Complaint." Motion at 34. But Intuitive itself omitted the applicable legal standards. Therefore, Restore has never had a full opportunity to correct any purported deficiency.

---

[10] "A court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because if consumers view the products as substitutes, the products are part of the same market." *Restore Robotics*, 2019 WL 8063989, at *5 (citations and quotation marks omitted). Here, Restore alleges "a very low cross-elasticity of demand between robotic and laparoscopic surgery" because customers are switching to robotic surgery despite much higher prices per procedure. *See id.* and Complaint ¶¶ 20-21.

"For product submarkets, other factors considered include industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Restore Robotics*, 2019 WL 8063989, at *5 (citations and quotation marks omitted). Robotic surgery has all of those practical indicia. *See id.* and Complaint ¶ 22.

Moreover, Restore continues to discover facts from related litigation, such as deposition testimony revealed at trial in related litigation, that bolster its claims. For example, a district court recently released deposition testimony from Intuitive's President admitting that Intuitive did not have any policy for approving EndoWrists for an additional cycle of uses before their March 2023 statement on the website:

> **"QUESTION:** What was Intuitive's policy in this regard before this statement came -- comes out in and around early March of 2023? What was Intuitive's policy about shutting down or whether people could get authorized?"
> And the answer was:
> **"ANSWER:** You know, when I think about it, our conversations, I don't know that we had a clear sort of an agreed-to policy within the company. So I'm actually not sure if I could have said, 'Here is our policy for our cleared instruments.'"

*Surgical Instrument Service Co. v. Intuitive Surgical, Inc.*, No. C-21-03496 (N.D. Ca.), Trial Transcript (Vol. 11) at 1780 (January 22, 2025).

For those reasons, Restore respectfully requests the Court provide an opportunity to amend in the unlikely event that the complaint does not meet the applicable legal standards.

## VII.   CONCLUSION

For all the foregoing reasons, the motion to dismiss should be denied.

18

Respectfully submitted on February 14, 2025.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

Pursuant to Local Rule 7.1(F), the undersigned hereby certifies that this memorandum contains 4,704 words.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

20