IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIRS LLC,

                Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Case No. 3:24-cv-444-MCR-ZCB

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

Pursuant to Fed. R. Civ. Proc. 15(a)(2), Plaintiff Restore Robotics Repairs LLC ("Restore") hereby files its Second Amended Complaint against Defendant Intuitive Surgical, Inc. ("Intuitive") for monopolizing and restraining trade in the nationwide market for service and replacement of X/Xi EndoWrist instruments for use with the Da Vinci X and Xi Surgical Systems ("X/Xi EndoWrist Market").[1] Plaintiff alleges the following upon personal knowledge as to its own acts and information and belief and investigation by counsel as to all other allegations.

For more than two decades, Intuitive has had a monopoly in the manufacture and sale of surgical robots for minimally-invasive soft-tissue surgery ("Surgical

---

[1] Pursuant to N.D. Fla. Loc. R. 15.1(B), this proposed amended pleading is simultaneously filed with the motion for leave to amend. ECF No. 34.

Robots"). During that time, Intuitive has maintained a market share of more than

99% of the sales and installed base for Surgical Robots in the United States. Intuitive

is the sole manufacturer of Da Vinci X and Xi Surgical Systems and X/Xi

EndoWrists. The Xi is the fourth generation of the Da Vinci Surgical System.

Intuitive no longer supports the prior generation (da Vinci Si) with parts, service, or

instruments. Intuitive is also the sole provider of service for the da Vinci X and Xi.

Intuitive uses its contracts for the sale and service of the robots to block and

delay the entry of competitors into the service and replacement of the instruments

for use with the robot. In contracts for the sale and lease of the Da Vinci Xi, Intuitive

prohibits customers from using the Xi EndoWrists beyond the usage limits set by

Intuitive. Intuitive contractually prohibits its customers from using X/Xi EndoWrists

repaired or remanufactured by third parties as part of the sale or lease of the da Vinci

X and Xi. The contracts provide that Intuitive can withhold the necessary robot parts,

robot service, and new X/Xi EndoWrists to use the da Vinci Surgical System if the

robot owner uses X/Xi EndoWrists repaired or remanufactured by third parties.

For roughly ten years, no one entered the X/Xi EndoWrist market to compete

with Intuitive. It was unproven whether anyone willing to enter the market would be

able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to

reset the usage count on an X/Xi EndoWrist for additional cycles of uses on the

robot. On or about February 29, 2024, Restore became the first and only independent

service organization ("ISO") to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments. On or about March 11, 2025, Restore received the first and only clearance from the FDA to market and sell remanufactured X/Xi EndoWrist instruments (K242610).

Restore brings this action for injury to its business repairing and remanufacturing X/Xi EndoWrists. If Intuitive had not imposed the contractual restrictions on da Vinci X and Xi users and vigorously enforced those terms, Restore would have sought and achieved the technological capability to reset the usage count on the encrypted memory chip and entered the X/Xi EndoWrist market as early as July 2020. Restore also continues to suffer harm and the threat of future harm to its X/Xi EndoWrist business because Intuitive maintains contractual restrictions on the use of repaired or remanufactured X/Xi EndoWrists in its existing and new contracts for sale and lease of the Da Vinci X and Xi Surgical System.

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Restore Robotics Repairs LLC ("Restore") is a Florida limited liability company with its principal address at 7543 Holley Circle, Panama City Beach, Florida. Restore is in the business of servicing robotic surgical instruments for hospitals for an additional cycle of uses and selling remanufactured robotic

surgical instruments, directly and through distributors to hospitals, to use for an additional cycle of uses.

2.      Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California. Intuitive provides surgical robots, along with related parts, instruments, accessories, and services, to hospitals and surgical centers in Escambia County in the Pensacola Division of the Northern District of Florida and elsewhere. Intuitive can be served with process through its registered agent C T Corporation System at 1200 South Pine Island Road, Plantation, FL 33324.

3.      Defendant is subject to the personal jurisdiction of this Court.

4.      This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22. The Defendant has been engaged in interstate commerce during all relevant times of the complaint.

5.      Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2). The Defendant is transacting and carrying on business in this District.

4

**ROBOTIC SURGERY**

6.      Intuitive's Chief Medical Officer has publicly described a "robotic revolution" in surgery. With traditional open surgery, the surgeon uses one large incision to perform a procedure. With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure. Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera. The surgeon sits at a console and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.



7.      Robotic surgery has a variety of practical advantages over laparoscopic surgery:

-   stereoscopic high-definition cameras for 3-D visibility

-   additional arm for the surgeon to hold a third instrument

-   wrist joints for expanded range of motion compared to human

-   scalability to allow for small movements in the arms and instruments

-   ergonomic console design to minimize surgeon fatigue.

**DA VINCI ROBOT**

8.    Intuitive specializes in the manufacture and sale of the da Vinci surgical system (image below).



9.    Intuitive sells all necessary instruments and accessories for the da Vinci robot system. Intuitive offers roughly eighty different instruments, including a variety of forceps, retractors, and scissors, under the EndoWrist brand. The da Vinci Surgical System is only cleared for use with EndoWrist instruments.

10.    The da Vinci robot system is generally used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck – primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery. The da Vinci robot system is indicated for adult and pediatric use.

11.    In its latest annual report, Intuitive estimated that surgeons using the da Vinci robot system completed roughly 2,286,000 surgical procedures of various

types in hospitals throughout the world during the year ended December 31, 2023. The number of estimated annual surgical procedures nearly doubled in four years.

12.    As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S. Nearly all customers are currently using the da Vinci X or Xi, which works with the X/Xi EndoWrist instruments.

13.    In its most recent annual report, Intuitive acknowledged that "[t]he initial system sale into an account is a major capital equipment purchase by our customers and typically has a lengthy sales cycle." The average sales price is more than $1 million.

14.    For the calendar year 2023, Intuitive reported more than $3 billion in Instruments and Accessories Revenue in the United States. Intuitive is on pace for more than $3.5 billion in Instruments and Accessories Revenue in the United States for 2024.

15.    On March 14, 2024, Intuitive announced that it had received clearance from the FDA to market and sell the next generation of the robot – da Vinci 5 – in the United States. The existing X/Xi EndoWrists are compatible with – and cleared for use with – the da Vinci 5. At that time, Intuitive stated that "Da Vinci 5 will initially be available to a small number of customers in the U.S. who collaborated with Intuitive during the development period and those with mature robotic surgery

programs. Intuitive will work with surgeons at these initial sites to generate additional data on the system's use before a wider commercial introduction."

## SURGICAL ROBOT MARKET

16.    Intuitive has monopoly power in the U.S. market for Surgical Robots ("U.S. Surgical Robot Market"). In the U.S. Surgical Robot Market, Intuitive is able to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels. For nearly 20 years, Intuitive was the only manufacturer of Surgical Robots in the United States. Intuitive currently has a 99.9% share in annual sales and installed base in the U.S. Surgical Robot Market. There is only one other manufacturer selling Surgical Robots in the U.S.: Asensus Surgical. Asensus placed one (1) system in the United States in 2023. Intuitive placed 666 da Vinci systems in the United States in 2023.

17.    There is a relevant product market or submarket for surgical robots. Surgical robots have no practical substitute. Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery. Moreover, certain procedures, such as prostatectomies, are increasingly performed now by surgeons operating exclusively with surgical robots.

18.    Due to the unique attributes of surgical robots, many hospitals believe that robotic surgery leads to shorter hospital stays and greater patient satisfaction.

Many surgeons strongly prefer robotic surgery and require it to work at a given hospital. As a result of perceptions about the reduced pain and scarring and increased safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

19.    There are distinct prices for surgical robots. The da Vinci Surgical System has an average sales price of more than $1 million. By comparison, a laparoscopic tower has an average sales price of roughly $100,000.

20.    There is a very low cross-elasticity of demand between robotic and laparoscopic surgery. The estimated cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic surgery. (Exhibit 1 (Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018)).) In addition, the estimated cost per procedure of acquiring and servicing the surgical robot is an additional $1,701 for robotic surgery. Id. Nevertheless, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. Id.

21.    In response to much higher prices for the use of surgical robots, customers are not switching to use of laparoscopic equipment. Id. In fact, they are replacing their laparoscopic equipment with surgical robots at much higher prices.

9

Id. In other words, customers in the surgical robot market strongly prefer surgical robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market.

22.    The industry and the public recognize surgical robots as a separate economic entity. The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots. There are several professional and trade associations focused on robotic surgery – *e.g.*, the Society for Robotic Surgery and the Clinical Robotic Surgery Association. Surgical robots have very peculiar characteristics. Supra at ¶¶ 6-7. In addition, surgical robots have very distinct prices.  Supra at ¶ 19. Intuitive and Asensus both specialize in surgical robots and instruments. Surgeons specialize in robotic surgery. Robotic surgery requires specialized training and experience.

23.    Orthopedic robots are not part of the surgical robot market. Orthopedic robots are not a practical substitute for surgical robots. They are designed for assisting in removal of bone and aligning prosthetics for knee and hip replacement. They are not indicated for use in minimally invasive soft tissue surgery.

24.    There are significant barriers to entry into the surgical robot market. In fact, Restore is not aware of any new entrants into this lucrative market in the last seven (7) years at least.

10

25.    The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States. New entrants require five to ten years and several hundred million dollars from design concept to regulatory clearance or approval by the FDA. The FDA is now reportedly requiring new entrants to obtain premarket approval, which is much more difficult than 510(k) premarket clearance. The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States.

26.    Intuitive holds numerous patents blocking development of competing robot systems: "As of December 31, 2023, we owned more than 4,800 patents granted and still in force." Intuitive has multiple unexpired patents issued by the United States, covering each of the following features on its current models of the da Vinci Surgical System for sale:  highly-magnified 3DHD vision, true depth perception, intuitive instrument controls, wristed instruments, and tremor reduction.

27.    The da Vinci Surgical System has been widely accepted in the United States. The da Vinci has been the subject of twenty years of clinical data and studies. Surgeons already have significant training and extensive experience invested in the da Vinci robot system. That specialized training often begins in fellowship programs. In addition, the large hospital systems with significant demand for robot surgery already have a sizable installed base of da Vinci robots. Intuitive secures

agreements with customers that they will not purchase any competing robots from other manufacturers.

28.    As a result of its monopoly power in surgical robots, Intuitive is able to, and does, charge supracompetitive prices for its da Vinci robots. Intuitive has maintained gross margins of 66% to 72%, which far exceed median gross margins in the healthcare sector generally. Those gross margins are not explained by lagging or current research and development expenses, which pale in comparison. For the most recent calendar year 2023, Intuitive had a gross profit of $4.73 billion and research and development expenses of $999 million.

29.    For calendar year 2023, Intuitive had a net margin of 25%. By comparison, GE Healthcare Technologies, which is also a major manufacturer of capital-intensive medical equipment like MRI and CT machines, had a net margin of 12% for the same time period.

## AFTERMARKETS: PARTS, SERVICE, AND INSTRUMENTS

30.    Intuitive has also used its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for servicing the da Vinci Surgical System ("da Vinci Service Market") and repairing and replacing X/Xi EndoWrist instruments ("X/Xi EndoWrist Market"). [2] Intuitive

---

[2] While the complaint defines a da Vinci Service Market and an X/Xi EndoWrist Market, the claims in this action also apply to a surgical robot service aftermarket

has monopolies in the primary market and the aftermarkets and is able to extract monopoly prices and profits from each of those markets by charging separate prices for the robot, the service, and the instruments.

31.    There is a relevant aftermarket for the service of da Vinci Surgical Systems in the United States. Intuitive represents that it is the "sole provider" of service for the da Vinci Surgical System. The standard sales contract prohibits third parties from repairing the robot. Intuitive has a market share of 100%. Intuitive is able to charge supracompetitive prices. Intuitive charges an hourly rate of $995 (including travel time) for repairs. In addition, Intuitive charges fees exceeding $100,000 to replace parts like the instrument or camera arm. Their service contracts have an average price of more than $100,000 per year.

32.    There are no practical substitutes for the specialized parts, equipment, and training required to service the da Vinci Surgical System.  Service requires access to a proprietary service laptop and toolkit owned and controlled by Intuitive. The service laptop is necessary to remove warning messages from the screen on the system console and input the serial number for the system to recognize replacement

---

and a surgical robot instrument aftermarket. Even if the aftermarkets were more broadly defined to include all brands of surgical robots, *i.e.*, Intuitive and Asensus, Intuitive has market shares of 99.9% for surgical robot service and surgical robot instruments with the same barriers to entry into the aftermarkets and the same ability to charge inflated prices and exclude competition in the aftermarkets described below at ¶¶ 31-94.

parts like the robot arms. Intuitive does not provide third parties with access to the service laptop.

33.    Service requires access to proprietary parts like robot arm assemblies that are specially designed and built for the da Vinci robot system. There are no substitutes for most da Vinci robot parts. Intuitive only provides the parts with the service and only provides the service directly to customers.

34.    Intuitive does not disclose the performance specifications for the da Vinci Surgical System. Intuitive provides its field service engineers with the parts and toolkit, along with specialized training on the performance specifications for the da Vinci Surgical System, to maintain, troubleshoot, and repair the system.

35.    There is a relevant aftermarket for the repair and replacement of X/Xi EndoWrist instruments in the United States. There are no substitutes for X/Xi EndoWrist instruments. They are specially designed and built for the latest generation of the da Vinci Surgical System. Intuitive provides X/Xi EndoWrist instrument replacement to all customers inside the United States.

36.    The da Vinci robot service aftermarket and X/Xi EndoWrist instrument aftermarket are separate from the surgical robot market. Intuitive sets separate prices for each type of service and instrument separately from the original purchase price for the system, and customers purchase the service and instruments a la carte on an ongoing basis throughout the lifecycle of the system. The prices for instruments are

14

not fixed for the lifetime of the robot. Since Intuitive had and has monopoly power in the surgical robot market, Intuitive has not been, and is not, prevented from acting anticompetitively in the aftermarkets. The average system price does not respond to changes in service or instrument prices.

37.    In addition, Intuitive has an installed base of more than 5,600 da Vinci robot systems. Those customers purchased their robot in a monopolistic market and face significant switching costs. Surgical robot systems have an average sales price of more than $1 million. The customer takes a massive risk in spending more than $1 million on a robot that is not supported by Intuitive. Their physicians have already been trained on the da Vinci robot system. Furthermore, no other manufacturer has anything approaching a critical mass of installed systems to provide timely field service. It is unclear whether competing systems will even be supported over the lifecycle of the robot.

38.    Even now, customers are unable to calculate lifecycle costs at the time of purchase because they have little or no information for projecting the costs of robot parts and service or instruments. Assuming the customer has a complete service agreement at a flat rate, it is still very difficult to project costs on a per use or life cycle basis. Major repairs are not included in the service agreements. In order to forecast the cost per use, the customer would also need to know how often the robot will be used. In order to project the cost over the lifecycle, the customer must

know how often the instruments will be used and replaced. Yet the customer typically cannot forecast demand for a surgical robot. Surgeons may have varying degrees of adaption to a surgical robot at a new location or for a new procedure. The product mix and usage costs vary dramatically by procedure. Competing hospitals may or may not acquire their own robots. The FDA may or may not add new indications for use of the robot system.

39.     The costs for instruments are also unpredictable. The customer cannot predict the timing for replacing instruments: Intuitive has complete control over the usage limits on the X/Xi EndoWrist instruments and has changed the usage limits unilaterally without notice. As the sole original manufacturer of EndoWrist instruments, Intuitive also has complete control over the prices for new EndoWrist instruments.

40.     If the customer is paying for service based on time and materials after the expiration of the service agreement, the customer also faces unpredictable repair costs. The need for repairs on the robot system is unpredictable. So is the price. Intuitive is the only manufacturer of the da Vinci robot parts. Intuitive does not publish the prices for da Vinci robot parts. There has never been a competitive market with multiple vendors able to provide anything resembling the full array or parts or services. Intuitive also retains control of the decision to repair or replace a

part. For example, a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm.

## X/XI ENDOWRIST INSTRUMENT AFTERMARKET

41.   Intuitive has monopoly power in the relevant market or submarket for the repair and replacement of X/Xi EndoWrist instruments ("X/Xi EndoWrist Market"). Intuitive is able to exclude competition and maintain prices for the repair and replacement of X/Xi EndoWrist instruments at supracompetitive levels: Intuitive is the only original manufacturer for the X/Xi EndoWrists, has a market share of 100%, and has prevented Restore and other ISOs from entering the market through its contractual restrictions. Intuitive makes, rather than takes, prices on instruments. Intuitive has maintained the exact same list prices and adhered to them for every customer in the United States for several years at a time. Intuitive has maintained gross margins for the EndoWrists that far exceed median gross margins in the healthcare sector generally. Intuitive is able to unilaterally set usage limits on the instruments because of its market power in the X/Xi EndoWrist Market.

42.   The X/Xi EndoWrist instruments are necessary to perform surgery with the da Vinci X or Xi and are only available new from Intuitive. The customers do not have the option of turning to the S/Si EndoWrist Market because the S/Si EndoWrists do not work on the da Vinci X or Xi and Intuitive has stopped sale of, and support for, the da Vinci Si.

43.    The X/Xi EndoWrist Market includes any ISO with the ability to reset the usage count and enter the market by repairing X/Xi EndoWrists for hospitals directly or through distribution or selling or licensing the technology for distributors or hospitals to do it themselves. The FDA permits servicing of approved medical devices by hospitals and third parties. The ISO repairs instruments to meet their original intended use. Third-party service does not affect the safety and effectiveness of the instrument or affect the indications for use. The instrument is maintained at, or returned to, its original safety and effectiveness. Intuitive has never tested its instruments to failure. As an alternative to servicing a hospital's instrument for a second cycle of uses, or licensing or selling the technology to the hospital, an ISO can also obtain regulatory clearance from the FDA through a 510(k) clearance to market and sell the "remanufactured" instrument for a second cycle of uses for sale under its own brand name.

44.    In fact, hospitals prefer to have the option of servicing their medical devices with third parties to enhance patient safety and reduce healthcare costs. The device has already been shown to be safe and effective without any manufacturing defect in its first cycle of uses. The service typically has significantly lower cost than the purchase of a new device. ISOs are a recognized and accepted part of the healthcare industry for everything from powerful scanning machines to electrophysiology catheters mapping electrical signals inside the heart. For example,

an ISO can capture 30% to 40% of the market if it is the only competitor, or 10% to 20% of the market if it is one of several competitors, besides the original manufacturer in providing intracardiac mapping catheters for use with a cardiac mapping system.

45.    The X/Xi EndoWrist Market is not disciplined by competition in the U.S. Surgical Robot Market. Intuitive has maintained monopoly power in the U.S. Surgical Robot Market for two decades. Intuitive charges monopoly prices in the foremarket and the aftermarkets. Intuitive obtains more than twice as much annual revenue from the sale of instruments and accessories than the sale and lease of surgical robots. In addition, their instrument and accessories sales revenue is growing roughly 20% per year while their robot sales are flat.

## BARRIERS TO ENTRY INTO X/XI ENDOWRIST MARKET

46.    There are significant barriers to entry into X/Xi EndoWrist Market. In fact, no one had achieved the technological capabilities to compete in the market for ten years.

47.    Intuitive does not face competition from original manufacturers of instruments that can be used with the da Vinci X or Xi. Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system. In addition, the standard sales contract prohibits the use of any instruments besides the X/Xi EndoWrists designed by Intuitive. The Food and Drug

19

Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States. In order to work with the Da Vinci Surgical System, the EndoWrist instrument must have a serial number to be recognized by the machine.

48.    The encryption on the memory chip has also been a barrier to entry into the X/Xi EndoWrist Market. For more than a decade, no one was able to achieve the technological capability to enter the X/Xi EndoWrist market to compete with Intuitive. Intuitive installs an encrypted pre-programmed memory chip on the X/Xi EndoWrists to limit the number of uses for each instrument.

49.    Intuitive has claimed that the da Vinci X and Xi were "upgraded to a wireless connection for the communication of the instrument, calibration, and use count information between the EndoWrist and the rest of the system to improve consistency in the communication channel[.] [T]his required the chip to be encrypted for security purposes to avoid remote tampering or other types of wireless attacks." Intuitive has taken the position that "the antitrust laws cannot be used to challenge product improvements" like the encryption of the chip on the X/Xi EndoWrists. Restore has not alleged – and does not allege – that the encryption of the chip violated the antitrust laws.

50.    The encryption is proprietary. There is only one manufacturer of the chip. It had been unproven whether anyone would be able to bypass or override the

encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for one or more additional cycle of uses on the robot.

51.    The memory chip prevents the instrument from being connected to the robot for more than a certain number of times regardless of whether the instrument is maintained at, or returned to, its original safety and effectiveness through service. The instruments do not display the number of remaining uses until there are no remaining uses. The robot will no longer engage with an instrument that has reached the usage limit.  Intuitive itself can service the instrument and reset or replace the usage counter. It simply chooses not to do so.

52.    Intuitive imposes additional barriers to entry through its contractual restrictions. Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to be able to use the da Vinci Surgical System. For more than twenty years, Intuitive has operated on a business model of extracting monopoly rents through recurring revenue from instruments with limited uses. Intuitive maintained the same 10 use limits for most instruments for almost two decades until Restore tried to enter the S/Si EndoWrist Market.

53.    The standard sales and lease contracts provide that the customer "purchases" any instruments for use with the robot system. The standard contract does not prohibit use of the system off label. Nevertheless, the standard contract

requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog. In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit. Intuitive has never approved any third party to repair the instruments and has never set up a process for doing so.

## ANTICOMPETITIVE CONDUCT

54.    Intuitive contractually requires customers to deal exclusively with Intuitive for repairing or replacing their X/Xi EndoWrists. Intuitive sells and leases every robot with a Sales, License, and Service Agreement ("Agreement") that prohibits the customer from using its robot with instruments that have been reset for an additional cycle of uses.

55.    Intuitive has always sold the da Vinci X and Xi robots in the United States with the Agreement. Upon information and belief, Intuitive has placed more than 50% of the da Vinci installed base with the Agreement since September 19, 2020. Since September 19, 2020, Intuitive has continued to sell thousands of da Vinci X and Xi robots in the United States with the Agreement. Upon information and belief, Intuitive has also started to sell the da Vinci 5 in the United States with the Agreement.

56.    Customers have purchased and continue to purchase X/Xi EndoWrists from Intuitive instead of ISOs based on the restrictions in the Agreement, and

Intuitive has collected and continues to collect payments for those purchases of X/Xi EndoWrists.

57.    The Agreement prohibits the customer from using the instruments beyond the usage limits set by Intuitive, which includes any resetting of the usage count for an additional cycle of uses by the customer or an ISO:

> Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory.

ECF No. 17 at 6 (§ 8).[3]

58.    Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service. The Agreement removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third party repairs the instruments. In addition, any third-party service on the EndoWrist

---

[3] "Documentation" is defined as "related manuals, instructions for use, notifications, and other documentation." ECF No. 17 at 4 (§ 2.6).

instruments voids Intuitive's one-year warranty on the entire da Vinci Surgical System:

> Customer will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. . . If Customer fails to comply with the requirements of Section 3.4, Intuitive may terminate this Agreement immediately upon written notice, and any warranties applicable to the System will become void.

ECF No. 17 at 5 (§ 3.4).

59.    "Any notice given under this Agreement must be in writing and will be deemed given and received five (5) days after the date of mailing, one (1) day after dispatch by overnight courier service or electronic mail, or upon receipt if by hand delivery, or upon completion of confirmed transmission if by facsimile." ECF No. 17 at 10 (¶ 15.8). Upon information and belief, Intuitive has never sent notice under the Agreement to any customer that Intuitive has approved the customer to use an Instrument that has been repaired, refurbished, or reconditioned under Section 8 of the Agreement. Upon information and belief, Intuitive has never sent notice under the Agreement to any customer that Instruments are not subject to a license that expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory.

60.    Intuitive remotely tracks the use of instruments by serial number. When Intuitive detects that a customer has used an instrument beyond the usage limits prescribed by Intuitive, Intuitive sends a warning letter quoting the exact language

above from Sections 3.4 and 8 from the Agreement and notifying the customer that "[u]sing instruments beyond the programmed number of uses is a material breach of the Agreement" and that Intuitive may not provide further service on the robot.

61.    Starting no later than February 2017, Intuitive has been engaged in an aggressive campaign to stamp out nascent competition from ISOs entering into the business of repairing and replacing EndoWrists. As part of this campaign, Intuitive has threatened dozens of hospitals and hospital systems around the country with possible termination of their agreements with Intuitive for "[u]sing instruments beyond the programmed number of uses" – and terminated their agreement if they did not heed the warning letter. The warning letters and contract terminations have a massive ripple effect across the industry because potential customers will usually review their contracts with Intuitive and ask the ISO whether Intuitive objects to the use of instruments for an additional cycle of uses. Of course, the answer is clearly yes. Whenever a hospital uses its da Vinci robot with an EndoWrist reset for an additional cycle of uses, Intuitive engages in the same pattern of behavior.

62.    Restore was one of several targets of the campaign. From around July 2018 to around October 2019, Intuitive gave verbal warnings and sent warning letters to hospitals around the country, including Panama City Surgery Center, that were using instruments repaired and reset for an additional cycle of uses by Restore. As recently as 2022, Intuitive has instructed Panama City Surgery Center that they

could not use EndoWrists that had been reset for an additional cycle of uses by Restore. If Intuitive continued to detect use of instruments reset for an additional cycle of uses, Intuitive terminated the agreement in its entirety, citing Sections 3.4 and 8 of the Agreement. As a result, customers have lost the ability to acquire new instruments or accessories or receive service on their robot, often with little or no notice, when Intuitive refused to deal with the customer due to violations of the contractual restrictions on repairing or remanufacturing the instruments with third parties. Many other hospitals asked Restore if Intuitive had taken any action against its customers using the instruments that had been reset for an additional cycle of uses and ended negotiations when Restore told them that Intuitive had done so. The customers continue to operate under that threat so long as those contractual restrictions remain in place. Intuitive maintained its position – that the usage limits were absolute and could not be reset without jeopardizing product quality and patient safety – throughout the S/Si EndoWrist Litigation. [4]

63.    Notwithstanding the approval clause in Section 8 of the Agreement, customers did not and do not have a meaningful freedom of choice in the markets for instruments. Intuitive had no policy to authorize the use of remanufactured instruments. Infra ¶ 64. Moreover, customers understand from their course of dealing

---

[4] *E.g.*, S/Si EndoWrist Litigation, ECF No. 140 at 2, 11, 23 (Motion for Summary Judgment) and ECF No. 124 (Reply) at 16.

in the market that Intuitive does not approve of the use of EndoWrists for an additional cycle of uses. Since entering the surgical robot market more than two decades ago, Intuitive has never approved any ISO to service instruments for hospitals "[u]sing instruments beyond the programmed number of uses."

64.    Intuitive continues to manipulate the approval clause. For the first time in or about March 2023, Intuitive embedded a statement on the third screen of a web page on its website regarding the use of repaired instruments ("Statement"):

> We are aware that certain third parties have sought to offer products or services to healthcare providers that would modify some of our instruments to extend their use. It is our understanding that such modifications constitute remanufacturing under FDA regulations and require 510(k) clearance from FDA.
>
> We recognize the role that third-party medical device servicers have come to play in the medical device ecosystem, and we support healthy, lawful competition in the marketplace. We also have a responsibility to protect patient safety and provide customers with proven, safe and effective tools and technologies. The remanufacturing of EndoWrists is performed by third parties that are not affiliated with Intuitive, and we are not privy to their testing protocols, verifications and validations, remanufacturing processes, or quality controls, among other things. Therefore, Intuitive will not bear responsibility for instruments that are remanufactured by a third party, or for harms or damages caused by the use of such instruments.
>
> However, Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.
>
> As of March 1, 2023, Intuitive is not aware that FDA has granted 510(k) or equivalent clearance to any party to remanufacture any instruments

for use with 4th generation da Vinci technology, including the da Vinci X, Xi and SP systems.

65.    On January 22, 2025, Intuitive's President testified that he was not aware of any policy for ISOs to get authorized by Intuitive to remanufacture EndoWrists before the Statement in March 2023.

66.    The Statement reminds customers that Intuitive can and will "void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States" who chooses to use instruments that have been reset for an additional cycle of uses without 510(k) clearance from the FDA.

67.    The Statement did not and does not provide customers with any meaningful choice. No vendor had a 510(k) clearance to market and sell remanufactured X/Xi EndoWrists. No one had obtained the technological capability, or a 510(k) clearance from the FDA, to market and sell remanufactured X/Xi EndoWrists because Intuitive had repeatedly told customers that "[u]sing instruments beyond the programmed number of uses is a material breach of the Agreement." In fact, it would take an ISO more than a year to do so if they were even able to do it at all.

68.    The Statement has created confusion rather than clarity with customers regarding the use of repaired or remanufactured EndoWrists for an additional cycle of uses because Intuitive has not revised its Agreement or User Manual to conform with the Statement. The Agreement and User Manual continue to state that the

customer has a limited license to use the EndoWrists up to the maximum number of uses specified by Intuitive and programmed on the instrument.

69.    As a result of this ongoing course of conduct, customers continue to adhere to the terms of the limited license in their Agreements with Intuitive. Since receiving clearance on March 11, 2025, Restore has started to market to customers interested in buying its remanufactured EndoWrists. Customers have indicated that they need written notice from Intuitive that the EndoWrists are not subject to a limited license based on the number of uses under their Agreements with Intuitive and that Intuitive approves Restore Robotics to remanufacture EndoWrists.

70.    For example, the Chief Supply Chain Officer for Orlando Health (which has more than 25 hospitals in Florida, Alabama, and Puerto Rico), told Restore Robotics that he was interested in purchasing remanufactured EndoWrists to reduce costs and needed a statement in writing from Intuitive that it would not enforce the limited license in the Agreements because they could "make my life a living hell." The Chief Executive Officer of Panama City Surgery Center, told Restore Robotics that his facility was interested in taking advantage of using remanufactured instruments for the "huge impact on the cost of care to our patients" but wanted assurance that (1) the hospital would not be violating any Agreements with Intuitive by doing so and (2) Intuitive approved that the hospital could use

EndoWrists remanufactured by Restore, because he did not "want to go through that fight again."

71.    On or about March 23, 2025, Restore sent a letter from Clif Parker, Chief Executive Officer of Restore, through counsel to David Rosa, President of Intuitive, requesting that: (a) Intuitive revise its User Manual and amend its Agreements with customers to state that its instruments are not subject to a limited license based on the number of uses, (b) Intuitive notify customers in writing that Intuitive approves Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA, and (c) Intuitive provide Restore with a letter signed by Mr. Rosa that "simply states that Intuitive approves Restore Robotics to remanufacture and sell EndoWrists in compliance with a 510(k) clearance." (Exhibit 2.)

72.    Sometime after March 20, 2025, Intuitive revised the Statement to acknowledge that Intuitive was aware that Restore Robotic's subsidiary Iconocare Health had received clearance from the FDA to market and sell remanufactured S/Si EndoWrists and X/Xi EndoWrists. On or about March 27, 2025, Intuitive stated in writing to Restore for the first time that Intuitive "has granted approval" under its contracts for Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA and authorized Restore to provide copies of the letter to its customers. Upon information and belief, Intuitive has not

revised its User Manual or amended its Agreements with customers to state that its instruments are not subject to a limited license based on one cycle of uses.

73.    Upon information and belief, Intuitive has added terms or conditions to its standard sales agreements prohibiting ISOs from collecting used instruments from the customers.

74.    Intuitive also informed at least one hospital consulting company that Intuitive will not cooperate with them if the consulting company or its clients deal with Restore.

## ANTICOMPETITIVE EFFECTS

75.    As a result of its exclusionary conduct, Intuitive has eliminated all competition in the X/Xi EndoWrist Market and has maintained a market share in the X/Xi EndoWrist Market of 100% for more than 10 years. By eliminating all competition, Intuitive is able to charge supracompetitive prices in the X/Xi EndoWrist Market.

76.    Intuitive has imposed usage limits on each instrument to extract consumer surplus, *i.e.*, monopoly profits, from its customers. Instead of simply buying the instruments, the customer is forced to pay a usage fee. Intuitive is charging a price that is independent, and far in excess, of the cost. When Intuitive has increased the number of uses on certain instruments, Intuitive has simply

increased the price on those instruments to maintain or even increase their profit margins.

77. Intuitive does not make up the difference to customers on supracompetitive prices in the X/Xi EndoWrist Market by charging subcompetitive prices on its surgical robots or its robot service. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. For example, Intuitive did not raise its monopoly prices for the system itself after modestly reducing the price per use on some instruments through the X/Xi Extended Use Program because Intuitive was already charging a monopoly price for the systems.

**THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS**

78. There is no procompetitive justification for the usage limits. The usage limits are not necessary to protect the da Vinci or EndoWrist brand or preserve consumer demand in surgical robots generally or da Vinci specifically. The usage limits do not correspond with the wear and tear on the instrument, which varies widely depending on the type and length of procedure, the technique of the physician, and the complications with the patient. In fact, the FDA has previously cleared Restore to market and sell S/Si and X/Xi EndoWrists under its own label for a second cycle of uses based on performance testing demonstrating that they are as safe and effective as the new instruments.

79.    The physicians are simply left to their own devices, quite literally, because Intuitive does not disclose performance specifications to the public for the surgeon to have any manufacturer guidance for determining functionality and safety on the first or any subsequent use of the EndoWrist instrument. And Intuitive itself does not inspect every one of the hundreds of thousands of new instruments produced at its manufacturing plants.

80.    Intuitive could resolve any question regarding safety by disclosing performance specifications for the instruments, which would allow the surgeon to assess the safety of the new, used, or repaired instrument, rather than simply blocking the surgeon from using repaired instruments. In fact, the instruments do not even display the number of uses for the device.

81.    The usage limits are not based on any regulatory requirements from the FDA. Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing usage limits. The FDA has never taken enforcement action against any independent third party for repairing EndoWrists and resetting their usage counter. Intuitive recently marketed and sold X/Xi EndoWrists under its Extended Use Program for nearly two years without any new clearance from the FDA.

82.    In addition, the usage limits do not appear to be based on any scientific determination of the useful life of the instruments. There does not appear to be any

33

clinical data in the public domain to support the limits on usage for the EndoWrist instruments. (Ex. 1 at 836.)  For instance, there are no usage limits on the smaller reusable instruments for the Senhance System from Asensus Surgical. Nor are there usage limits on reusable instruments for open surgery or laparoscopic surgery.

**RESTORE PREVIOUSLY ENTERED THE S/SI ENDOWRIST MARKET**

83.    Restore has developed a process for repairing EndoWrist instruments and resetting the usage count by replacing the programmed memory chip. After previously licensing technology from a third party to enter the market in July 2018, Restore was able to repair S/Si EndoWrists with its own technology and process by July 2020.

84.    The FDA has determined that the technology is safe for repairing EndoWrists and resetting their usage count for an additional cycle of uses: Performance testing demonstrated that Restore EndoWrists "are as safe and effective" as the predicate Intuitive S/Si EndoWrists. They "operate as originally intended" for an additional cycle of uses. The FDA has cleared Restore to remanufacture the S/Si EndoWrist under its own Iconocare label.

85.    On February 27, 2019, Restore filed an antitrust case for injury to its business repairing S/Si EndoWrists ("S/Si EndoWrist Litigation"). *Restore Robotics LLC, et. al v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55-TKW-MJF (N.D. Fl. filed February 27, 2019). At that time, Restore was unable to reset the usage count on the

X/Xi EndoWrists and could not bring any claims for injury to business repairing X/Xi EndoWrists. S/Si EndoWrist Litigation, ECF No. 1 (Complaint) ¶ 60. The case was "about Plaintiff's alleged exclusion from the aftermarkets related to S/Si, not the X/Xi . . ." S/Si EndoWrist Litigation, ECF No. 192 at 3. After settlement by the parties of the S/Si EndoWrist Litigation after the pretrial conference in the case, the action was dismissed with prejudice on joint stipulation of the parties on January 27, 2023. ECF No. 225.

### RESTORE INTENDED TO ENTER X/XI MARKET BY JULY 2020

86.    Restore would have also entered the X/Xi EndoWrist market by July 2020 if not for the anticompetitive conduct of Intuitive. Restore had entered the S/Si EndoWrist market in July 2018. Restore always intended to expand from the S/Si EndoWrist market into the X/Xi EndoWrist market. Restore had the background and experience necessary to compete in the X/Xi EndoWrist market from its experience in the S/Si EndoWrist market. The customer base is the same set of hospitals with robotic surgery programs. The repair process itself is virtually identical.  So is the process verification and validation for clearance from the FDA to remanufacture the devices under your own label.  Restore and its business partners also have prior experience in servicing and reprocessing a variety of medical devices from endoscopes to cardiac mapping catheters.

87.    Restore was capable of taking all the necessary steps to enter the X/Xi EndoWrist market by July 2020 and would have done so if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses. The obstacles to full entry flowed from the anticompetitive conduct of Intuitive. Restore's inability to grow was a direct result of Intuitive's restrictions on the use of instruments reset for additional cycle of uses. Restore had been counting on the revenues from the S/Si business to fund research, development, and ultimately production for the X/Xi business. Since Intuitive was blocking any and all access to customers indefinitely, the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture.

88.    Even in the face of this anticompetitive conduct, Restore took a series of affirmative steps over time to enter the X/Xi EndoWrist market by negotiating agreements with vendors and distributors, acquiring the necessary equipment, inventory, and facilities and developing the relevant tools:

- No later than June 2019, Restore executed an agreement with Medline, a medical supply company with more than $20 billion in annual sales, to sell Restore's repair services, which expressly included the X/Xi EndoWrists.

- No later than July 2019, Restore was negotiating an agreement with its business partner for preparing and filing for 510(k) clearances for

remanufactured instruments, which expressly included the X/Xi EndoWrists.

- No later than December 2019, Restore was working with its engineering firm on options for developing the technological capability to reset the usage counter on the X/Xi EndoWrists and testing and validation protocols for a 510(k) submission for remanufactured X/Xi EndoWrists.

- No later than October 2020, Restore started development of a handheld wireless reader through its engineering firm to determine the remaining lives on an X/Xi instrument without connecting the instrument to the robot arm and expending one life.

- No later than June 2021, Restore completed development of a patented handheld wireless reader to determine the remaining lives on an X/Xi instrument without connecting the instrument to the robot arm and expending one life.

- No later than January 2022, Restore started to operate out of a new facility to handle the much larger demand for remanufacturing the X/Xi EndoWrists.

- No later than June 2022, Restore acquired a da Vinci Xi robot from a third party for regularly testing X/Xi EndoWrists.

- No later than February 2023, Restore started a program to collect used X/Xi EndoWrists from hospitals to build up an inventory for entering the market.

Restore would have taken those steps to expand into X/Xi EndoWrists much more quickly if not for the anticompetitive conduct of Intuitive restricting customers from using instruments that had been reset for an additional cycle of uses.

37

## RESTORE IS NOW ABLE TO ENTER THE X/XI ENDOWRIST MARKET

89.    During the S/Si EndoWrist Litigation, Restore was not able to enter the X/Xi EndoWrist Market. The X/Xi EndoWrists are based on the S/Si EndoWrists. They have the same mechanical design. Restore has developed the processes and tools (*e.g.*, instrument reader and cap removal) for repairing the X/Xi EndoWrists. But there is one significant difference between the S/Si EndoWrists and the X/Xi EndoWrists: the difficulty in resetting the usage count on the pre-programmed memory chip. Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists.

90.    Therefore, it was unknown whether anyone would be able to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for any additional cycles of uses on the robot. Potential entry required significant time and expense with significant risk of failure to achieve the technological capability to reset the usage count on X/Xi EndoWrists. Restore did not attempt to acquire the ability to enter the X/Xi EndoWrist Market so long as Intuitive appeared to strictly enforce its contractual restrictions against repairing or remanufacturing its instruments. Without access to customers, it was futile to take that step to expand into X/Xi EndoWrists.

91.    In the S/Si EndoWrist Litigation, Judge Wetherell denied a motion by Restore to compel Intuitive to produce sales data for the X/Xi EndoWrists. Dkt. 192

at 2-3.  Intuitive argued that Restore was "seek[ing] to assert a theory alleging harm to its contemplated (but currently non-existent) business of extending X/Xi EndoWrists beyond their FDA-cleared limits, even though [Plaintiff] admittedly lacks the technological capability to circumvent the X/Xi use counter—a prerequisite to extending EndoWrist use limits." Id. at 2. Judge Wetherell denied the motion "for the reasons articulated by Defendant in its response." Id. at 3.

92.    Judge Wetherell later granted a motion by Intuitive to exclude any evidence at trial regarding the harm to Restore's X/Xi EndoWrist business. S/Si EndoWrist Litigation, Dkt. 218 at 3. In its motion, Intuitive argued that the technical ability to reset the memory chip on the X/Xi EndoWrists was "hoped-for" but "still apparently non-existent." Dkt. 204 at 1-2. Intuitive argued the case had not included claims for harms to "Restore's hypothetical new X/Xi business" and that Restore did not have a "basis to *assert* such a claim." Id. at 9.

93.    As part of the settlement agreement in the S/Si EndoWrist Litigation executed on January 23, 2023, Intuitive agreed for the first time that it would not void the warranty or withhold service on a robot or refuse to sell a robot, instruments, or accessories if a customer used EndoWrists remanufactured by Restore under clearance from the FDA.

94.    On or about February 24, 2023, Restore restarted the process to evaluate options for trying to achieve the technological capability to reset the usage count on

the X/Xi EndoWrists. On or about September 15, 2023, Restore launched the expensive and risky process to try to bypass or override the encrypted memory chip on the X/Xi EndoWrists to reset the usage count on an X/Xi EndoWrist for a one or more additional cycles of uses on the robot. On or about February 29, 2024, Restore became the first and only ISO to achieve the technological capability to reset the pre-programmed usage limits on the EndoWrist instruments for use with the X/Xi EndoWrist instruments.

95.     On or about August 16, 2024, Restore completed testing to submit its first 510(k) to market and sell remanufactured X/Xi EndoWrists for one additional cycle of uses. On or about August 30, 2024, Restore submitted its application for clearance by the FDA to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses. On or about March 11, 2025, Restore received clearance through its subsidiary Iconocare Health from the FDA to market and sell remanufactured X/Xi EndoWrists (K242610). Restore has transferred the clearance from Iconocare to Restore to sell the instruments under the Restore label.

**RESTORE WOULD HAVE ENTERED THE X/XI MARKET BY JULY 2020**

96.     As a result of Intuitive's anticompetitive conduct, Restore has lost significant sales in its business repairing and replacing X/Xi EndoWrists beginning as early as July 2020. But for the anticompetitive conduct of Intuitive, Restore would have started the expensive and risky process to achieve the technological capability

to reset the usage count on the X/Xi EndoWrists as early as July 2019. On or about February 29, 2024, Restore established that it is possible to achieve the technological capability to reset the usage counter on the X/Xi EndoWrists and that it would have achieved that capability within one year – *i.e.*, as early as July 2020 – if not for the anticompetitive conduct of Intuitive. But for the anticompetitive conduct of Intuitive, Restore would have also sought and received clearance from the FDA to remanufacture X/Xi EndoWrists as early as January 2021.

97.    Due to the contractual restrictions, Restore continues to lose sales in the X/Xi EndoWrist Market. In fact, it is futile for Restore to offer to repair X/Xi EndoWrists and reset their usage limits because Intuitive continues to insist that it will enforce the various contractual restrictions against customers that repair their instruments with Restore. It is equally futile for Restore to sell or license the technology to hospitals or distributors for resetting the usage limits on X/Xi EndoWrists.

98.    In addition, Intuitive has never amended the language in the existing contracts for the da Vinci Surgical Systems to allow customers to use remanufactured instruments cleared by the FDA. Since Intuitive announced its position on remanufactured instruments on its website, customers have repeatedly informed Restore and its agents that they will still not buy remanufactured instruments from Restore because Intuitive has not changed the terms in their

contracts. Moreover, Intuitive continues to incorporate the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi. Upon information and belief, Intuitive also uses the same or similar terms and conditions in contracts with new customers purchasing or leasing the da Vinci X and Xi and the da Vinci 5.

99.    The claims in this action for lost profits in the business of repairing and replacing X/Xi EndoWrists accrued no sooner than February 29, 2024. On or about that date, Restore became the first and only ISO to achieve the technological capability to reset the usage count on the X/Xi EndoWrist instruments. Restore was unable to earlier prove with requisite certainty the existence and amount of damages to its business in repairing and replacing X/Xi EndoWrists going back to June 2020. "It would be too speculative for Restore to assert a claim . . . when it admittedly lacks the technology to circumvent X/Xi use limits." S/Si EndoWrist Litigation, ECF No. 190 at 6.

## COUNT ONE – MONOPOLIZATION

100.    The foregoing allegations are expressly incorporated.

101.    Intuitive has willfully acquired and maintained monopoly power in the domestic market for X/Xi EndoWrist instrument repair and replacement (or the domestic market for repair and replacement of instruments for use with Surgical

Robots in the alternative) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

102.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT TWO – ATTEMPTED MONOPOLIZATION

103.   The foregoing allegations are expressly incorporated.

104.   Intuitive has attempted to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement (or the domestic market for repair and replacement of instruments for use with Surgical Robots in the alternative) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has the specific intent to monopolize the domestic market for X/Xi EndoWrist instrument repair and replacement by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

105.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT THREE – TYING

106.   The foregoing allegations are expressly incorporated.

107.   Intuitive has tied X/Xi EndoWrist instrument replacement to its surgical robots and robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Intuitive has forced customers to purchase X/Xi EndoWrist instrument replacements to get the da Vinci surgical robot and da Vinci robot service. Intuitive has sufficient economic power in the domestic surgical robot market and the domestic da Vinci robot service market to coerce customer acceptance of X/Xi EndoWrist instrument replacement. The tying arrangements have had anticompetitive effects in the domestic aftermarket for X/Xi EndoWrist repair and replacement (or the domestic market for repair and replacement of instruments for use with Surgical Robots in the alternative), which involves a not insubstantial amount of interstate commerce.

108.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT FOUR – EXCLUSIVE DEALING

109.   The foregoing allegations are expressly incorporated.

110.   Intuitive has entered agreements with its customers to provide X/Xi EndoWrist instrument repair and replacement on an exclusive basis that have foreclosed competition in substantially all of the domestic aftermarket for repair and replacement of X/Xi EndoWrist instruments (or the domestic market for repair and

replacement of instruments for use with Surgical Robots in the alternative) and have resulted in higher prices and lower service in the domestic X/Xi EndoWrist repair and replacement aftermarket (or the domestic market for repair and replacement of instruments for use with Surgical Robots in the alternative), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

111.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiff respectfully asks that this Court:

(a)    conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)    enter judgment awarding damages to Plaintiff in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on its federal antitrust claims;

(c)    enter injunctive relief in favor of Plaintiff to prevent the threat of loss or injury by violation of the antitrust laws as provided in Section 16 of the Clayton Act, 15 U.S.C. § 26;

(d)    award Plaintiff the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, and

Section 16 of the Clayton Act, 15 U.S.C. § 26, on its federal antitrust

claims; and

(e)    order such other and further relief as this Court deems proper and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of its claims by jury to the extent authorized by law.

Respectfully submitted on April 7, 2025.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800
jeff@berhold.com

**COUNSEL FOR PLAINTIFF**

* Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.