## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

                Plaintiff,

    v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Defendant Intuitive Surgical, Inc. ("Intuitive") respectfully submits this Memorandum of Law in Opposition to Plaintiff Restore Robotics Repair LLC's ("Restore") Motion for Leave to File a Second Amended Complaint.

## PRELIMINARY STATEMENT

Intuitive moved to dismiss Restore's first two complaints, identifying multiple reasons why Restore's claims fail as a matter of law. In response, Restore now seeks leave to try, a third time, to plead a viable antitrust claim. Each successive version of Restore's pleading has only worsened its position. Restore's proposed Second Amended Complaint ("SAC"), ECF No. 35, confirms that further amendment is futile. Restore's motion for leave to amend should be denied, and its claims should be dismissed with prejudice.

For the Court's convenience, and because the futility of the proposed SAC is intertwined with the reasons the First Amended Complaint ("FAC") should be dismissed, Intuitive identifies here in a single brief the principal arguments for dismissal made in Intuitive's still-pending Motion to Dismiss, ECF No. 25, as well as why Restore's proposed amendments do not cure the fatal deficiencies in its prior pleadings.

Intuitive is the developer of da Vinci, the first FDA-cleared system for robotic-assisted, minimally invasive soft tissue surgery in the United States. Restore challenges as anticompetitive Intuitive's contracts with hospital customers which limit the use of unauthorized third-party products and services with the da Vinci. The contract terms that Restore complains about have been in place for many years. In a prior lawsuit, filed in 2019, Restore alleged that the same contract terms blocked Restore from remanufacturing Intuitive's "S/Si" generation EndoWrist instruments for use with the da Vinci. SAC ¶85. That case settled in 2023. *Id.* Restore's SAC attempts to reprise the same theory as to the subsequent "X/Xi" generation EndoWrists. But Restore's current claims are time-barred and legally baseless. And recent events confirm that Restore has no cognizable antitrust claim.

After filing its first lawsuit, Restore applied for and received 510(k) clearance from the FDA to remanufacture S/Si EndoWrists. *Id.* ¶¶83-84. Shortly thereafter, Intuitive published on its website a statement that:

> Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.

*Id.* ¶64.

In its current lawsuit, Restore admits that Intuitive's contracts have not stopped it from developing the technical ability to remanufacture X/Xi EndoWrists or from obtaining FDA clearance. Restore admits that—notwithstanding Intuitive's contracts—Restore submitted an application for FDA clearance "to market and sell X/Xi EndoWrists remanufactured for a second cycle of uses" on August 30, 2024, and that Restore obtained clearance from the FDA on March 11, 2025. *Id.* ¶95. Restore newly alleges in the SAC that after receiving FDA clearance, Restore asked Intuitive for written assurance that Restore's FDA-cleared products would be treated as authorized under Intuitive's contracts. *Id.* ¶72. And, while that request was hardly necessary given Intuitive's prior website statement, Restore admits that ***Intuitive promptly provided assurance of authorization***. *Id.*

In short, Restore's proposed SAC demonstrates that whatever antitrust complaint Restore may once have believed it had against Intuitive has collapsed like a house of cards. Accordingly, its motion for leave to file the SAC should be denied, and its claims should be dismissed with prejudice. Each independent reason for dismissal is summarized below.

*First*, Restore's complaint is time-barred.  The four-year statute of limitations on an antitrust claim resting on a vertical contract (such as Intuitive's contracts with hospitals) begins to run when the defendant first imposes the challenged term.  *See SaurikIT, LLC* v. *Apple, Inc*., 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023).  Restore asserts that Intuitive has employed the contract terms it challenges for longer than four years, *and* that those terms caused injury to Restore more than four years ago.  Specifically, Restore alleges it would have begun selling remanufactured X/Xi EndoWrists as early as July 2020 (four years and three months before it filed this lawsuit) but-for Intuitive's contracts.  SAC ¶86.  By waiting more than four years to file this case, Restore has pled itself out of court.

*Second*, Restore challenges Intuitive's contracts as illegal tying or exclusive dealing arrangements.  But there is no tying or exclusive dealing as a matter of law where, as here, a defendant permits customers to buy a secondary product or service from an approved third party—unless the plaintiff can show the possibility of approval was illusory.  *Kentucky Fried Chicken* v. *Diversified Packaging Corp.*, 549 F.2d 368, 377-79 (5th Cir. 1977); *see also Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979).  Intuitive's hospital contracts, on their face, limit only the use of *unauthorized* products and services.  Restore acknowledges that Intuitive has made clear to the entire industry, via its website, that third parties who obtain FDA clearance for remanufactured EndoWrists automatically are "approved" under

those contracts.  SAC ¶64.  And Restore now admits—in the proposed SAC—that, once it obtained FDA clearance, ***Intuitive approved Restore*** to sell remanufactured X/Xi EndoWrists.  *Id.* ¶72.  Restore cannot plausibly claim that approval by Intuitive is illusory when Restore itself successfully obtained such approval.

*Third*, Restore has failed to plead causation of antitrust injury.  Unable to allege it is currently blocked from selling remanufactured X/Xi EndoWrists, Restore instead claims that Intuitive's contracts somehow delayed Restore's entry into the alleged market.  But that claim makes no sense.  Restore concedes that it began investing in technology to remanufacture X/Xi EndoWrists well before Intuitive's March 2023 website statement.  *Id.* ¶88.  It made those same investments as to S/Si EndoWrists years before Intuitive's statement, and also obtained FDA clearance for S/Si remanufacturing before the statement.  The SAC alleges no facts showing that Intuitive *ever* took the position that a company that obtained FDA clearance would not be "approved."  Nor does the SAC allege that Intuitive ever refused approval to Restore (or anyone else) for an FDA-cleared remanufactured EndoWrist.  Restore thus has no plausible explanation for how Intuitive's conduct—as opposed to Restore's own business decisions—prevented Restore from pursuing the X/Xi remanufacturing business sooner than it did.

*Finally*, the alleged "aftermarket" in which Restore claims that Intuitive restrained competition—Intuitive's X/Xi EndoWrists—is limited to a single brand.

Yet, Restore fails to allege the kinds of facts required to establish a single-brand aftermarket under controlling law. *See Maris Dist. Co.* v. *Anheuser Busch, Inc.*, 302 F.3d 1207, 1222-24 (11th Cir. 2002). Restore tries in the proposed SAC to allege an alternative aftermarket for robotic surgery instruments that is not limited exclusively to Intuitive's X/Xi EndoWrists, but pleads no facts showing that such a market is plausible.

For all these reasons, Restore's motion should be denied and its claims should be dismissed with prejudice.

## RESTORE'S ALLEGATIONS

### A.    Intuitive Offers Innovative, FDA-Cleared Surgery Products.

This case concerns a "robotic revolution" in surgery led by Intuitive. SAC ¶6. Intuitive is the sole manufacturer of the da Vinci system, and has continually innovated and developed the da Vinci over the last 20 years. *Id.* ¶¶26-27. "As of September 30, 2024, Intuitive had an installed base of 5,627 da Vinci Surgical Systems in the U.S.," nearly all of which were Intuitive's X/Xi system. *Id.* ¶12. While other competitors sell robotic-assisted surgery systems, Intuitive sells a large percentage of such systems in the United States. *Id.* ¶16.

EndoWrists are surgical instruments developed by Intuitive specifically for use with the da Vinci. The FDA has cleared the da Vinci for use only with EndoWrist instruments. *Id.* ¶9. Intuitive is the only original manufacturer of X/Xi

EndoWrists.  *Id.* ¶41.  EndoWrists are cleared by the FDA to be reused up to a limited number of uses, and include a counter that tracks how many times each instrument has been used.  *Id.* ¶51.

**B.    Intuitive Requires Hospitals to Use Authorized Providers for EndoWrist Service**.

"[T]o work with the Da Vinci Surgical System, the EndoWrist Instrument must have a serial number to be recognized by the machine."  SAC ¶47.  An encrypted memory chip prevents remote tampering or wireless attacks.  *Id.* ¶49. Further, "[t]he memory chip prevents the instrument from being connected to the robot for more than a certain number of times."  *Id.* ¶51.  After the specified number of uses, the EndoWrist must be replaced—either with a new EndoWrist from Intuitive, or with a remanufactured EndoWrist from a provider that can "bypass or override the encrypted memory chip" to reset the usage count.  *Id.* ¶90.

Restore does not challenge the encryption on X/Xi EndoWrists as anticompetitive.  *Id.* ¶49.  Rather, Restore alleges that "Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties)."  *Id.* ¶52.  But Restore's other allegations reveal that is not true.  Restore admits that Intuitive's contracts require customers to obtain EndoWrist service or replacement *either* from Intuitive *or* from an authorized third party.  *Id.* ¶53.  Restore also admits that Intuitive made clear on its website in March 2023 that Intuitive will not consider it a breach of contract for a customer to purchase

remanufactured instruments from third parties with FDA clearance. *Id.* ¶64. Thus, Intuitive's contracts do *not* "force" customers to purchase EndoWrist instrument replacements from Intuitive; rather, they allow purchases from authorized third parties which, as discussed below, include Restore itself.

## C.    Restore Is Authorized to Offer Modified EndoWrists to Customers.

Restore initially modified S/Si EndoWrists by "replacing the programmed memory chip" to reset the usage limit on the instruments. SAC ¶83. The FDA cleared Restore to remanufacture one type of S/Si EndoWrist under its "Iconocare" label in September 2022. *Id.* ¶84.[1]

Restore achieved the "technological capability" to reset the usage counter on an X/Xi EndoWrist for "one or more additional cycles of use" on or about February 29, 2024. *Id.* ¶94. Restore then submitted an application to the FDA for clearance to market and sell its remanufactured X/Xi EndoWrist on August 30, 2024, and received that clearance on March 11, 2025. *Id.* ¶95.

Restore alleges that it has begun offering remanufactured X/Xi EndoWrists to customers and that customers have asked for confirmation that Intuitive approves Restore to remanufacture EndoWrists. *Id.* ¶¶69-70. The SAC acknowledges that,

---

[1] FDA, 510(k) K210478 Premarket Notification, https://tinyurl.com/4624sx2z. The Court may take notice of the content of records on FDA's website at the pleading stage. *Sullivan* v. *Bos. Sci. Corp.*, 2020 WL 4558303, at *1 (N.D. Fla. June 23, 2020).

in response to Restore's request, Intuitive promptly sent Restore a letter confirming "that Intuitive 'has granted approval' under its contracts for Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA and authorized Restore to provide copies of the letter to its customers." *Id.* ¶¶71-72; *see also* Ex. B.[2]

Restore's case boils down to the assertion that, but for Intuitive's contracts, Restore would have started work on resetting X/Xi EndoWrists "as early as July 2019" and achieved that capability "as early as July 2020." *Id.* ¶96. In other words, Restore is seeking damages on the theory that Intuitive somehow delayed Restore's ability to provide service for X/Xi EndoWrists. But as discussed below, Restore pleads no facts to support that theory and instead makes admissions in the SAC that conclusively refute it.

**D.    Restore Is Challenging Contracts That Restore Has Known About for More Than Four Years**.

Restore previously challenged Intuitive's contracts in an antitrust case filed in this Court in February 2019. SAC ¶85 (citing *Restore Robotics, LLC, et al.* v. *Intuitive Surgical, Inc.*, No. 19-cv-00055 (N.D. Fla.) ("*Restore I*")). Restore alleged in that case that Intuitive's contracts with customers "force[d] customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service

---

[2] References to "Ex." refer to exhibits to the Declaration of William B. Michael.

from third parties)." *Restore I*, ECF No. 14 ¶85.[3]  Restore asserts nearly identical allegations in this case.  SAC ¶¶52, 58.

Restore alleges that Intuitive's contracts have not changed since it filed the prior case.  Rather, Intuitive incorporates "the old terms and conditions into contracts with customers that traded in their older models of da Vinci Surgical System for the da Vinci X and Xi." *Id.* ¶98.  Restore alleges that Intuitive has adhered to and enforced its contractual authorization provisions since February 2019. *Id.* ¶¶61-62.

## LEGAL STANDARD

Leave to amend a complaint should be denied when amendment would be futile because the amended complaint would be subject to dismissal under Rule 12(b)(6). *L.S. ex rel. Hernandez* v. *Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

## I.    RESTORE'S CLAIMS ARE TIME-BARRED UNDER THE CLAYTON ACT'S FOUR-YEAR STATUTE OF LIMITATIONS

Antitrust claims must be asserted "within four years after the cause of action accrued."  15 U.S.C. §15b.  An antitrust cause of action accrues "when [the]

---

[3] The Court can take judicial notice of Plaintiff's allegations in *Restore I*. *Lozman* v. *City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013).

defendant commits an act which injures the plaintiff's business." *Morton's Mkt., Inc.* v. *Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (quoting *Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

Restore's claims are time-barred. Restore challenges the same "contractual restrictions" it challenged in its February 2019 complaint. *See Restore I*, ECF No. 14 ¶85. Restore alleges the contracts have never changed. SAC ¶98.

Where an antitrust challenge is directed to a contract, the statute of limitations begins to run at the time of the contract's formation. *See Amey, Inc.* v. *Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1501-02 (11th Cir. 1985). If a competitor challenges as exclusionary a contractual term that appears in all of the defendant's customer contracts, the statute begins to run when that term is introduced, and does not restart each time the defendant repeats that term in a new contract or each time the contract is performed or enforced. *See, e.g.*, *SaurikIT*, 2023 WL 8946200, at *1 (competitor's claims accrued when iOS warranty term was introduced, not each time Apple sold a new iOS device with the warranty term); *US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019) (similar). Just like the competitor in *SaurikIT*, Restore is challenging as exclusionary the terms of a customer contract that Restore admits have been in place without modification longer than four years.

The complaint does not identify any anticompetitive acts by Intuitive in the last four years. At most, Restore alleges that Intuitive has enforced its contracts

since February 2017.  SAC ¶¶61-63.  Restore admits it was aware of the challenged contracts at least as early as 2019, and claims it would have had the ability to modify X/Xi EndoWrists by July 2020.  *Id.* ¶96.  Yet Restore did not file this case until September 2024.  Restore thus brought suit more than four years after it claims to have been excluded from the market.

Restore argues its claims did not accrue until 2024 when it obtained the technical ability to reset the X/Xi EndoWrists because it could not "prove the fact of damage" until then.  ECF No. 34 at 8 n.2.  That argument is incorrect.  The statute of limitations began running as soon as Restore suffered injury, *Morton's Mkt.*, 198 F.3d at 827, which Restore admits was no later than July 2020.  Restore concedes it knew of its alleged exclusion from X/Xi EndoWrists by July 2020, when it says it would have entered the X/Xi business but-for Intuitive's conduct—conduct of which Restore was aware at the time.  SAC ¶86.  The limitations clock began to run as of that moment.

Restore alleges it had no basis to assert claims based on X/Xi EndoWrists at any earlier point because Judge Wetherell granted Intuitive's motion *in limine* to exclude X/Xi damages evidence in *Restore I*.  *Id.* ¶¶91-92.  But Judge Wetherell did not decide whether claims based on Restore's alleged exclusion from the X/Xi EndoWrist business had accrued by July 2020 or earlier—the issue here.  And the fact that Restore was trying to bring X/Xi damages into *Restore I* confirms that it

knew of its alleged injury years ago. Even if Restore was uncertain of the exact measure of its alleged damages, the limitations clock nevertheless began to run. *Pace Indus., Inc.* v. *Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987).

Restore alternatively resorts to the "continuing violation" doctrine to argue, contrary to *SaurikIT*, that the statute of limitations restarted every time Intuitive signed a new hospital contract containing the challenged terms. ECF No. 34 at 8-10. It bizarrely claims that Intuitive conceded this in a hospital class action pending in California, *id.* at 9, but the language it references from Intuitive's brief says just the opposite—that the hospitals identified ***no*** proof of new conduct that would restart the running of the statute. *Id.* at 9 n.3.[4]

Restore cites *Poster Exchange, Inc.* v. *National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), ECF No. 34 at 8, for the proposition that an alleged monopolist can be subject to the continuing violation doctrine. But *Poster Exchange* makes clear that there is no liability for "assertedly exclusive agreements entered into" before the limitations period, unless the defendant takes some specific exclusionary action during the limitations period—rather than merely adhering to a

---

[4] In any event, the hospital class action is distinguishable because that case (filed in 2021, and involving allegations going back to 2017) is brought by Intuitive's *customers*, who claim they were overcharged and thus injured each time they purchased replacement EndoWrists at a supracompetitive price. Here, Restore's injury was complete when it was allegedly excluded as *competitor* by no later than July 2020.

prior anticompetitive policy (*e.g.*, a refusal to deal with competitors). *Id.* at 128-29. Here, Restore concedes that Intuitive's contract terms have been the same for years—including back in 2019 and 2020 when Restore alleges those contracts excluded it from the X/Xi business. This is thus *not* a case where Intuitive has engaged in new or expanded anticompetitive conduct.

Finally, Restore argues, citing *Morton's Market*, that the statute of limitations "begins to run anew with each sale." ECF No. 34 at 8. But *Morton's Market* concerns claims by *buyers* harmed by an overcharge, not *competitors* excluded from a market. As discussed above, a *competitor's* cause of action accrues when it is first excluded from the market by the defendant's contract terms, and does not restart anew each time the defendant enters into a new customer agreement containing the same terms. *SaurikIT*, 2023 WL 8946200, at *1; *CSX Transp. Inc.* v. *Norfolk S. Ry. Co.*, 114 F.4th 280, 290-91 (4th Cir. 2024) (explaining that "a *customer* . . . suffers a new and accumulating injury each time a subsequent supracompetitive price is paid," but "an excluded *rival* [] is injured as soon as the exclusion begins" (emphasis in original)). Restore's claims are thus all time-barred, and the proposed SAC pleads no facts to establish otherwise.

## II.    RESTORE FAILS TO PLEAD FACTS SHOWING UNLAWFUL TYING OR EXCLUSIVE DEALING

### A.    All Four Counts of the Complaint Hinge on the Same Alleged Conduct.

Restore's Monopolization, Attempted Monopolization, Tying, and Exclusive Dealing claims are based on the same conduct—namely, that "Intuitive contractually requires customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service." SAC ¶58.  Courts assess Section 1 and 2 tying arrangements and exclusive dealing arrangements under similar standards.  *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992); *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).  Where a tying and exclusive dealing claim rest on the same allegations, the failure of the tying claim dooms the exclusive dealing claim.  *Dream Big Media Inc.* v. *Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024).

### B.    Restore Fails to Allege Facts Showing That Intuitive's Third-Party Authorization Clause Is "Illusory."

A crucial element of any tying or exclusive dealing claim is the forcing of customers to buy a product or service *exclusively* from the defendant.  *See Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 12 (1984) ("essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere"); 18A

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1800a (5th ed. 2024) ("[A]n exclusive-dealing arrangement is a contract between a manufacturer and a buyer that forbids the buyers from purchasing the contracted good from any other seller or that requires the buyer to take all of its needs in the contracted good from that manufacturer."). Restore cannot allege forcing or exclusivity. To the contrary, Intuitive's contracts with hospitals expressly allow for third parties to service EndoWrists with Intuitive's authorization, and Restore alleges no facts showing that the possibility of obtaining such authorization was "illusory," as required by law. In its proposed SAC, Restore admits the opposite—that authorization not only was not illusory, but Restore has actually obtained it. SAC ¶95; Ex. B.

1. **There Is No Tying or Exclusive Dealing Where the Contract Allows for Purchase from Authorized Third Parties, Unless Authorization Is Illusory**.

Where a supplier's "contractual language [] at least provides for the possibility of purchasing" a secondary product from third-party sources, the courts are "reluctant to find a tying arrangement without some evidence that [the defendant] applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest*, 606 F.2d at 722. In a case still binding here, the Fifth Circuit acknowledged the "fundamental distinction" between "coercing [customers] to purchase from [the defendant] and coercing [customers] to purchase from approved sources." *Kentucky Fried Chicken*, 549 F.2d at 377. Where the defendant permits

customers to purchase from third parties in which it has no interest and from which it receives no commission, but which it has to approve, there is no illegal tie. *Id.* at 377-78; *see also Pullos* v. *All. Laundry Sys., LLC*, 2009 WL 10708625, at \*13 (D. Nev. July 29, 2009) (rejecting tying claim where customers were permitted to purchase from third parties that met the defendant's specifications).

The only exception to this rule applies when, despite a contractual third-party authorization clause, the possibility of authorization is "illusory" because the defendant refuses to authorize third parties in good faith. *Kentucky Fried Chicken*, 549 F.2d at 377-79 (no tie where franchisor's approval of suppliers not "unreasonably withheld").

### 2. Intuitive's Contracts Allow for Authorized Third Parties.

The SAC repeatedly refers to Intuitive's Sales, License, and Service Agreement. The Court may therefore consider that contract's terms on a motion to dismiss. *Day* v. *Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Feaz* v. *Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104-06 (11th Cir. 2014) (interpretation of a contract is a matter of law). Intuitive submitted its customer contract with its prior Motion to Dismiss, ECF Nos. 16, 17, and reattaches it here as Exhibit A.

Three provisions of the contract concern potential third-party servicing of da Vinci robots or EndoWrists. Section 3.4 prohibits any third party to "modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and

17

Accessories," including "reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software … *without Intuitive's express written <u>permission</u>*." Ex. A at 2 (emphasis added).  Section 5.2(A) provides that "Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician *or an individual <u>approved</u> by Intuitive* or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of *<u>unauthorized</u> repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration*, or misuse of the System, or negligence or recklessness on the part of Customer."  *Id.* at 3 (emphases added).    Finally, Section 8 prohibits "repair, refurbishment, or reconditioning *<u>not approved by Intuitive</u>*."  *Id.* (emphases added).

The SAC selectively quotes §3.4, SAC ¶58, but omits the language about Intuitive giving permission for third-party activities.  Even standing alone, §3.4 makes clear that the third-party activities otherwise prohibited may be done with Intuitive's permission.  And, if that was not already clear from §3.4, it is made abundantly clear in §§5.2(A) and 8, which expressly contemplate authorized third-party repairs.  *See Caron* v. *NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1367-68 (11th Cir. 2018) (contracts must be read "as a whole").

Restore argues that these contractual authorization provisions are meaningless because EndoWrists are sold pursuant to a limited license that expires after the

instrument has been used up to its maximum number of uses.  ECF No. 34 at 9.  But that argument fails because (in addition to all the other language about authorization discussed above) Intuitive's contracts clearly state that EndoWrist "use is prohibited, whether before *or after* the Instrument or Accessory's license expiration," if it is "not approved by Intuitive."  SAC ¶57 (emphasis added); *id.* ¶53 ("[T]he standard contract requires that Intuitive must approve any repairs or service during or after that usage limit.").

Thus, contrary to Restore's assertion, the plain language of the challenged contracts expressly contemplates third-party authorization.

### 3. Restore Does Not Allege that Intuitive Has Ever Refused Third-Party Authorization.

Restore alleges that Intuitive "tracks the use of instruments by serial number," threatens termination of agreements for breaches of contract, and has given "verbal warnings and sent warning letters" to customers about the use of *unauthorized* third parties, including Restore before it obtained FDA clearance.  SAC ¶¶60-62.  It further alleges that, despite the possibility of contractual authorization, "customers did not and do not have a meaningful freedom of choice in the markets for instruments," and that "Intuitive continues to manipulate the approval clause."  *Id.* ¶¶63-64.

None of these allegations establishes that obtaining approval was "illusory." *Kentucky Fried Chicken*, 549 F.2d at 377; *Photovest*, 606 F.2d at 722.

*First*, Restore does not allege that any of Intuitive's contractual enforcement concerned third parties that had sought or obtained third-party approval from Intuitive. It is not unlawful tying or exclusive dealing for a contract to prohibit third-party servicing except with authorization, and then to enforce the contract when the third party does not have authorization and does not seek it.

*Second*, Restore alleges that Intuitive "never approved any ISO to service instruments for hospitals '[u]sing instruments beyond the programmed number of uses.'" SAC ¶63. That is false, as the SAC itself demonstrates. Restore acknowledges that Intuitive told the industry in March 2023 that it would not

> void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.

*Id.* ¶64. That policy, which remains on Intuitive's website,[5] does not distinguish between S/Si and X/Xi EndoWrists. And Restore's proposed SAC admits, as it must, that when requested, Intuitive wrote to Restore to confirm Restore's approval after Restore obtained 510(k) clearance to remanufacture X/Xi EndoWrists. *Id.* ¶72;

---

[5] *See* Da Vinci Instruments, Intuitive.com, https://tinyurl.com/3ne4jz3r. The Court may take notice of the content of a website in considering a motion to dismiss. *U.S. ex rel. Jacobs* v. *JP Morgan Chase Bank, NA*, 113 F.4th 1294, 1300 (11th Cir. 2024).

Ex. B.[6]  Restore fails to allege that any third party ever sought such approval and was denied.

Where a contract contains a third-party authorization clause, the plaintiff must demonstrate that the approval clause was applied to withhold approval unreasonably. *Photovest*, 606 F.2d at 722; *see also Tic-X-Press, Inc.* v. *Omni Promotions Co.*, 815 F.2d 1407, 1416-18 (11th Cir. 1987) (favorably citing *Photovest* and allowing tying claim where—unlike here—defendant had never approved a third party and had no process for doing so, and plaintiff showed that "the approval clause was somewhat bogus").  Restore does not allege that it or any other third party applied for authorization and was turned down, or told it would be turned down.  *Cf. Photovest*, 606 F.2d at 722.  To the contrary, Restore was expressly authorized, and Intuitive's website statement confirms that third parties with FDA clearance are authorized.

*Third*, Restore alleges that Intuitive "has never approved any third party to repair the instruments and has never set up a process for doing so."  SAC ¶53.  That allegation is false and contradicted by Restore's own pleading, for the reasons discussed above.  Intuitive has authorized third parties that remanufacture EndoWrists pursuant to FDA clearance, including Restore.  To the extent Restore

---

[6] When, as here, "a complaint quotes part of a document[,] . . . the full text . . . is [] properly considered in deciding a Rule 12 motion."  *Lewis* v. *Governor of Alabama*, 944 F.3d 1287, 1298 n.7 (11th Cir. 2019) (internal quotation marks and citation omitted).

means that Intuitive has never approved any third party that engages in EndoWrist servicing that does *not* constitute "remanufacturing," any such allegation cannot save its complaint. Again, Restore does not allege that it or any third party has sought such approval and been denied. *Photovest*, 606 F.2d at 722. Moreover, according to the proposed SAC, "remanufacturing" and "repair" are part of the same market. SAC ¶62. Restore cannot claim that Intuitive violated the antitrust laws by not granting third-party approval on precisely the terms that Restore preferred, as opposed to demonstrating that third-party approval was illusory.

In the proposed SAC, Restore alleges that two hospital executives asserted that they would need "a statement in writing from Intuitive" or "assurance" that purchasing from Restore would not impair their contractual standing with Intuitive. SAC ¶70. It further asserts that, on March 23, 2025, Restore sent a letter to Intuitive demanding that Intuitive "revise its User Manual and amend its Agreements with customers to state that its instruments are not subject to a limited license based on the number of uses," "notify customers in writing that Intuitive approves Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA," and "provide Restore" with a letter stating "that simply states that Intuitive approves Restore Robotics to remanufacture and sell EndoWrists in compliance with a 510(k) clearance." *Id.* ¶71.

These proposed allegations do not establish that obtaining authorization from Intuitive was illusory—just the opposite.  If hospital customers were unaware of Intuitive's website statement on authorization, Restore simply had to show it to them.  Restore makes no allegation that any hospital ever reached out to Intuitive for clarification on the implications of its website statement and was denied such clarification or given incorrect information.  Nor does Restore provide any basis for its demand that Intuitive modify its customer contracts or User Manual, or plead any facts to suggest that such a change was necessary for Restore to be able to compete.  There is no inconsistency between the contracts, which allow for use of authorized third parties, and the website statement, which grants authorization to third parties who have FDA clearance.  Finally, Restore admits that Intuitive responded to its March 23 letter by *again* providing a clear statement that third parties (including Restore) who have received FDA clearance are authorized.  SAC ¶72; Ex. B.  If Restore believes that any potential customers have any remaining doubts, it can show them this letter.

Unable to dispute the content of Intuitive's March 2023 website statement,[7] Restore tries to shift the focus to the period before that date.  That effort fails too.

---

[7] Restore further admits that in the parties' January 2023 settlement agreement, Intuitive agreed that it would not prevent customers from purchasing FDA-cleared remanufactured products from Restore.  ECF No. 34 at 12.  Restore pleads no facts suggesting that Intuitive ever breached that agreement.

Restore falsely asserts that "Intuitive's President (Dave Rosa) testified that he was not aware of any policy for ISOs to get authorized by Intuitive to remanufacture EndoWrists before the Statement in March 2023." SAC ¶65. Restore does not attach Mr. Rosa's testimony, but the Court may consider it in determining whether Restore has stated a cause of action.[8] Far from testifying that Intuitive had no process for approving third-party devices to work with da Vinci robots, Mr. Rosa testified without contradiction that: Intuitive has long had such a process; it has approved dozens of third parties; Intuitive never refused to authorize any third party for modified EndoWrists; Intuitive specifically informed third parties that they could submit clinical evidence about their remanufactured EndoWrists but they did not respond; and, later, Intuitive did approve third parties to sell modified EndoWrists. Ex. C at 1841:19-1851:13. That Intuitive did not make a public announcement regarding its policy for FDA-cleared remanufactured instruments before any third party had received FDA clearance is of no moment. What matters is that third parties were always free to seek approval, as Restore ultimately did, and that, when they did, Intuitive approved them. Mr. Rosa's testimony confirms that Restore cannot plead illusoriness.

_____

[8] By (inaccurately) citing Mr. Rosa's testimony, Restore has incorporated *all* of Mr. Rosa's actual testimony into the SAC, and the Court may consider what Mr. Rosa actually testified in determining whether Restore has stated a claim. *South Jersey Gas Co.* v. *Muller Co.*, 2012 WL 12898818, at *3 (D.N.J. 2012); *Wittaker* v. *West Virginia Div. of Corrections*, 2022 WL 16702741, at *3 n.3 (S.D. W. Va. 2022).

In sum, Restore has failed to plead facts showing that third-party authorization is illusory. Such authorization is not only possible, it has been granted to Restore. Restore therefore cannot state a claim for tying or exclusive dealing.

## III. RESTORE FAILS TO ALLEGE FACTS SHOWING THAT INTUITIVE'S ENFORCEMENT OF ITS CONTRACTS CAUSED RESTORE ANTITRUST INJURY

To assert a claim under the antitrust laws, Restore must plead antitrust injury—"injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co.* v. *Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (quotation omitted).

Courts dismiss antitrust claims for failure to plead antitrust injury when a plaintiff does not adequately allege that its purported injury is directly attributable to anticompetitive conduct by the defendant. *See, e.g.*, *Spanish Broad. Sys. of Fla., Inc.* v. *Clear Channel Commc'ns*, 376 F.3d 1065, 1076 (11th Cir. 2004); *Jacobs* v. *Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010).

Restore does not allege any conduct by Intuitive that has prevented Restore from competing. There is no allegation that Intuitive or its contracts blocked Restore from pursuing the ability to compete. Rather, Restore concedes the opposite, by alleging that Restore developed its alleged capability to compete while Intuitive's contracts allegedly remained in force and unchanged. SAC ¶88. Restore's admitted ability to develop the technology to reset X/Xi EndoWrists, obtain FDA clearance,

and begin offering remanufactured EndoWrists to customers—all while Intuitive's contracts remained in effect—refutes any claim that Intuitive's contracts precluded Restore from competing.

Restore also fails to allege facts showing that Intuitive's conduct caused Restore's delayed entry into the X/Xi market. Restore admits that it received FDA clearance for both the S/Si and X/Xi, even while Intuitive's contracts remained unchanged. Its damages claim for delayed entry therefore hinges on the assumption that Intuitive did something to prevent Restore from developing the technology to service X/Xi EndoWrists and applying for FDA clearance in 2020, rather than in 2024, even though Restore had begun the same process with respect to the S/Si EndoWrists years earlier and subject to the same Intuitive contracts with hospitals.

Attempting to cure this obvious problem, Restore asserts there is a difference between the S/Si and X/Xi—namely, that "Intuitive switched to an encrypted memory chip on the X/Xi EndoWrists," that Restore did not know whether it would be able to bypass that encryption, and that it "was futile to take that step to expand into X/Xi EndoWrists" before Intuitive's 2023 announcement that companies with FDA clearance were contractually cleared. *Id.* ¶¶89-90. For two reasons, this effort to blame Intuitive for Restore's delay in developing X/Xi capability is unavailing.

*First*, far from alleging facts showing that investing in X/Xi capability before 2023 was "futile," Restore asserts it took ***many*** steps to achieve X/Xi capability

starting in 2019.  *Id.* ¶88.  The allegations that Restore spent considerable resources on X/Xi technology before 2023 contradict and render implausible its conclusory assertion that "the expenditure of substantial resources on achieving the technological capability to reset the usage count on the encrypted X/Xi EndoWrists would have been a clearly futile competitive gesture."  *Id.* ¶87.

*Second*, Restore alleges no facts showing that Intuitive's website statement was a change of policy—*i.e.*, that before March 2023, Intuitive suggested it would not authorize third parties.  There is a reason Restore does not make any such allegation: it would be false.  As Restore knows, Intuitive has consistently communicated to the market, including to Restore itself, that it would be willing to consider authorization upon a showing of FDA clearance or clinical evidence that third-party activities were safe and effective.  Restore alleges no facts to the contrary. That Restore did not take advantage of the option to seek FDA clearance for X/Xi, or otherwise seek approval from Intuitive, before 2023 was its own business choice.

Restore further asserts that "Intuitive already lost this exact same argument on antitrust injury" in litigation with another competitor—Rebotix.  ECF No. 34 at 10. Not so.  *Rebotix* involved a different question of antitrust injury—whether Rebotix was sufficiently "prepared" to enter the market in light of the fact that it had not yet determined how to break the encryption on the X/Xi EndoWrists.  *Rebotix Repair, LLC* v. *Intuitive Surgical, Inc.*, 2022 WL 3272538, at *9-10 (M.D. Fla. Aug. 10,

2022).  That is not an issue here, because Restore alleges that it has obtained the means of bypassing the X/Xi encryption.  SAC ¶94.  Unlike Rebotix, Restore alleges it has done everything necessary to enter the market.  Restore's own pleading thus makes clear that Restore has been able to enter and that Intuitive has not stopped that from happening.  Restore therefore fails to allege antitrust injury.

## IV.    RESTORE FAILS TO ALLEGE A PROPER SINGLE-BRAND AFTERMARKET

Proper definition of a relevant market is a necessary threshold step in any challenge to a vertical agreement, including Intuitive's customer agreements.  *Ohio* v. *Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018).  Whether a plaintiff's relevant market definition is adequately pleaded is properly determined on a motion to dismiss.  *Jacobs*, 626 F.3d at 1336-37.

Restore asserts that Intuitive caused harm in the alleged aftermarket for "repairing and replacing EndoWrist instruments."  SAC ¶30.  In antitrust parlance, Restore has alleged a "single-brand" aftermarket—*i.e.*, a market confined to parts or service (EndoWrists) necessary only in conjunction with Intuitive's own branded surgical robot (the da Vinci).  "It is an understatement to say that single-brand markets are disfavored.  From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (collecting cases).  "'Absent exceptional market conditions, one brand in a

market of competing brands cannot constitute a relevant product market.'" *Metzler* v. *Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) (cleaned up) (quoting *Domed Stadium Hotel, Inc.* v. *Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984)); *see also Green Country Food Mkt., Inc.* v. *Bottling Grp., LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004). Restore has not pled the exceptional facts necessary to establish a single-brand aftermarket.

The rare exception to the general rule prohibiting single-brand aftermarkets arises from the Supreme Court's decision in *Eastman Kodak*, where the Court permitted a claim that Kodak had restrained competition in the aftermarkets for parts and service for Kodak copiers based on the unique facts of that case. 504 U.S. at 481-82. Drawing on *Kodak*, the Ninth Circuit recently distilled the requirements for demonstrating a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). *Epic* is consistent with Eleventh Circuit precedent, which has similarly interpreted *Kodak* and related cases to require distinguishing "between contract power and market power," including when customers knowingly contract

to make aftermarket purchases from the seller's single brand. *Maris*, 302 F.3d at 1222.

Restore cannot establish a single-brand market because it fails to plead that the relevant contract provision was "not generally known" at the time the hospitals made their purchase decisions. *Epic*, 67 F.4th at 977. Restore makes a weak and implausible effort to plead the second two *Epic* factors—inability to anticipate life-cycle pricing and high switching costs, *see* SAC ¶¶37-38—but it does not and cannot allege that the challenged contractual provisions were unknown to hospitals. To the contrary, Restore's entire case is premised on explicit terms in Intuitive's customer contracts—including contract language that (according to Restore) requires customers that purchase a da Vinci to purchase EndoWrist instruments from Intuitive. *Id.* ¶54.

But "contracts always restrain and affect a party's available choices." *Maris*, 302 F.3d at 1222. Unless, as in *Kodak*, the challenged contract provision was implemented only after customers had *already* purchased a Kodak copier and were therefore "locked in," the contract does not "raise the same antitrust concerns." *Metzler*, 19 F. Supp. 2d at 1356. Thus, the Seventh Circuit has recognized that the critical issue in *Kodak* was "whether the *change* in policy enabled Kodak to exact supracompetitive prices from customers who had *already* purchased its machines." *Digit. Equip. Corp.* v. *Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996)

(emphases added).  Similarly, in *Queen City, Inc.* v. *Domino's Pizza, Inc.*—adopted by the Eleventh Circuit in *Maris*, 302 F.3d at 1222—the Third Circuit held that "the *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies" imposed after customers had already made their primary market purchases.  124 F.3d 430, 440 (3d Cir. 1997); *see also PSI Repair Servs, Inc.* v. *Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("*change in policy* in *Kodak* was the crucial factor in the Court's decision." (emphasis added)); *Clark Mem'ls of Ala.* v. *SCI Ala. Funeral Servs., Inc.*, 991 F. Supp. 2d 1151, 1164 (N.D. Ala. 2014) ("[A]n essential element of a lock-in claim is a change in policy in the after-markets after a consumer has made a purchase in the initial market.").  Restore alleges the opposite—that Intuitive has made no change in policy.  SAC ¶98.

Restore argues that the "lock-in" factors for single-brand aftermarkets do not apply in a case in which the defendant has market power in the foremarket.  ECF No. 34 at 6.  Restore has invoked the recent trial in the Northern District of California involving another competitor's (SIS) claims against Intuitive, also premised on an alleged single-brand aftermarket, but has failed to inform this Court of how that trial ended.  Like Restore, SIS argued that it did not have to satisfy the lock-in factors for proving a single-brand aftermarket since Intuitive allegedly has market power in the foremarket.  The court rejected plaintiff's argument and held that SIS would have to satisfy the lock-in factors.  Plaintiff then conceded that it could not meet those

factors, and the court entered judgment for Intuitive. *Surgical Instrument Service Co.* v. *Intuitive Surgical, Inc.*, No. 21-cv-03496, ECF No. 445 at 1 (N.D. Cal. Jan. 28, 2025). Restore is in the same posture. It cannot plead facts showing lock-in, and cannot escape the lock-in requirement by asserting that Intuitive has market power in the foremarket.

In a footnote to its proposed SAC, Restore asserts that Intuitive would have a market share of 99.9% "even if the aftermarkets were more broadly defined to include all brands of surgical robots." SAC ¶30 n.2. But Restore does not define an alternative relevant aftermarket for "all brands of surgical robots" nor assert any facts from which the plausibility of such a relevant market could be tested. *See Jacobs*, 626 F.3d at 1338 (holding that plaintiff has "responsibility under *Twombly* to plead facts 'plausibly suggesting'" a relevant market). Restore suggests that aftermarket purchases of replacement wrists for Intuitive and Asensus surgical robots might be in the same relevant market, SAC ¶30 n.2, but provides no factual basis for this facially implausible conjecture. Two products are only in the same relevant market if there is "cross-elasticity of demand between them," meaning that an increase in the price of one will lead to increase in demand for the other. *U.S.* v. *Engelhard Corp.*, 126 F.3d 1302, 1305 (11th Cir. 1997). Restore does not allege that an Intuitive surgical wrist is compatible with an Asensus robot, or vice versa, and therefore offers no factual basis for concluding that replacement wrists for

different brands of surgical robot are reasonable substitutes in the same relevant market.  In short, neither Restore's actual aftermarket allegation nor the alternative aftermarket it speculates about but does not actually allege meets the requirements for pleading facts demonstrating a plausible relevant aftermarket.  Without a properly pled relevant aftermarket, all of Restore's claims fail.

## V.    THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

A complaint should be dismissed with prejudice if granting leave to amend would be futile because "the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."  *Cockrell* v. *Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).  Although all of the fatal deficiencies discussed above were present in both its original complaint and its amended complaint, Restore did not cure them in its SAC.  Accordingly, further amendment of the complaint would be futile, and dismissal should be with prejudice.  *U.S. ex rel 84Partners* v. *Nuflo, Inc.*, 79 F.4th 1353, 1363 (11th Cir. 2023) (affirming dismissal with prejudice of second amended complaint where plaintiff failed to show how it could cure deficiencies of prior complaints); *Eiber Radiology, Inc.* v. *Toshiba Am. Med. Sys.*, 673 F. App'x 925, 930 (11th Cir. 2016) (dismissal with prejudice was appropriate where "Plaintiff—and its counsel—was offered ample opportunity to state a claim on which relief could be granted").

## CONCLUSION

Restore's Motion for Leave to Amend should be denied as futile, and its claims should be dismissed with prejudice.

Dated April 21, 2025

Respectfully submitted,

/s/ *William B. Michael*
William B. Michael (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
T: 212-373-3000
E: wmichael@paulweiss.com

Kenneth A. Gallo (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
T: 202-223-7300
E: kgallo@paulweiss.com

Andrew Lazerow (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
T: 202-662-6000
E: alazerow@cov.com

Bruce D. Partington
CLARK PARTINGTON
125 East Intendencia Street, 4th Floor
Pensacola, Florida 32502
T: (850) 432-1399
E: bpartington@clarkpartington.com

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Intuitive certifies that its Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint complies with the word count limitation set forth in Local Rule 7.1(F) because it contains 7,810 words, excluding the parts exempted by the Local Rule.

/s/ *William B. Michael*
William B. Michael (*pro hac vice*)