## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC,

               Plaintiff,

    v.

INTUITIVE SURGICAL, INC.,

               Defendant.

Civil Case No. 3:24-cv-444-MCR-ZCB

## DECLARATION OF WILLIAM B. MICHAEL
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR LEAVE TO FILE A
## SECOND AMENDED COMPLAINT

I, WILLIAM B. MICHAEL, declare as follows:

1.      I am an attorney licensed to practice in New York and am admitted *pro hac vice* to practice before this Court.  I am a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel for Intuitive Surgical, Inc. ("Intuitive") in this matter.  I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently hereto.

2.      Attached to this declaration as **Exhibit A** is a true and correct copy of a Sales, License, and Service Agreement between Intuitive and one of its customers (Valley Medical Center).  This document was previously filed on the public docket in a case pending in federal district court in California.

3.      Attached to this declaration as **Exhibit B** is a true and correct copy of a letter from David Rosa to Clif Parker dated March 27, 2025.

4.      Attached to this declaration as **Exhibit C** is a true and correct copy of excerpts of the January 22, 2025 trial transcript from a case in federal district court in California.

Dated April 21, 2025                        /s/ *William B. Michael*
                                            WILLIAM B. MICHAEL

# Exhibit A

# SALES, LICENSE, AND SERVICE AGREEMENT

**Agreement No.: MA-517-2018 (407056)**

This Sales, License, and Service Agreement ("Agreement") is dated **August 31, 2018** (the "Effective Date") and is between **Intuitive Surgical, Inc.,** a Delaware corporation ("Intuitive"), located at 1266 Kifer Road, Sunnyvale, California 94086, **and Valley Medical Center** located at 400 S. 43rd Street, Renton, WA 98055 ("Customer").

**The parties agree as follows:**

1. **Introduction**

    Customer agrees to purchase the Hardware and license the Software and Documentation from Intuitive, and Intuitive agrees to respectively sell and license the same to Customer, as well as provide Service for the System all according to the terms and conditions of this Agreement.

2. **Definitions**

    2.1  **"Acceptance"** means Customer's acceptance of the System as specified in **Exhibit A.**

    2.2  **"Delivery Date"** means the estimated scheduled date for delivery of the System to Customer specified in **Exhibit A.**

    2.3  **"Instruments and Accessories"** means those instruments or accessories made or approved by Intuitive for use with the System.

    2.4  **"Proctoring"** means the assistance, coaching, or surgical training provided by a surgeon (the "Proctor") who is familiar with the System to another surgeon (the "Proctee") on how to perform a particular surgical procedure (or procedures) using the System.

    2.5  **"Services"** means the support and maintenance of the System described in Section 5 for the Service fees designated in **Exhibit A.**

    2.6  **"System"** means the items comprising the da Vinci® Surgical System specified in **Exhibit A** consisting of certain hardware components ("Hardware"), software program elements ("Software") and related manuals, labeling, instructions for use, notifications or other documentation ("Documentation"), that Customer may receive, purchase and license under this Agreement. If Customer purchases multiple Systems under this Agreement, all references to "System" or "System(s)" apply to each System sold and licensed. Each System purchased is a separate transaction to be delivered, accepted, and paid for separately.

    2.7  **"Taxes"** means any taxes, levies, or similar governmental charges, now in force or enacted in the future, and however designated, including related penalties and interest, imposed by any governmental authority on, or measured by, the activities described.

    2.8  **"Customer's Access Requirements"** means any reasonably applicable requirements designated by Customer that Intuitive personnel must meet to gain access to Customer's facility. Such requirements may include, but are not limited to, compliance with Customer's site policies and vendor credentialing requirements, such as vaccination, immunization, background investigation, training, hospital orientation, and liability insurance coverage.

    2.9  **"Reprocess" or "Reprocessing"** means Customer's process for cleaning, disinfection, and sterilization of Instruments and Accessories, including testing to validate cleaning, disinfection and sterilization process as may be required by applicable law and/or regulation.

3. **System Delivery, Use, Disposal**

    3.1  **Delivery and Installation.** Subject to credit approval of Customer by Intuitive, Intuitive will use commercially reasonable efforts to deliver the System on or before the Delivery Date. Each party will provide the other party with thirty (30) days notice, or if this Agreement is executed within thirty (30) days before the Delivery Date, a reasonable advance notice of any change in the Delivery Date. Customer will fully cooperate with Intuitive to permit Intuitive to install the System. Intuitive will use commercially reasonable efforts to install the System in an efficient and expeditious manner. Customer will also provide Intuitive with information, consultation, and advice reasonably necessary to permit installation.

    3.2  **Delivery Terms.** Intuitive will deliver the System to Customer's designated location noted as the "Ship-to" in **Exhibit A** using a carrier selected by Intuitive. Fees for shipping the System are specified in **Exhibit A.** Risk of loss or damage to the System passes to the Customer upon delivery of the System to Customer. Title to the System passes to the Customer upon Acceptance.

    3.3  **On-Site Support.** At no charge to Customer, Intuitive will provide periodic on-site support to Customer's designated personnel on the proper operation and upkeep of the System in order for Customer to operate the System as further described

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                     VMC-00020652

in Section 3.4. To clarify, this support includes, but is not necessarily limited to, training on draping the System for use in surgery, proper attachment of Instruments and Accessories, cleaning of parts of the System, the Instruments and Accessories and discussing opportunities to improve cost efficiencies. The cleaning to be performed regularly by Customer is described in the Documentation.

3.4     **Use of System**. Customer will ensure the proper use of the System consistent with the Documentation, and Customer will ensure the proper management and supervision of the System. Customer will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. Prohibited actions include, but are not limited to: (1) adding or subtracting any Customer or third party equipment, hardware, firmware, or software to or from the System, or (2) reconfiguring any of the Intuitive equipment, Hardware, firmware, or Software as originally provided to Customer as part of the System without Intuitive's express written permission. Customer will ensure that the System is moved and operated only by trained personnel in accordance with the Documentation and Intuitive's instructions. If Customer fails to comply with the requirements of this Section 3.4, Intuitive may terminate this Agreement immediately upon written notice, and any warranties applicable to the System will become void.

3.5     **Reprocess and Disposal**. Customer is responsible for properly Reprocessing and/or disposing of all medical instruments, devices, and systems related to the operation and function of the System, including Instruments and Accessories, in accordance with the Documentation and the then current local environmental and safety laws and standards.

**4.**     **Software License and Restrictions**

Software embedded within the System is provided under license and is not sold to Customer. Subject to the terms and conditions of this Agreement, Intuitive grants to Customer a non-exclusive, non-transferable, fully paid, restricted use license to use the Software solely as incorporated in the System in machine-executable object code form and solely in connection with the operation of the System as described in the Documentation. Customer must not use, copy, modify, or transfer the Software or any copy thereof, in whole or in part, except as expressly provided in this Agreement. In addition, Customer must not reverse engineer, decompile, disassemble, attempt to derive the source code for, or otherwise manipulate the Software, except that manipulation of the Software is permitted if, and then only to the extent that, the foregoing prohibition on manipulation is required to be modified by applicable law. In that case, Customer must first request from Intuitive the information to be sought from the Software, and Intuitive may, in its discretion, provide information to Customer under good faith restrictions and impose reasonable conditions on use of the Software. The structure and organization of the Software are valuable trade secrets of Intuitive and Customer will protect the Software as Intuitive's Proprietary Information (as defined in Section 13). Intuitive reserves all rights to the Software not expressly granted to Customer. Some components of the Software may be provided to Customer under a separate license, such as an open source license. In the event of a conflict between this Agreement and any such separate license, the separate license will prevail with respect to the component that is the subject of such separate license.

**5.**     **Services**

5.1     **Services Included**. If Customer is current in payment to Intuitive of the Service fees specified in **Exhibit A**, Intuitive, directly or through one of its designated service providers, will provide Services to Customer as listed below. Intuitive will use parts sourced by Intuitive, which may, at Intuitive's discretion, include reconditioned parts, ("Equivalent to New" or "ETN"). ETN parts are components, assemblies, or partial products which have had prior usage, but have been inspected, reworked, and tested as required so that their function, performance, and appearance will be essentially equivalent to that of new parts. Regardless of whether parts are new or ETN, Intuitive's appropriate warranties under Section 10.1(A) apply. Customer may contact Intuitive to upgrade its Service Plan to **dv Complete Care Plan Plus**. A $15,000/year uplift fee to annual Service fees set forth in Exhibit A will be charged; a detailed Service plan description will be provided to Customer for its acceptance and signature.

Intuitive will provide Services under the *__dv Complete Care Plan__*, with benefits and limitations as follows:

(A)     Adjust parts on the System from time to time;

(B)     Replace defective or malfunctioning System parts (excludes Instruments and Accessories; and any items contained in the Instrument Starter Kit, Camera Starter Kit, and Training Instrument Starter Kit set forth in Exhibit A);

(C)     Repair System operational malfunctions;

(D)     Replace and install Software, Hardware, and mechanical equipment for safety and reliability;

(E)     Provide twenty four (24) hours per day, seven (7) days per week (24 x 7) telephone support by qualified service personnel;

(F)     Provide and install Software upgrades for feature enhancements. Software upgrades and Service with respect to additional equipment not included on **Exhibit A** may be subject to separate terms to be agreed upon by the parties;

(G)     Provide preferred pricing and next day service repairs or replacement due to accidental damage on endoscopes and camera heads;

(H)     Respond to Customer's request for Services described in Section 5.1(B)-(C) by phone, e-mail, or an on premise visit, during normal business hours (excluding Intuitive holidays) promptly as is reasonable after Intuitive's receipt of Customer's request, but not later than twenty-four (24) hours after Intuitive's receipt. Normal business hours are Monday through Friday, 8:00 a.m.- 5:00 p.m. Customer's local time. Billable rates are applicable for service outside of normal business hours, and for reasons defined below in Section 5.2 (Limitations of Service). Intuitive's current Billable rates are attached as Exhibit C.

(I)     Perform System preventative maintenance inspections as necessary to maintain factory specifications.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       VMC-00002653

(J)    Provide on-site visits for support of advanced training of Customer's personnel on sterile Reprocessing process.

(K)    When the system is connected to OnSite®, remotely monitor system to diagnose potential issues and proactively dispatch a Field Service Engineer to make repairs when needed.

(L)    Provide access to the da Vinci Surgery Customer Portal.

5.2    **Limitations on Services**.

(A)    **General**. Intuitive does not have an obligation to provide Services (1) on any System where installation, repair, or adjustments have been made by an individual other than an Intuitive technician or an individual approved by Intuitive or (2) which are either necessary or desired as a direct or indirect result, in whole or in part, of unauthorized repair, modification, disassembly, alteration, addition to, subtraction from, reconfiguration, or misuse of the System, or negligence or recklessness on the part of Customer.

(B)    **Cleaning**. Regular daily cleaning of the System as described in the Documentation is not included in the Services.

(C)    **Additional Equipment**. Intuitive's Services obligations do not include the provision to Customer of any hardware developed by Intuitive that is not contained in the initial System purchased by Customer, and which Intuitive offers as a separate product or for an additional fee.

(D)    **Time and Materials**. If the System needs repair or maintenance services due to any of the circumstances described in Section 5.2(A)-(B) above, Intuitive may, at its sole election, provide repair services at Customer's expense and at Intuitive's then current time and material rates. Intuitive is not obligated to provide Services on any System for which any applicable warranty has been voided, or for which the performance of Services is otherwise excused by the terms of this Agreement.

(E)    **Unauthorized Instruments and Accessories**. The System is designed for use only with the Instruments and Accessories. If Customer uses the System with any surgical instrument or accessory not made or approved by Intuitive, Intuitive may discontinue Services, and any warranties applicable to any Services provided prior to any discontinuance will be void.

5.3    **Customer's Obligations.**

(A)    **Notice, Access, and Cooperation**. Customer will notify Intuitive or Intuitive's designated service provider of any requests for Services. Customer will fully cooperate with and assist Intuitive in the provision of Services.

(B)    **Clinical Liaison**. Customer will designate one of its employees, agents, or representatives as a "Clinical Liaison." The Clinical Liaison will be the point of contact with Intuitive for installation, Services, use of the System, and other related issues. Nothing in this Section 5.3 authorizes Customer or the Clinical Liaison to perform Services or to perform any act otherwise prohibited by this Agreement.

6.    **Training**

Intuitive offers training to surgical personnel on the use and operation of the System. At Customer's request, at mutually agreed times and at mutually agreed locations, Intuitive will provide training in the use of the System to Customer's surgical personnel in accordance with the terms specified in **Exhibit A**.

7.    **Proctoring**

At Customer's request, and upon Customer's issuance of a purchase order, Intuitive will arrange for Proctoring at Customer's location in accordance with the terms specified in **Exhibit A**. Each Proctor is an independent contractor, is not an agent or employee of Intuitive, and is not authorized to act on behalf of, or legally bind, Intuitive. Intuitive is not responsible for Proctoring services provided by Proctors. The decision to utilize a Proctor is solely that of the Customer. Customer is responsible for ensuring that each Proctor meets Customer's credentialing requirements.

8.    **Instruments and Accessories**

Instruments and Accessories will be made available to Customer from Intuitive pursuant to separate orders placed by Customer to Intuitive from time to time in accordance with the terms and conditions contained in the then current Instrument and Accessory Catalog. Intuitive's current Instruments and Accessories Ordering terms are attached as Exhibit D. Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Customer is responsible for Reprocessing Instruments in accordance with the Documentation. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning or sterilization inconsistent with the Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory. Customer may purchase Instruments and Accessories for the purpose of Customer's Reprocessing requirements. The cost of Instruments and Accessories used in Customer's Reprocessing, including Instrument and Accessories used or involved in destructive testing, will be the responsibility of the Customer. Customer may contact Intuitive's Customer Support Department if, during the Reprocessing, Customer experiences results unacceptable under applicable law and/or regulation. Intuitive will provide commercially

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        VMC-00020654

reasonable assistance in such investigations and remediation efforts but shall not be obligated to conduct or pay for such studies or provide materials at no cost or reduced cost as a condition of purchase or continued use.

**9.      Pricing and Payment Terms**

9.1      **System.**

(A)      **Price.**   Customer will pay to Intuitive the price specified in **Exhibit A** for the System acquired under this Agreement according to the payment terms in Section 9.1(B).

(B)      **Payment Terms.**  Upon Acceptance, Intuitive will deliver an invoice to Customer for amounts due under this Agreement for the System. Customer agrees and acknowledges payment for the System shall not be excused by any contingencies including, but not limited to, Customer's internal practices, policies, or any state approvals. Customer will pay the invoiced amount not later than thirty (30) days after the date of invoice.  Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower. If there is a dispute as to any invoice the parties will work in good faith to resolve said dispute.

(C)      **Security Interest.** Intuitive will retain a security interest in the System until payment of the full System purchase price has been received by Intuitive.  Customer will perform all acts Intuitive reasonably determines are necessary or appropriate to perfect and maintain the security interest.  If Customer defaults in its payments for the System, Intuitive has the right, without liability to Customer, to reclaim the System.

9.2      **Services.**

(A)      **Price.**   Customer will pay for the Services at the price specified in **Exhibit A**.

(B)      **Payment Terms.**  Intuitive will deliver to Customer an invoice for the annual Services fee forty-five (45) days prior to the first anniversary of Acceptance and each subsequent anniversary of Acceptance throughout the Initial Term of the Agreement. Customer will pay the invoice for Services not later than forty-five (45) days after the date of invoice. If there is a dispute as to any invoice the parties will work in good faith to resolve said dispute. In the event Customer requires a purchase order to be referenced on a Service invoice to facilitate payment, Customer will provide Intuitive with a purchase order number sixty (60) days prior to each anniversary of Acceptance.  Interest will accrue from the date on which payment is due, at an annual rate of twelve percent (12%) or the maximum rate permitted by applicable law, whichever is lower.  After the Initial Term of the Agreement, and subject to mutual written agreement, annual Services may be renewed at Intuitive's then current list price.

9.3      **Funding Entity.**

A funding entity ("Funding Entity") may provide the funding for Customer to purchase the System defined herein, provided however, Customer remains responsible for payment in full according to the terms of this Agreement if Funding Entity fails to pay.  A Funding Entity will have no rights or obligations whatsoever under this Agreement, except as specified in this Agreement. Customer acknowledges and agrees that once Acceptance has occurred and title of the System has passed to the Customer, if Customer subsequently enters into an arrangement with a Funding Entity, then Customer will enter into an agreement (such as a sale and lease-back agreement) directly with the Funding Entity that does not involve Intuitive. Intuitive will not reverse the sale of the System to Customer in order to sell it to another entity, including but not limited to a Funding Entity.

9.4      **Taxes.**

Customer will pay any Taxes in addition to the prices invoiced.  Customer will pay, or reimburse Intuitive for the payment of all Taxes, including related penalties and interest, except Taxes for which Customer has provided a certificate of exemption acceptable to both Intuitive and the appropriate taxing authority prior to delivery of the System.  Customer will also pay, or reimburse Intuitive for, all Taxes, related penalties, or interest resulting from Customer's use of a Funding Entity.

**10.      Warranty and Disclaimer**

10.1      **System Warranty.**

(A)      Intuitive warrants to Customer that:

(1)      the System as delivered will be free and clear of all liens and encumbrances (except as otherwise specified in this Agreement), and

(2)      for the period specified in **Exhibit A,** will be free from defects in material and workmanship and will conform in all material respects to the Documentation when used in accordance with the Documentation and Intuitive's instructions.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                              VMC-00020655

(B)    Intuitive's obligations under this Section 10.1 are limited to the repair (as further described in Section 5.1(B)-(C)) or, at Intuitive's option, replacement of all or part of the System.

(C)    This warranty is void with respect to any claims:

    (1)    due to any installation, repair, adjustment, modification, disassembly, alteration, reconfiguration, addition to, subtraction from, or misuse of the System by Customer or any third party without the express written permission of Intuitive; or

    (2)    to the extent Customer has not operated, repaired, or maintained the System in accordance with the Documentation or any reasonable handling, maintenance, or operating instructions supplied by Intuitive; or

    (3)    to the extent Customer has used the System with surgical instruments or accessories that are not Instruments or Accessories; or

    (4)    to the extent Customer or Customer's employee, agent, or contractor has subjected the System to unusual physical or electric stress, misuse, abuse, negligence, or accident.

(D)    The foregoing expresses Customer's sole and exclusive remedy, and Intuitive's sole and exclusive liability, for any breach of warranty with respect to the System by Intuitive.

10.2    **Services Warranty.**  Intuitive warrants that the Services will be performed consistent with generally accepted industry standards. If Intuitive breaches this warranty, Customer's sole and exclusive remedy will be to require Intuitive to re-perform the Services.

10.3    **No Other Warranties.  INTUITIVE MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SYSTEM OR SERVICES PROVIDED HEREUNDER AND THIS TRANSACTION, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND NON-INFRINGEMENT.  SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF IMPLIED WARRANTIES; THEREFORE, THE ABOVE LIMITATION WILL APPLY ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

## 11.    Indemnification

11.1    **Intuitive's Indemnification Obligations.**

(A)    **Intellectual Property Indemnification.**  Intuitive will indemnify Customer against all liabilities, expenses, or damages in connection with any third party claim that the System infringes any third party patent, trade secret, or copyright.  If Customer is enjoined from the use of the System due to any such third party claim, Intuitive will promptly, at its option and expense, either (1) substitute the System or any part thereof with non-infringing material that will perform substantially in accordance with the Documentation; or (2) obtain the right of Customer to continue to use the System; or (3) remove the System and refund to Customer the purchase price of the System less reasonable depreciation.

(B)    **Indemnification Limitations.**  Intuitive has no obligation under this Section 11.1 to the extent any claim of infringement is based upon or arises out of: (1) any modification to the System if the modification was not made directly by Intuitive or through its designated service provider; or (2) the use or combination of the System with any hardware, software, products, data or other materials not specified, provided or approved by Intuitive.

(C)    **THE PROVISIONS OF THIS SECTION 11 STATE THE SOLE AND EXCLUSIVE OBLIGATIONS OF INTUITIVE FOR ANY PATENT, COPYRIGHT, TRADEMARK, TRADE SECRET OR OTHER INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT.**

11.2    **By Intuitive.**  To the extent allowable by law, Intuitive hereby assumes all liability for, and agrees to indemnify, defend and hold harmless Customer, its successors, permitted assigns, medical staff, agents and employees from and against, any and all liabilities, losses, damages, claims and expenses to the extent that they arise from third party claims, actions or demands including without limitation, claims arising in contract or tort (including negligence), strict liability or otherwise (collectively, "Claims") in any way relating to or arising from (a) Intuitive's breach of any of its representations or warranties or any other obligation hereunder, or (b) Intuitive's negligence or willful misconduct; provided that Intuitive's indemnification obligations under this Section 11.2 shall not apply to the extent that (i) such Claims arise from Customer's negligence or willful misconduct or breach of any of its obligations hereunder.

11.3    **By Customer.**  To the extent allowable by law, Customer hereby assumes all liability for, and agrees to indemnify, defend and hold harmless Intuitive and its successors, permitted assigns, agents and employees from and against any and all Claims by third parties to the extent that they arise from: (a) Customer's or its employees', medical staff's, agents', affiliates' or representatives' negligence or willful misconduct in the use, possession, or operation of the System, including without limitation, (i) use of the System by individuals who have not completed appropriate training or whose training was not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        VMC-00020656

conducted by Intuitive, (ii) use of the System with any surgical instrument or accessory that is not made or approved by Intuitive for use with the System, or (iii) the conduct of surgical procedures on cadavers used in training; or (b) Customer's breach of any of its representations or warranties or any other obligation hereunder, including without limitation Customer's failure to comply with the requirements of Section 3.4 (Use of System) and 3.5 (Reprocess and Disposal). Notwithstanding the foregoing, Customer's indemnification obligations under this Section 11.3 shall not apply to the extent that such claims arise from Intuitive's negligence or willful misconduct or breach of any of its obligations hereunder.

11.4 **Claim Notification Requirement.** A party's indemnification obligations under this Section 11 will not apply unless the indemnified party promptly notifies the indemnifying party of the claim as soon as the indemnified party became aware of it. The indemnifying party will have the right to control the defense or settlement of any claim at its cost and with its choice of counsel. The indemnified party will provide all reasonable cooperation to assist the indemnifying party in the defense or settlement of the claim.

12. **Limitation of Liability**

Except for a breach of the obligations in Sections 3.4 (Use of System), 4 (Software License and Restrictions), 8 (Instruments and Accessories), 9 (Pricing and Payment Terms), the indemnification obligations of Section 11, 13 (Proprietary Information), and any HIPAA obligations to the extent permitted by applicable law, each party's aggregate liability to the other for claims relating to this Agreement, whether for breach in contract or tort (including negligence), is limited to an amount equal to the sum of amounts paid by Customer under this Agreement for the activity (such as procurement of the System, Service, or training) giving rise to the claim. Except for a breach of the obligations in Sections 3.4, 4, 8, or 13, neither party will be liable for any indirect, punitive, special, incidental, or consequential damages in connection with or arising out of this Agreement (including loss of business, revenue, profits, use, data, or other economic advantage), even if that party has been advised of the possibility of damages. Some jurisdictions do not allow the limitation of liability for incidental or consequential damages; therefore in those jurisdictions, the foregoing limitation of liability applies only to the extent permitted by law.

13. **Proprietary Information**

"Proprietary Information" includes, but is not limited to, all non-public information (1) of the disclosing party ("Disclosing Party") that relates to past, present, or future research, development, or business activities or the results of those activities and (2) that the Disclosing Party has received from others and is obligated to treat as confidential and proprietary. In addition, Intuitive's Proprietary Information includes the terms and conditions of this Agreement and all information derivable from the System, but excluding information that can be learned simply through observation of the System and its operation. Proprietary Information does not include information previously known by the receiving party ("Receiving Party") as demonstrated by the Receiving Party's contemporaneous written records, or information publicly disclosed without breach of an obligation of confidentiality, either before or after the Receiving Party's receipt of the information. The Receiving Party will hold all Proprietary Information of the Disclosing Party in strict confidence and must not use for any purpose, or disclose to any third party, any Proprietary Information, except (1) as expressly authorized in this Agreement or in writing by the Disclosing Party, and (2) as required by law or by court order. Notwithstanding any provision of this Agreement, the Recipient shall be permitted to disclose the Disclosing Party's Confidential Information solely to the extent that such disclosure is required by law or by order of any court or governmental authority, provided, however, that the Recipient shall first have given advance notice to the Disclosing Party, so as to permit the Disclosing Party as owner of the information an opportunity to review such information for confidentiality and privilege preservation and/or to attempt to obtain a protective order or similar administrative or legal remedy requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued or for such other legal requirement, and that the Recipient shall cooperate with the Disclosing Party in such efforts. The Receiving Party will use the same degree of care to protect the Proprietary Information as Receiving Party uses to protect its own information of like kind, but not less than all reasonable steps to maintain the confidentiality of the Proprietary Information.

14. **Term**

14.1 **Initial Term.** The Initial Term is specified in **Exhibit A**.

14.2 **Termination and Survival.** Either party may terminate this Agreement if the other party breaches a material term or condition of this Agreement and fails to cure the breach following thirty (30) days' written notice from the non-breaching party. Sections 3.4, 3.5, 4, 9.1, 9.3, 11, 12, 13, 14.2, 15, and any other provision which by its nature will survive, will remain in effect notwithstanding the expiration or termination of this Agreement.

15. **Miscellaneous**

15.1 **Assignment.** This Agreement will be binding upon the permitted successors and assigns of the parties. Neither party may assign this Agreement without the prior written consent of the other party, except pursuant to a transfer of all or substantially all of a party's assets and business relating to the subject of this Agreement, whether by merger, re-organization, sale of assets, sale of stock, or otherwise. Customer may not assign or transfer the Software license granted to it under this Agreement to any third party without Intuitive's prior written consent. Any attempt by either party to assign this Agreement or any rights or duties hereunder contrary to the foregoing provision is void. Intuitive consents to Customer's assignment of this Agreement to a Funding Entity as part of Customer's financing arrangement with the Funding Entity. If Customer assigns this Agreement to a Funding Entity, Customer retains its right to all benefits under this Agreement, including without limitation all warranties, representations, and indemnification provided by Intuitive, and may independently enforce any obligation, warranty, or representation, including without limitation Intuitive's obligations under Section 5 (Services).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              VMC-00002657

15.2    **Costs.**  Except as otherwise specifically provided herein, each party will bear its own costs and expenses incurred in connection with the performance of its obligations hereunder.

15.3    **Debarment**.  Intuitive warrants and represents that individuals of its organization involved in providing Services under this Agreement have not been convicted of any criminal offense relating to health care and are not debarred, excluded, or otherwise ineligible for participation in any federal or state health care program.  If at any time before completion of this Agreement, Intuitive or any individual in its organization involved in providing Services under this Agreement is so convicted or is debarred, excluded or otherwise determined to be ineligible, Intuitive will notify Customer in writing, the individual will immediately cease providing Services under this Agreement, and Intuitive will replace the individual with a replacement employee reasonably suitable to Customer, and, if it is Intuitive, this breach will be considered a material breach by Intuitive.

15.4    **Federal Audit**.  Until the expiration of four (4) years after furnishing Services under this Agreement, Intuitive will make available upon written request of the Secretary of the Department of Health and Human Services (the "Secretary") or upon request of the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement and the books, documents, and records of Intuitive that are necessary to certify the nature and extent of costs for which Customer may properly seek reimbursement.  If Intuitive carries out any of the duties of this Agreement through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, the subcontract will contain a clause to the effect that until the expiration of four (4) years after furnishing of services under the subcontract, the subcontracting party will make available, upon written request of the Secretary, or upon request of the U.S. Comptroller General or any of their duly authorized representatives, the subcontract, and the books, documents, and records of the organization that are necessary to verify the nature and extent of the costs.  Intuitive will promptly notify Customer of any requests for information made under this provision.

15.5    **Force Majeure**.  Neither party will be liable for any loss, damage, detention, delay, or failure to perform in whole or in part resulting from causes beyond that party's control including, but not limited to, acts of terrorism, fire, flood, earthquake, war, riots, labor disputes, shortage of components, or any governmental law, order, regulation, or ordinance.

15.6    **Insurance**. Intuitive has obtained, and will maintain throughout the term of the Agreement, (i) Commercial General Liability Insurance including coverage for contractual liability, product liability, personal injury and bodily injury in an amount not less than $1,000,000 per occurrence/$3,000,000 aggregate (or as may be aggregated by the excess liability policy on the General Liability policy); or (ii) a self-insurance program of equivalent protection.  Intuitive will furnish the Customer with a certificate of insurance evidencing the coverage as outlined above, or comparable evidence of self-insurance, on Customer's request.  Intuitive carries, and will continue to carry, Workers' Compensation Insurance as required by law.

15.7    **Interpretation**.  Headings used in this Agreement are provided for convenience only and do not in any way affect the meaning or interpretation hereof.  The terms "sale", "purchase", "acquire", "procure" and variations of such terms, as used in this Agreement with respect to the System, do not imply that the Software and Documentation aspect of the System are sold or purchased; the Software and Documentation are licensed under this Agreement and only the Hardware is sold.  Neither party is the drafter of this Agreement.  Accordingly, the language of this Agreement will not be construed for or against either Party.

15.8    **Notices**.  Any notices given under this Agreement must be in writing and will be deemed given and received five (5) days after the date of mailing, one (1) day after dispatch by overnight courier service or electronic mail, or upon receipt if by hand delivery, or upon completion of confirmed transmission if by facsimile.  Any notices under this Agreement must be sent to Intuitive or the Customer at the address shown in the preamble above, in both cases to the Contracts Dept/General Counsel's office. Each party may change its address for receipt of notices by giving the other party notice of the new address.

15.9    **Relationship of the Parties**.  The parties' relationship is one of contract, and they are not, and will not be construed as partners, joint venturers, or agent and principal.  Neither party is authorized to act for, or on behalf of, the other party.

15.10    **Severability**.  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, then that provision will not affect the validity of the remaining provisions of the Agreement, and the parties will substitute a valid provision for the invalid provision that most closely approximates the intent and economic effect of the invalid provision.

15.11    **Access to Customer's Facilities.**  Intuitive agrees that any Intuitive personnel who routinely provide Services at Customer's facilities will use commercially reasonable efforts to comply with Customer's Access Requirements, provided that Customer provides Customer's Access Requirements in writing prior to execution of this Agreement.  Customer's need for Service may be unplanned and urgent with patient safety at stake.  Therefore, if Customer denies access to its facilities to any Intuitive personnel for performance of Services (Section 5) or warranty (Section 10) obligations in connection with a surgical procedure because such personnel have not met Customer's Access Requirements, Intuitive's Services and warranty obligations in this Agreement will be suspended during such denial of access, provided that Intuitive uses commercially reasonable efforts to find replacement Intuitive personnel who comply with Customer's Access Requirements.  Customer will indemnify and hold harmless Intuitive from any losses, claims, liabilities or causes of action arising from such denial of access.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    VMC-00020658

15.12 **Data Use.** Customer agrees that Intuitive and its affiliates within the Intuitive Surgical group of companies (collectively, "Intuitive") may collect data relating to the use of Intuitive products ("Data"). In some instances Data may be communicated via data gathering or transmission technology to Intuitive. In other instances, Intuitive may require Customer and Customer agrees to provide Data to Intuitive. Such Data may be used for a variety of purposes, including, but not limited to (1) providing support and preventative maintenance of Intuitive products, (2) improving Intuitive products or services, (3) ensuring compliance with applicable laws and regulations, and (4) providing a general resource for Intuitive's research and business development. Intuitive does not intend to collect protected health information (PHI) as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or analogous foreign patient privacy laws or regulations, as may be amended from time to time. In the event any Data communicated to Intuitive identifies an entity or individual, Intuitive will not share such Data with any third parties without the entity's or individual's consent, unless required by law or regulatory authorities.

15.13 **Waivers.** No waiver of any right by either party under this Agreement will be of any effect unless the waiver is in writing and signed by the waiving party. Any purported waiver not consistent with the foregoing is void.

15.14 **Counterparts.** This Agreement may be executed by facsimile or in multiple copies, each of which is an original, and all of which taken together will constitute one single agreement.

15.15 **Entire Agreement; Amendment.** This Agreement is the entire agreement between Intuitive and Customer and supersedes any prior agreements, understandings, promises, and representations made either orally or in writing by either party to the other party concerning the subject matter herein, pricing, and the applicable terms. Any terms or conditions in Customer's (or as applicable, Funding Entity's) purchase order that are different from, inconsistent with, or in addition to, the terms and conditions of this Agreement will be void and of no effect, unless otherwise mutually agreed to in writing by the parties. This Agreement may be amended only in writing, signed by both parties. Any purported oral modification intended to amend the terms and conditions of this Agreement is void.

**BOTH PARTIES HAVE READ, UNDERSTOOD, AND AGREED TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT AND EXECUTE THIS AGREEMENT AS OF THE EFFECTIVE DATE.**

**IF THIS AGREEMENT IS NOT SIGNED BY BOTH PARTIES AND RETURNED TO INTUITIVE ON OR BEFORE AUGUST 31, 2018 THE TERMS WILL BE SUBJECT TO CHANGE.**

ACCEPTED BY:

**Intuitive Surgical, Inc.**

Signature: _Marc Giuffrida (Aug 31, 2018)_

Email: marc.giuffrida@intusurg.com

Title: Director, Contract Administration

Company: Intuitive Surgical, Inc

BC

ACCEPTED BY:

**Valley Medical Center**

By: _Jeannine Grinnell_

Name: _Jeannine Grinnell_

Title: _SVP CFO_

e-mail: _Jeannine_Grinnell@valleymed.org_

Date: _8/31/18_

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    VMC-00020659

# Exhibit B

INTUITIVE

1020 Kifer Road
Sunnyvale, CA 94086

T. 408-523-2100
F. 408-523-1390

intuitive.com

March 27, 2025

Mr. Clif Parker
Chief Executive Officer
Restore Robotics
7543 Holley Circle
Panama City Beach, FL  32408

Dear Clif:

I received your letter regarding the 510(k) clearance recently granted to Iconocare Health for remanufactured 8mm Monopolar Curved Scissors (470179) EndoWrist instruments.  Your letter requests that Intuitive Surgical grant approval under its contracts for "Restore Robotics to remanufacture any EndoWrist that falls under the scope of any 510(k) clearance from the FDA." This request is unnecessary because as you know Intuitive has already granted such approval.

Since March 2023, Intuitive has stated on its website that Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party under a 510(k) clearance or equivalent granted by the FDA.  To be very clear: Intuitive's policy concerning FDA-cleared remanufactured instruments remains in effect, and we stand by it with respect to any existing or future products for which Restore Robotics, Iconocare Health or any other third party obtains 510(k) clearance.  This includes but is not limited to the 8mm Monopolar Curved Scissors (470179) for which FDA clearance was recently granted.

Intuitive has long made clear on our public website that we will not consider it a breach of contract for any customer to purchase any FDA-cleared remanufactured instrument from Restore Robotics or anyone else.  To the extent you believe there are any customers who do not understand this policy (as I understand you allege in your most recent complaint), please feel free to refer them to me and/or to share a copy of this letter with them.

I also take this opportunity to reiterate an offer that has always been available to Restore Robotics, which is to work with Intuitive directly to validate the safety and compatibility of your

remanufactured instruments with the da Vinci system.  While remanufactured instruments that have been cleared by the FDA are treated as approved under our contracts, as indicated above, Intuitive nevertheless believes patients will be best served if our organizations engage directly as part of our quality and validation process—as we have done for many years with dozens of other third parties.

Given the "commitment to transparency and collaboration" stated in your letter, I hope you will consider the option of sharing safety and performance information with Intuitive so that we can work together directly to validate product safety and compatibility.  I also hope that you will be willing to engage with Intuitive to address postmarket and labeling processes and ensure that any mutual customers of our organizations understand how product complaints or other servicing issues are to be handled—as, again, we routinely do with third parties who participate in our validation processes.

Please let me know if Restore Robotics would be interested in pursuing this path of direct engagement with Intuitive.  If so, we would be happy to propose a framework for moving forward.

Sincerely,

Dave Rosa
President
Intuitive Surgical

INTUITIVE

# Exhibit C

Volume 11

Pages 1770 - 1984

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

SURGICAL INSTRUMENT SERVICE      )
COMPANY, INC., et al.,           )
                                 )
          Plaintiffs,            )
                                 )
  vs.                            )  No. C 21-03496 AMO
                                 )
INTUITIVE SURGICAL, INC.,        )  San Francisco, California
                                 )  Wednesday
          Defendant.             )  January 22, 2025
---------------------------------)  8:00 a.m.
AND RELATED COUNTERCLAIMS.       )
_____)

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**            MCCAULLEY LAW GROUP
                               180 N. Wabash Avenue
                               Suite 601
                               Chicago, Illinois 60601
                          BY:  **RICHARD McCAULLEY JR., ESQ.**


                               HALEY GUILIANO LLP
                               111 Market Street
                               Suite 900
                               San Jose, California 95113
                          BY:  **JOSHUA V. VAN HOVEN, ESQ.**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

**APPEARANCES**:    (CONTINUED)

**For Defendant:**

                            PAUL, WEISS, RIFKIND, WHARTON
                              & GARRISON LLP
                            2001 K Street NW
                            Washington, D.C. 20006
                    BY:   **KENNETH A. GALLO, ESQ.**
                            **PAUL D. BRACHMAN, ESQ.**


                            PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
                            1285 Avenue of the Americas
                            New York, New York 10019
                    BY:   **WILLIAM MICHAEL, ESQ.**


                            PAUL, WEISS, RIFKIND, WHARTON
                              & GARRISON LLP
                            535 Mission Street
                            24th Floor
                            San Francisco, California 94105
                    BY:   **JOSHUA HILL, JR., ESQ.**


**Also Present:**              **Bobby Cox**
                            **Ryan Lee**
                            **Greg Posdal**


                        -  -  -

<u>**I N D E X**</u>

Wednesday, January 22, 2025 - Volume 11

**DEFENDANT'S WITNESSES**                                    <u>**PAGE**</u>  <u>**VOL.**</u>

**ROSA, DAVID**
(PREVIOUSLY SWORN)                                          1793  11
Direct Examination Resumed by Mr. Michael                   1793  11
Cross-Examination by Mr. McCaulley                          1937  11

- - -

<u>**E X H I B I T S**</u>

**TRIAL EXHIBITS**                             <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

 TX-602-R                                           1813  11

 TX-616-R                                           1843  11

 TX-1314                                            1918  11

 TX-1323                                            1917  11

 TX-1325                                            1921  11

 TX-1389                                            1906  11

 TX-1394                                            1929  11

 TX-1585-R                                          1872  11

 TX-1632.022-R                                      1902  11

 1633.003-R                                         1832  11

 TX-1634.323                                        1839  11

 TX-1642                                            1869  11

— — —

1        without the express written permission of Intuitive."

2        Do you see all that?

3    **A.**    I do.

4    **Q.**    To your knowledge, was Intuitive's purpose for including

5    the provisions that we just looked at in its contracts the same

6    or different in 2020 as it was in the year 2000?

7    **A.**    These are -- these are largely the same between the two

8    contracts.

9    **Q.**    And did Intuitive, in your experience, have the power to

10   force customers to accept terms in 2020 any more than it did in

11   2000?

12   **A.**    No.  You know, we are -- this is a contract that is

13   negotiated between the two entities, between Intuitive and the

14   purchaser or the hospital.  There's not a forcing of terms

15   here.

16       **MR. MICHAEL:**  You can take that down, Mr. Lee.

17       (Document removed from display.)

18   **BY MR. MICHAEL:**

19   **Q.**    So, Mr. Rosa, we just saw a number of references in

20   Intuitive's contracts to authorization or approval of third

21   parties.  And I now want to ask you:  Has Intuitive, over the

22   years, actually authorized or approved any third-party products

23   to be used with the da Vinci?

24   **A.**    We have, actually.

25   **Q.**    And let me ask you to turn to Tab 3 in your binder,

1    please.

2         (Witness complied.)

3    **Q.**   This is, for the record, a document that has been stamped

4    TX-616-R.  And if I could ask you to identify this document,

5    again generally, without talking yet about its specific

6    contents?

7    **A.**   Sure.  So this -- this is a document that has a listing of

8    third-party devices that have been approved for use with a

9    da Vinci system.

10   **Q.**   And is this a document that Intuitive keeps and maintains

11   in the ordinary course of its business?

12   **A.**   It is.

13   **Q.**   Did you have access to this document in the ordinary

14   course of your business at Intuitive?

15   **A.**   Yes.

16   **Q.**   And is this document, to your knowledge, updated

17   regularly?

18   **A.**   One or one like this.  And so this is specific to IS2000

19   and IS3000, which are S/Si.

20   **Q.**   Do you recognize this as an example from in and around

21   2017?

22   **A.**   I do, yes.

23            **MR. MICHAEL:**  Your Honor, I offer TX-616-R.

24            **MR. McCAULLEY:**  No objection.

25            **THE COURT:**  It's admitted.

 1        (Trial Exhibit 616-R received in evidence.)

 2            **THE COURT:**  Would you like to publish it?

 3            **MR. MICHAEL:**  Yes, please.

 4            **THE COURT:**  Go ahead.

 5            **MR. MICHAEL:**  Thank you.

 6        (Document displayed.)

 7   **BY MR. MICHAEL:**

 8   **Q.**   So, Mr. Rosa, if you could start by just explaining how is

 9   this document used at Intuitive?

10   **A.**   Sure.  So this is -- again, it's a compilation, a record

11   of the devices that have been approved for use with the system.

12   And so this is -- probably not this document, but it would --

13   it would be the foundation of information that's provided to

14   customers about which products are approved for use with the

15   da Vinci system.

16   **Q.**   What kinds of products are included on this list, just

17   generally?

18   **A.**   Just generally, there's a number.  There's -- on the first

19   page, there are a group of products that are called "cannula"

20   that are the ports for -- that go into the body at the

21   beginning of the case for instruments to move in and out of.

22        There's a group of electrosurgical generators that are

23   compatible with the system.

24        There's a section for chemicals that have been approved

25   for use for cleaning da Vinci instruments and accessories, a

1  variety of other cleaning devices, like ultrasonic and washer

2  disinfectors, that sort of thing.  And then there's a group of

3  instrument trays as well.  So it's a variety of accessories.

4  **Q.**    There are a number of columns in the document.

5        Do you see, I think it's the fourth one over, the column

6  that's entitled "Validated Third-Party Device"?

7  **A.**    I do.

8  **Q.**    What does it mean for a third-party device to be validated

9  for use with the da Vinci system?

10  **A.**    So what it means is that the two companies have worked

11  together to ensure that the device that is being -- that wants

12  to be proven compatible have done two things.  That

13  Intuitive -- we've done a lot of the testing that's required to

14  ensure it will work appropriately with our system or

15  instrument, whatever it is that the compatibility is associated

16  with.  So there's a set of testing there that can include

17  mechanical testing, electrical testing, sterilization, and

18  disinfection testing.  It just really depends on the device.

19  So there's -- there's that sort of work that gets done.

20        And then there's also a -- basically an agreement between

21  the companies that helps to lay out a couple of things that

22  include -- one is how the companies will work together to

23  inform each other if a change is made that may impact the

24  compatibility of the third-party device.  So if we make a

25  change that may impact, that we contact that company.  If they

 1  make a change, they contact us.  And so that's in kind of the

 2  normal course of business.

 3       And then, importantly, we also want to make sure that we

 4  know who at that company -- how do the two companies interact

 5  if there's an issue that's reported by the customer or by

 6  somebody else that says, you know, something didn't work.

 7       For example, if on this page, on the very top that's being

 8  shown, it's Ethicon endosurgery.  And let's say that device,

 9  this endopathic cell, something went wrong with it.  Customer

10  contacts us.  We want to make sure Ethicon knew about it.  So

11  we would have a contact and kind of a process laid out by which

12  the two companies would work together.

13  **Q.**   In order to validate a third-party device or approve it

14  for use with the da Vinci system, does Intuitive require any

15  information regarding the safety of that product?

16  **A.**   We do.  So, again, it really depends on the device.  But

17  because there can be complex interactions, we will get

18  specifications and testing and other documentation from that

19  third-party company so that we can inform the validation and

20  the testing that we want to do.  It's just how the two

21  companies work together, and it really depends on what it is

22  we're testing on what kind of data are provided between the

23  companies.

24  **Q.**   Does Intuitive, under the policy and process you have been

25  discussing, approve any third-party products for which

 1  Intuitive has not received some form of clinical proof of

 2  safety?

 3  **A.**    I can't think of any that would be on this list, where we

 4  haven't worked to understand how that third-party device is

 5  going to -- needs to work safely and effectively.  How does

 6  that happen and what kind of data are exchanged?  I don't --

 7  I'd have to look through this carefully, but I can't think of

 8  any examples.

 9  **Q.**    Now, you said earlier that this particular list refers

10  only to the S and Si da Vinci system; is that correct?

11  **A.**    That's -- that's what it looks like from kind of the top

12  description here.

13  **Q.**    Did Intuitive also, to your knowledge, validate

14  third-party products for use with its X and Xi systems?

15  **A.**    Yes, definitely.

16  **Q.**    If a third party wants to be validated or approved, in

17  your experience, do you approach them or do they approach you?

18  **A.**    It can --

19          **MR. McCAULLEY:**  Objection.  Speculation, Your Honor.

20          **THE COURT:**  Mr. Rosa, can you answer that in your

21  experience?

22          **THE WITNESS:**  I can.

23          **THE COURT:**  Overruled.  You can answer.

24  **A.**    So in my experience, I have been approached by third-party

25  companies to say:  Hey, we would like our device to potentially

 1  be used with da Vinci.  What's the process?

 2      It's also true that there are times where we may approach

 3  a third party to ask some questions and talk about

 4  compatibility as well.

 5  **BY MR. MICHAEL:**

 6  **Q.**   And based on what you've seen and you've experienced

 7  through your work at Intuitive, could you estimate, at least

 8  roughly, around how many different third-party companies had

 9  products validated or approved by Intuitive, say, between 2000

10  and 2020?

11  **A.**   Probably range -- it may be in the dozens number.

12          **MR. MICHAEL:**  Thank you, Mr. Lee.  You can take that

13  document down.

14      (Document removed from display.)

15  **BY MR. MICHAEL:**

16  **Q.**   Now, Mr. Rosa, the third-party validation list we just

17  looked at from 2017, did that include any third-party modified

18  EndoWrists?

19  **A.**   It did not.

20  **Q.**   And at that time had any third party, to your knowledge,

21  applied to become authorized or approved by Intuitive to modify

22  EndoWrists and reset their use counters?

23  **A.**   No.  To my knowledge, no one had approached us and asked.

24  **Q.**   To your knowledge, did SIS ever ask Intuitive to become

25  authorized or approved to perform services on EndoWrists?

ROSA - DIRECT / MICHAEL

1   A.    No, not to my knowledge.

2   Q.    Did SIS, to your knowledge, ever offer to show Intuitive

3   any form of clinical evidence that the service it wanted to

4   offer on EndoWrists was safe and effective?

5   A.    No, they have not.

6   Q.    By 2019 had Intuitive, to your knowledge, become aware

7   that a company called Rebotix was performing services to modify

8   EndoWrists without Intuitive's authorization?

9   A.    We had become aware of that.

10  Q.    And in 2019 or 2020 did Rebotix, to your knowledge, show

11  Intuitive any clinical evidence that the changes it was making

12  to EndoWrists at that time were safe?

13  A.    No, I'm not aware of anything they showed us.

14  Q.    Let me ask you to turn to Tab 10 in your binder, please.

15      (Witness complied.)

16      **MR. MICHAEL:**  And for the record, this is a document

17  that's been stamped TX-1441-R.

18      Mr. Rosa, do you recognize this document based on your

19  work and your experience at Intuitive as being a letter on

20  Intuitive's letterhead?

21  A.    I do.

22  Q.    And do you recognize it as a letter that was sent to

23  Rebotix in April of 2019?

24  A.    I do.

25  Q.    At the time, you were Intuitive's Chief Business Officer

1    or Chief Commercial Officer?

2    **A.**    It's hard for me to remember when that -- when that title

3    changed.  I'm not sure.

4    **Q.**    Okay.  Is it fair to say that at this time, April of 2019,

5    you had responsibility for leading the sales and marketing

6    organization of Intuitive?

7    **A.**    That is fair.

8    **Q.**    Okay.

9         **MR. MICHAEL:**  So, Your Honor, this is a document

10   that's already in evidence, and I'd ask permission to publish

11   it to the jury.

12        **THE COURT:**  You may.

13        **MR. MICHAEL:**  Thank you.

14    (Document displayed.)

15   **BY MR. MICHAEL:**

16   **Q.**    Mr. Rosa, if you could turn to the last page of this

17   document.  The jury has already seen this document, but I just

18   want to ask you a question about the last page of it.

19        In this letter to Rebotix, do you see where it says at the

20   top of the last page [as read]:

21        "If you allege that you or your service centers

22        possess clinical proof that your service process

23        returns the modified instruments to a production

24        equivalent qualification and/or that additional use

25        does not affect the safety or performance of the

**ROSA - DIRECT / MICHAEL**

1            instruments, please provide proof of the same no later

2            than April 30, 2019."

3            Do you see that?

4    A.    I do.

5    Q.    And as far as you know, did Rebotix in 2019 or 2020

6    provide the clinical proof that was requested in this letter?

7    A.    No, they did not.

8    Q.    At that time, 2019 or 2020, had any third party offering

9    to modify EndoWrists provided that kind of clinical proof of

10   safety and performance to Intuitive?

11   A.    They had not.

12   Q.    And in 2019 or 2020 had Intuitive approved any third party

13   to modify EndoWrists under its policy?

14   A.    We had not.

15   Q.    To your knowledge, had any third party asked Intuitive to

16   be approved to modify EndoWrists as of 2019 or 2020?

17   A.    No, not to my knowledge.

18   Q.    And had Intuitive, to your knowledge, rejected any

19   application for approval by a third party?

20   A.    No.

21   Q.    Now, some years later, did Rebotix and Restore, to your

22   knowledge, each qualify for approval under Intuitive's policy

23   to offer modified EndoWrists?

24   A.    They did.

25            MR. McCAULLEY:  Objection, Your Honor.

1    **THE COURT:**  Overruled.

2        Keep going, Mr. Michael.

3    **BY MR. MICHAEL:**

4    **Q.**  Your answer, Mr. Rosa?

5    **A.**  They did.

6    **Q.**  And did Intuitive approve them?

7    **A.**  We did.

8    **Q.**  For how many different models of EndoWrists, to your

9    knowledge, did Restore and Rebotix each qualify for approval?

10   **A.**  They each -- one each.

11   **Q.**  Has Intuitive rejected any application for approval on any

12   other model?

13   **A.**  We have not.

14       **MR. MICHAEL:**  And, Mr. Lee, you can take down that

15   document.

16       (Document removed from display.)

17   **BY MR. MICHAEL:**

18   **Q.**  Now, when Intuitive started marketing and selling the

19   da Vinci system in the United States, which I believe you said

20   was around the year 2000, was SIS at that time, to your

21   knowledge, offering any product or service having to do with

22   EndoWrists?

23   **A.**  No, not to my knowledge.

24   **Q.**  At that time, was there any third party you knew of

25   offering to reset the use counter on EndoWrists?

<u>**CERTIFICATE OF REPORTER**</u>


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Debra L. Pas*

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, January 22, 2025