UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RESTORE ROBOTICS REPAIR LLC

    Plaintiff,

v.                                                  CASE NO. 3:24-cv-444-MCR-ZCB

INTUITIVE SURGICAL, INC.,

    Defendant.
_____/

**ORDER**

    Defendant Intuitive Surgical, Inc. has moved to dismiss Plaintiff Restore Robotics Repair LLC's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 25. Restore Robotics opposes the motion, ECF No. 27, and also requests leave to amend its pleading a second time, ECF Nos. 34 & 35. After due consideration, the Court will grant the motion to dismiss and deny the request for leave to amend as futile because Restore Robotics' antitrust claims, as pleaded, are barred by the applicable statute of limitations.

**I.    Background**

    At the turn of the millennium, Intuitive pioneered a "robotic revolution" in minimally invasive soft-tissue surgery. Intuitive's da Vinci robot surgical system, now on its fourth generation (referred to as "da Vinci X/Xi"), allows surgeons to sit behind an ergonomic console and, using the system's hand controls and high-

definition three-dimensional camera, navigate surgical instruments through small incisions on the patient.  Under its EndoWrist brand, Intuitive also sells surgical instruments, such as forceps, retractors, and scissors, that attach to its da Vinci system.  Intuitive's EndoWrist instruments, too, are on their fourth generation (broadly referred to as "X/Xi EndoWrist instruments"), and are the only instruments cleared by the Food and Drug Administration (FDA) for use on the da Vinci system during surgery.  By virtue of its patented technology and the high barriers to entry, Intuitive allegedly possesses near complete monopoly power in the robot surgical systems market in the United States.[1]  The present action, though, principally involves a different, related market: the so-called "aftermarket" for repairing X/Xi EndoWrist instruments.

For two decades, Intuitive has allegedly required hospitals and surgical centers purchasing or leasing its da Vinci systems to use EndoWrist instruments only a certain number of times, typically ten.  When an EndoWrist instrument reaches its usage limit, Intuitive supposedly forces its customers to purchase a new replacement

---

[1] The mere possession of monopoly power is not itself an antitrust violation, rather "it is an important element of the free market system" and is not unlawful unless "accompanied by an element of anticompetitive *conduct*."  *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original).  In fact, the allure of ultimately charging "monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth."  *Id.* (citation modified).

instrument—instead of allowing the existing instrument to simply be repaired and reset for additional cycles of use. Both requirements are enshrined in Intuitive's standard da Vinci system sales and lease contracts, which has purportedly been in place for multiple product generations.

As a third-party servicer of robotic surgical instruments, Restore Robotics has long claimed that Intuitive's terms prevent it from offering safe, effective, and cheaper repairs to EndoWrist instruments. This, in turn, allegedly ensures that Intuitive will continue to reap monopoly rents from its beholden hospital and surgical center customers through a perpetual stream of EndoWrist instrument replacement orders.

Indeed, there's some déjà vu here. In 2019, Restore Robotics brought a virtually identical lawsuit in this District alleging that Intuitive's standard terms excluded it from repairing and replacing the third generation of EndoWrist instruments ("S/Si EndoWrist instruments"). *See Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF (N.D. Fla.) (hereinafter, the "*S/Si EndoWrist Litigation*"). The *S/Si EndoWrist Litigation* settled in 2023, with Intuitive agreeing, subject to FDA clearance, to allow its customers to purchase repair and replacement services for S/Si EndoWrist instruments from Restore Robotics.

Page 4 of 19

Now, Restore Robotics is challenging Intuitive's allegedly anticompetitive contract terms as applied to the X/Xi EndoWrist instruments since their release in 2014. Unlike previous generations, the Xi/Xi EndoWrist instruments come equipped with an encrypted memory chip that tracks the number of uses for each instrument. Before any independent service organization can enter the aftermarket for repairing X/Xi EndoWrist instruments and compete with Intuitive, they first need to develop the technological capability to bypass or override the encrypted memory chip.[2] Restore Robotics obtained that capability on February 29, 2024. Notwithstanding that Leap Day breakthrough, Restore Robotics claims that it would have cracked the encryption and entered the putative aftermarket by July 2020 if not for Intuitive's anticompetitive contract terms that blocked "any and all access to customers indefinitely." *See* ECF No. 21 at ¶ 81.

On September 18, 2024, Restore Robotics filed the instant lawsuit claiming that Intuitive violated (i) Section 2 of the Sherman Act by monopolizing, or attempting to monopolize, the aftermarket for repairing X/Xi EndoWrist instruments, 15 U.S.C. § 2; and (ii) Section 1 of the Sherman Act by unlawfully tying the sale of the da Vinci X/Xi system to the replacement X/Xi EndoWrist

---

[2] Restore Robotics does not allege that the encryption of the X/Xi EndoWrist memory chip is anticompetitive. *See* ECF No. 21 at ¶ 49.

CASE NO. 3:24-cv-444-MCR-ZCB

instruments (thereby forcing customers to purchase replacements from Intuitive rather than repairs from independent service organizations) and through exclusive dealing, 15 U.S.C. § 1. Among other things, Restore Robotics seeks treble damages for the alleged harm to its business beginning in July 2020 and an order enjoining Intuitive's allegedly anticompetitive contract terms.[3]

## II. Legal Standard

Motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure seek dismissal of a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion, the courts accept factual allegations as true and construe them in the light most favorable to the plaintiff. *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008). Rule 12(b)(6) requires that the allegations of a complaint "state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief is . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*,

---

[3] Sections 4 and 16 of the Clayton Act (which amended the Sherman Act) grants private parties the power to enforce and recovery under the federal antitrust laws. *See* 15 U.S.C. §§ 15, 26.

556 U.S. at 679 (citation modified). A court may dismiss a complaint for failure to state a claim if it is apparent from the face of the complaint that the applicable statute of limitations bars the claim. *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1296 (11th Cir. 2021).

### III. Discussion

By deputizing civil plaintiffs to play the role of "private attorneys general," *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972), Congress intended that "private actions serve as a bulwark of antitrust enforcement and that the antitrust laws fully protect the victims of the forbidden practices as well as the public." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 340 (1971) (internal quotation marks and citations omitted). For that reason, Congress authorized private plaintiffs to recover treble damages to "penalize wrongdoers and deter wrongdoing," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977) (citation modified), as well as "to further the overriding public policy in favor of competition," *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968). *See also Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010). The only catch to obtaining "the carrot of treble damages," *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 151 (1987), is that private claims brought under the antitrust laws are subject to a four-

year statute of limitations from the date "the cause of action accrued," *see* 15 U.S.C. § 15b.

"Statutes of limitations are not simply technicalities," rather "they have long been respected as fundamental to a well-ordered judicial system." *Board of Regents of the University of the State of New York v. Tomanio*, 446 U.S. 478, 487 (1980). Indeed, a "federal cause of action 'brought at any distance of time' would be 'utterly repugnant to the genius of our laws,'" *Wilson v. Garcia*, 471 U.S. 261, 271 (1985) (quoting *Adams v. Woods*, 6 U.S. 336, 342 (1805)), as "even wrongdoers are entitled to assume that their sins may be forgotten," *Gabelli v. SEC*, 568 U.S. 442, 449 (2013). Professors Areeda and Hovenkamp, perhaps our Nation's foremost competition scholars, observe that "[r]epose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened." *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320a (5th ed. 2022). Moreover, because the antitrust laws "bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate," *Malley-Duff*, 483 U.S. at 151, it

would be "strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit [private antitrust enforcement] might realize," *Rotella v. Wood*, 528 U.S. 549, 558 (2000).  Simply put, when it comes to private antitrust enforcement, "the sooner the better." *Id.*

In *Zenith Radio*, the Supreme Court established the basic accrual rule under the federal antitrust laws: the statute of limitations "begins to run when a defendant commits an act that injures a plaintiff's business."  401 U.S. at 338.  Intuitive contends that Restore Robotics' antitrust challenge to its standard X/Xi contract terms came two months too late.  As Intuitive tells it, the clock began to run on Restore Robotics' claims no later than July 2020, the month Restore Robotics alleges it would have achieved the technological capability to repair X/Xi EndoWrist instruments and enter the aftermarket "if not for the anticompetitive conduct of Intuitive."  ECF No. 21 at ¶ 88.  Since Restore Robotics was aware of the standard contract terms since at least 2019 (and previously challenged identical terms in *the S/Si EndoWrist Litigation*), alleges that it has been excluded from the aftermarket for repairing X/Xi EndoWrist instruments since July 2020, and failed to file this action by July 2024, Intuitive says that Restore Robotics' antitrust claims are time-barred.  That argument is, well, intuitive.  So much so that Restore Robotics doesn't necessarily quarrel with it, instead contending that two of *Zenith Radio*'s exceptions

bring its claims within the limitations period. First, Restore Robotics invokes *Zenith Radio*'s speculative damages exception and reasons that, because it did not actually possess the technological capability to enter the X/Xi EndoWrist business until February 29, 2024, its claims did not accrue until that point. Second, Restore Robotics asserts that Intuitive's conduct amounted to a "continuing violation" of the antitrust laws because Intuitive routinely enforced, or threatened to enforce, the challenged contract terms on its customers—ensuring that Restore Robotics remained excluded from the putative after market for repairing X/Xi EndoWrists. Neither argument has any merit.

*Zenith Radio*'s exception for speculative damages provides that an antitrust cause of action does not accrue until the claimant's damages are ascertainable. *See Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 456 F.2d 662, 666 (5th Cir. 1972).[4] Under this exception, the defendant's anticompetitive conduct outside the limitations period is "revived" as a basis for damages, because when the act originally occurred, the plaintiff's damages were speculative or unprovable. *Id.* at

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981. *See also Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000) ("Of course, pre-split or 'Old Fifth' decisions . . . are binding on us, and where two prior panel decisions conflict we are bound to follow the oldest one." (citation omitted))

Page 10 of 19

667. Therefore, a plaintiff may recover for damages when its injuries are no longer speculative, even if the anticompetitive conduct took place more than four years earlier. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 191 (1997). But to avail itself of this exception, Restore Robotics must plausibly allege that it was unclear whether it would suffer damages *at all* due to Intuitive's alleged conduct, not simply that the *degree* of harm to its business was speculative. *See Perrigo Co. v. AbbVie Inc.*, 2022 WL 2870152, at *5 (3d Cir. July 21, 2022); Areeda & Hovenkamp ¶ 320d (noting that "courts . . . distinguish the uncertainty that prevents any recovery and shows that no cause of action has yet arisen from the mere uncertainty in damage measurement"); *see also Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 276 (8th Cir. 2004) ("Refusing to extend the statute of limitations" to a case where "the scope and extent" of "future damages may have been speculative, but the fact that [the plaintiff] had suffered a quantifiable injury was not" "ensures that the statute continues to have meaning"); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) (Posner, J.) (absent "excessively speculative" damages, "the statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff"); *Aurora Enterprises, Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) ("Mere uncertainty as to the extent or amount of damage will not bar recovery under the

antitrust laws." (citing *Story Parchment Co. v. Paterson Paper Co.*, 282 U.S. 555, 562 (1931))).

Although Restore Robotics only gained the technological capability to repair X/Xi EndoWrist instruments in February 2024, the Amended Complaint's allegations reveal that Restore Robotics was excluded from the putative aftermarket long before then. And there is nothing speculative about that competitive injury to Restore Robotics' X/Xi EndoWrist business. "Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs," even though "the victim's losses lie mostly in the future." *Brunswick*, 752 F.2d at 271. According to Restore Robotics, Intuitive imposed the challenged contract terms since its X/Xi EndoWrist instruments were released in 2014 (and were imposed across previous generations even before then) and shut out all competition by insurgent firms for over a decade. *See* ECF No. 21 at ¶¶ 46, 55. Restore Robotics says it "always intended" to enter the X/Xi EndoWrist aftermarket and possessed "the background and experience necessary to compete" in that market by virtue of its experience in repairing the previous S/Si generation of EndoWrist instruments. *See id.* at ¶ 80. The Amended Complaint claims that—"even in the face of [Intuitive's] anticompetitive conduct"—Restore Robotics began "negotiating agreements with vendors and distributors" and "acquiring the necessary equipment,

inventory, and facilities" to compete in the X/Xi EndoWrist aftermarket "no later than June 2019." *See id.* at ¶ 82 (citation modified).  However, Restore Robotics shied away from expending the "substantial resources" required to actually enter the X/Xi EndoWrist aftermarket because it believed doing so "would have been a clearly futile competitive gesture" due to Intuitive's contract terms "blocking any and all access to customers indefinitely." *See id.* at ¶ 81.  Taken together, those allegations demonstrate that Restore Robotics knew about the exclusionary contract terms since at least 2019, made considered business judgments accounting for those terms for many years, and, "if not for the anticompetitive conduct of Intuitive," would have entered the market by July 2020. *See id.* at ¶ 88.  As a sophisticated and experienced industry player, Restore Robotics' competitive injury—exclusion from the putative aftermarket—has always been "specific and calculable." *Klehr*, 521 U.S. at 191. *Zenith Radio*'s speculative damages exception accordingly offers no refuge to Restore Robotics.[5]  *See Brunswick*, 752 F.2d at 271 ("*Zenith* has not been understood

---

[5] At various times in its Opposition to the Motion to Dismiss, Restore Robotics suggests that its X/Xi claims were deemed to be speculative in the *S/Si EndoWrist Litigation*. *See, e.g.*, ECF No. 27 at 4.  But Restore Robotics cannot restore what never existed; in that case, Judge Wetherell never found Restore Robotics' X/Xi claims speculative.  Instead, as relevant here, Judge Wetherell denied Restore Robotics discovery into the X/Xi technology, stating that he failed to see the relevance of the X/Xi technology to the issues "framed by the pleadings"—which concerned the S/Si technology, not the X/Xi technology.  *Id.*, ECF No. 192 at 2 (expressing "serious reservations" that Restore Robotics could "expand this case" to encompass damages for anticompetitive conduct relating to the X/Xi aftermarket).  While Judge Wetherell did previously

to toll the antitrust statute of limitations in every case where the plaintiff is seeking damages for being excluded from a market the profitability of which will be revealed only in the fullness of time."); *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 573 (4th Cir. 1976) (future damage claim of potential, but thus far excluded, competitor was not speculative).[6]

---

remark at a hearing that it appeared "speculative" whether Restore Robotics could even assert an antitrust claim relating to the X/Xi technology, *see id.*, ECF No. 185 at 31-34, it's clear he never made any finding in regard to speculation. So, although Restore Robotics ultimately sought further discovery into the X/Xi technology, the issue before Judge Wetherell concerned threshold determinations of relevancy, not whether its claim was speculative. *Id.*, ECF No. 192.

[6] Many courts have noted that *Zenith Radio*'s speculative damages exception seldom applies. *See, e.g.*, *Kabealo v. Huntington Nat. Bank*, 17 F.3d 822, 826 (6th Cir. 1994) (observing that "the parties have not cited, nor have we found, a case . . . in which the statute of limitations was tolled by applying the *Zenith* speculative damages rule" nearly a quarter century after it was announced); *Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991) (noting that the exception is reserved for "rare cases" (citation modified)); *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679, 695 (E.D. Va. 2023), *aff'd*, 114 F.4th 280 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1921 (2025) ("The concept of "speculative" damages . . . must not be extended too far, lest it swallow the otherwise applicable accrual rule."). The only case that the Court has identified applying the exception as Restore Robotics requests, *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), is easily distinguishable. There, when the defendants allegedly conspired and entered into an anticompetitive agreement, no one "could have known for certain" that the plaintiff would even enter the relevant market. *Id.* at 1204–05. Here, the Amended Complaint portrays Restore Robotics as waiting in the wings of the putative aftermarket for X/Xi EndoWrist instruments—with only Intuitive's exclusionary contract terms keeping Restore Robotics at bay. *See* ECF No. 21 at ¶¶ 80–82. And, years ago, another potential entrant challenged much of the same anticompetitive conduct alleged here—before it achieved the technological capability to enter the aftermarket for X/Xi EndoWrist repairs; yet the court ultimately found that mere non-achievement of the technological capability to enter the aftermarket was not a *per se* bar to bringing suit. *See Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL 3272538, at *9-10 (M.D. Fla. Aug. 10, 2022) (denying Intuitive's motion for summary judgment, which argued that a potential new entrant lacked antitrust standing because it lacked the capability to "override use limits on X/Xi EndoWrists").

CASE NO. 3:24-cv-444-MCR-ZCB

Page 14 of 19

Alternatively, Restore Robotics insists that the "continuing violation" doctrine set out in *Zenith Radio* saves its claims from repose. Under that doctrine, even if "the events that initially created the cause of action" occurred outside the statute of limitations, a new cause of action accrues "after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'" *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (citing *Zenith*, 401 U.S. at 338). However, "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975).

Restore Robotics' leading argument on this score is that Intuitive's unrelenting enforcement of the purportedly exclusionary contract terms—which, again, were allegedly in place for decades—over the last four years suffices to keep its antitrust claims alive.[7] The question, then, is whether Intuitive's enforcement of

---

[7] Restore Robotics also contends that each sale of the da Vinci X/Xi system with the challenged contract terms restarted the statute of limitations. But this argument elides the distinction between consumers (*e.g.*, surgical centers and hospitals) and competitors (*e.g.*, independent service organizations like Restore Robotics). "This distinction matters because although a *purchaser* is injured each time it must pay an anticompetitive price, and thus a cause of action accrues to it, the same can't be said of a *competitor*—whose antitrust injury is its exclusion from the relevant market." *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 291 (4th

those terms were "new and independent acts" that "inflicted new and accumulating injury on the plaintiff" or a mere "reaffirmation of a previous act" that imposed "the same injuries previously alleged to have been suffered" outside the limitations period? *Pilkington v. United Airlines*, 112 F.3d 1532, 1537–38 (11th Cir. 1997) (adopting, in the civil RICO context, the Ninth Circuit's articulation of the continuing violation doctrine set forth in *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)) (citation modified);[8] *see also* Areeda & Hovenkamp ¶ 320c1 (crediting *Poster Exchange*'s "somewhat awkward but nevertheless helpful language" articulating the distinction "between 'independent predicate acts' that are sufficient to keep the claim alive from actions that are merely 'reaffirmations' of the initial act").

The conduct pleaded here fits comfortably within the latter category, rendering *Zenith Radio*'s continuing violation exception inapplicable.[9] Outside the

---

Cir. 2024), *cert. denied*, 145 S. Ct. 1921 (2025) (citations omitted); *see also SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (holding that "permitting . . . unchanged warranty agreements" accompanying each "new iOS device" sold "to establish continuing violations would vitiate the purpose of the statute of limitations")

[8] In *Klehr*, the Supreme Court noted that "Congress consciously patterned civil RICO after the Clayton Act." *See* 521 U.S. at 189. The Ninth Circuit's decision in *Pace* itself dealt with the continuing violation doctrine as applied in the antitrust context.

[9] Restore Robotics' resort to hyperbole betrays the weakness of its continuing violation argument. Contrary to Restore Robotics' protestations, the Court's conclusion does not mean that no new entrant could ever "bring an action to break up a long-standing monopoly." ECF No. 27 at 6. New entrants eager and sufficiently prepared to enter a monopolized market, of course, may

limitations period, Intuitive's contract terms allegedly excluded Restore Robotics from the X/Xi EndoWrist aftermarket—and Intuitive's putative enforcement of those terms within the limitations period changed nothing about the competitive landscape. *See Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) (holding that defendants' "enforcement of the initial contracts," did not "toll the four-year statutes of limitations"); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884–85 (N.D. Cal. 2015) (dismissing antitrust claim as untimely because plaintiffs alleged "only that Microsoft maintained and reaffirmed its preexisting non-solicitation agreements after 2009," which did not plead a continuing violation that restarted the limitations period); *see also CSX Transportation*, 114 F.4th at 288–91 (maintaining exclusionary policy did not restart statute of limitations because the policy was "final in its impact" and preserving it did not inflict "*new* harm causing *new* injury" (citation modified) (emphasis in original)); *GovernmentGPT Inc. v.*

---

challenge the dominant firm's anticompetitive practices—they simply need to do so within four years from the time at which they are excluded. *Cf. Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 740 (5th Cir. 2015) (to demonstrate antitrust standing, "nascent competitors need not pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.") (internal citations and marks omitted).  Restore Robotics has only itself to blame for sleeping on its rights.  Much of the damage to Restore Robotics' X/Xi EndoWrist business (if, in fact, Intuitive acted in violation of the antitrust laws) could have been avoided entirely had Restore Robotics acted sooner—as it did in the *S/Si EndoWrist Litigation*.  And hospitals and surgical centers across the country, the customers actually footing the bill, would not have been subjected to Intuitive's allegedly supracompetitive prices for nearly as long.

*Axon Enter. Inc.*, 769 F. Supp. 3d 959, 981 (D. Ariz. 2025) ("Pleading a continuing violation requires more than bald assertions that a defendant adhered to, enforced, and reaffirmed the alleged anticompetitive agreements." (citation modified)).  By Restore Robotics' telling, it has always been on the outside of the X/Xi EndoWrist aftermarket looking in due to Intuitive's anticompetitive contract terms.  Intuitive's sale and lease terms for its fourth generation of robotic surgery products have been fixed since 2014 and Restore Robotics claims to have been excluded from the putative aftermarket since July 2020.  *Cf. City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 523 (5th Cir. 1978) (noting that "the rights and liabilities of the parties were finalized by the contract" on the date it was signed and, because the plaintiff "felt an adverse impact" on that date, the statute of limitations began to run (citation modified)); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2nd Cir. 2019) ("Like the Sixth, Eighth, and Ninth Circuits, we think of the performance of a contract as a manifestation of the 'overt act,' . . . rather than an independent overt act of its own.").  Intuitive's continued and unwavering enforcement of the challenged terms plainly imposed the same competitive injury—exclusion—that Restore Robotics allegedly suffered outside the limitations period, *Pilkington*, 112 F.3d at 1537–38, and reflects the "abatable but unabated inertial consequences" of Intuitive's original decision to incorporate the putatively anticompetitive contract

terms in 2014, *Poster Exch.*, 517 F.2d at 128. *Cf. DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467–68 (6th Cir. 1996) (observing, in dicta, that defendant's representations to service customers that their warranties would be voided if they used unauthorized third-party repair services only amounted to "mere reaffirmations" that "inflicted no new and accumulating injury").[10]

Accordingly, neither exception to the four-year statute of limitations applies. Intuitive's motion to dismiss, ECF No. 25, is therefore **GRANTED**, the Amended Complaint is **DISMISSED**, and Restore Robotics' motion for leave to file a Second Amended Complaint, ECF Nos. 34 & 35, is **DENIED** as futile.[11]  The Clerk is directed to close the file.

---

[10] Restore Robotics does not allege that Intuitive, for example, only began enforcing its earlier-adopted exclusionary practices within the limitations period, *DXS*, 100 F.3d at 467–68, broadened its exclusionary practices to further entrench its monopoly, *Samsung*, 747 F.3d at 1204–05 (expanding a license agreement to include products not covered by the previous license agreement was an overt act restarting limitations period), or that Intuitive's decades-old contract terms, uniformly imposed across product generations, was anything other than a final, permanent policy, *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714–15 (11th Cir. 1984) (per curiam) (if the initial refusal to deal is not final, each time the excluded plaintiff requests to deal with the defendant and is rejected, a new cause of action accrues; however, no new cause of action accrues when excluded plaintiff makes subsequent futile efforts to deal with the defendant and is rebuffed).

[11] Although there is no limitations period for injunctive relief claims under the Sherman Act, *see* 15 U.S.C. § 26, those claims are still subject to the equitable defense of laches.  *See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 2014 WL 1329359, at *14 (S.D. Fla. Mar. 31, 2014), *aff'd*, 797 F.3d 1248 (11th Cir. 2015).  Neither Restore Robotics nor Intuitive explicitly discussed this nuance in their briefing.  Still, because courts generally look to the same principles

**DONE AND ORDERED** this 7th day of November 2025.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

that animate the four-year statute of limitations for antitrust damages actions when computing the laches period, Restore Robotics' claims for injunctive relief are likewise time-barred. *Id.* Moreover, Restore Robotics' proposed Second Amended Complaint avers that on March 27, 2025, Intuitive "granted approval" for Restore Robotics to repair X/Xi EndoWrist instruments. *See* ECF No. 35 at ¶ 72. Restore Robotics is therefore no longer excluded from the putative aftermarket and its claims for injunctive relief are moot. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citation modified)); *cf. Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (injuries no longer remediable by a court generally render a case moot and deprive a party of Article III standing).

CASE NO. 3:24-cv-444-MCR-ZCB